# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | )
| BUILDING SYSTEMS DE MEXICO, S.A. DE C.V., | )
| | )
| Plaintiff, | )
| | )  **Court No. 20-00069**
| v. | )
| | )
| UNITED STATES, | )
| | )
| Defendant. | )

_____

## COMPLAINT

Plaintiff Building Systems de Mexico, S.A. de C.V. ("BSM"), by and through its

attorneys, alleges and states as follows:

## DETERMINATION CONTESTED

1.     This action is an appeal from the affirmative final determination issued by the United

States Department of Commerce ("Commerce") in the less than fair value investigation

of certain fabricated structural steel ("FSS") from Mexico.  Commerce published its

contested final determination in the Federal Register on January 30, 2020.  *See Certain*

*Fabricated Structural Steel From Mexico: Final Determination of Sales at Less Than*

*Fair Value*, 85 Fed. Reg. 5390 (Dep't Commerce Jan. 30, 2020) ("*Final Determination*").

2.     Plaintiff brings this action to contest certain aspects of the *Final Determination* issued by

Commerce, which are not supported by substantial evidence and are otherwise not in

accordance with law.

## JURISDICTION

3.     This action was commenced under section 516A(a)(2)(B)(i) and 516A(d) of the Tariff

Act of 1930, as amended, to contest Commerce's *Final Determination* issued in the less

than fair value investigation of FSS from Mexico.  *See* 19 U.S.C. §§ 1516a(a)(2)(B)(i) and 1516a(d).

4.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1581(c), which provides that this Court has exclusive jurisdiction over civil actions commenced under section 516A of the Tariff Act of 1930, and section 516A(a)(2)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(2)(B)(i), which provides that final determinations in less than fair value investigations by Commerce are reviewable by this Court.

5.    As it arises from an investigation involving merchandise from Mexico, Commerce's *Final Determination* is a determination "made in connection with a proceeding regarding a class or kind of free trade area country merchandise" for purposes of section 516A(g) of the Tariff Act of 1930, 19 U.S.C. § 1516a(g).

6.    Section 516A(g)(2) provides in part that "{i}f binational panel review of {such} a determination is requested pursuant to article 1904 of the NAFTA . . . then, except as provided in paragraphs (3) and (4) . . . the determination is not reviewable under subsection (a) {of section 516A}."  19 U.S.C. § 1516a(g)(2).  Paragraph (3) provides in relevant part that "{a} determination is reviewable under subsection (a) {of section 516A} if the determination sought to be reviewed is . . . a determination as to which neither the United States nor the relevant FTA country requested review by a binational panel pursuant to article 1904 of the NAFTA."  19 U.S.C. § 1516a(g)(3)(A)(i).

7.    Neither the United States nor Mexico requested review of the *Final Determination* by a binational panel pursuant to article 1904 of the NAFTA, and thus the determination remains reviewable by this Court pursuant to section 516A(a) of the Tariff Act of 1930, 19 U.S.C. § 1516a(a).

96556184_1

## STANDING

8.    Plaintiff is a foreign producer and exporter of subject merchandise and is therefore an "interested party" under sections 516A(f)(3) and 771(9)(A) of the Tariff Act of 1930, 19 U.S.C. §§ 1516a(f)(3), 1677(9)(A), and 28 U.S.C. § 2631(k)(1).

9.    Plaintiff participated, through the submission of both factual information and legal argumentation, in the investigation that gave rise to the contested *Final Determination*. Plaintiff was therefore a "party to the proceeding" and is entitled to commence this action pursuant to section 516A(d) of the Tariff Act of 1930, 19 U.S.C. § 1516a(d), and 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

10.    Commerce published notice of the contested *Final Determination* on January 30, 2020. *See* 85 Fed. Reg. at 5390.

11.    Normally, an action contesting an affirmative determination by Commerce in a less than fair value investigation must be commenced within thirty days of publication of the antidumping duty order, if the U.S. International Trade Commission ("ITC") also issues an affirmative determination, or publication of a negative determination by the ITC. *See* Tariff Act of 1930 §§ 516A(a)(2)(A)(i)(II), 516A(a)(3), 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II), 1516a(a)(3).

12.    For cases that arise from an investigation involving merchandise from a free trade area country, section 516A(a)(5)(A) of the Tariff Act of 1930 provides that "an action . . . may not be commenced, and the time limits for commencing an action under this subsection shall not begin to run, until . . . the 31st day after the date on which notice of the {challenged} determination is published in the Federal Register." 19 U.S.C.

§ 1516a(a)(5)(A).  Because the underlying investigation involves merchandise from a free trade area country, the thirty-day time period for commencing an action began to run on March 1, 2020 (the 31st day after publication of Commerce's determination), and any action filed during the period March 1, 2020 through March 30, 2020 would be considered timely under the statute.

13.     This action was commenced with the filing of the Summons on March 30, 2020, during the time period for commencing an action specified by section 516A(a)(5)(A) of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(5)(A).

14.     This Complaint is filed within thirty days of the filing of the Summons in this action and is therefore timely under the statutorily prescribed time limits set forth in 19 U.S.C. § 1516(a)(2)(A).

15.     Finally, section 516A(g)(3)(B) of the Tariff Act of 1930 provides that a determination is reviewable by this Court pursuant to section 516A(a) only if the party seeking to commence review filed a notice of intent to commence judicial review no later than the date that is 20 days after publication of Commerce's determination.  *See* 19 U.S.C. § 1516a(g)(3)(B).  BSM timely filed a notice of intent to commence judicial review on February 19, 2020, and thus the statutory prerequisite for commencing judicial review has been satisfied.

## STATEMENT OF FACTS

16.     BSM is a Mexican producer of frames and long bay purlins used in pre-engineered metal building systems ("PEMBs").[1]  BSM is a subsidiary of Cornerstone Building Brands, Inc.

---

[1] Section A Questionnaire Response of Building Systems de Mexico, A-201-850 (Apr. 30, 2019) ("BSM Section A Response") at A-34, A-36.

("Cornerstone").[2] Cornerstone was formerly known as NCI Building Systems, Inc. ("NCI") and is a publicly traded U.S. company.[3] In its facilities in Mexico and the United States, Cornerstone produces components of PEMBs and sells them in component-form or as complete, unassembled PEMBs.[4] The PEMB components produced in Mexico by BSM are sold in the United States by its U.S. affiliates within the Cornerstone group of companies.[5]

17. On February 4, 2019, the Full Member Subgroup of the American Institute of Steel Construction, LLC (hereinafter, "Petitioner") filed antidumping and countervailing duty ("CVD") petitions concerning certain fabricated structural steel from Canada, China, and Mexico.[6] Petitioner excluded pre-engineered metal building systems from the scope of the merchandise covered by the petitions.[7] The petitions did not identify either BSM or NCI[8] as possible producers, exporters, or importers of fabricated structural steel.

18. On February 25, 2019, Commerce initiated an antidumping investigation of fabricated structural steel from Mexico, and Commerce published its notice of initiation on March 4, 2019.[9]

---

[2] *Id.* at A-5.

[3] *See id.* at A-5, A-23.

[4] *See id.* at A-6, A-24.

[5] *Id.* at A-17, A-24.

[6] Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 2910, as Amended, A-201-850 (Feb. 4, 2019), Vol. I at 1.

[7] *Id.*, Vol. I at 6.

[8] NCI did not change its name to Cornerstone Building Brands until after the petitions were filed.

[9] *Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 7330 (Dep't Commerce Mar. 4, 2019).

96556184_1

19.    Because BSM produced and sold only PEMB components, and not the full PEMB

systems themselves, it voluntarily submitted a Quantity and Value Questionnaire

response to Commerce on March 22, 2019.[10]  Despite not having been identified by

Petitioner as a foreign producer or exporter of the subject merchandise, Commerce

selected BSM as a mandatory respondent as one of the two largest Mexican exporters of

fabricated structural steel to the United States.[11]  Commerce selected mandatory

respondents on April 1, 2019 and issued that same day a request for information

regarding the respondents' sales of fabricated structural steel for projects completed

during 2018 and projects contracted for in 2018 but completed during the first quarter of

2019.[12]  Commerce issued Section A of its antidumping questionnaire on April 2, 2019.[13]

20.    On April 10, 2019, BSM submitted a response to Commerce's request for information

and reported that it produced components for more than 3,000 projects during 2018.[14]

The next day, Commerce issued Sections C through E of the antidumping

questionnaire.[15]  In Section C, Commerce instructed BSM to provide a data file

containing information on sales of fabricated structural steel for each project contract

---

[10] Quantity and Value Questionnaire Response of Building Systems de Mexico, S.A. de C.V., A-201-850 (Mar. 22, 2019).

[11] Memorandum from Krisha Hill and Aleks Nakutis to James Maeder, re: Less-Than-Fair-Value Investigation of Certain Fabricated Structural from Mexico: Respondent Selection, A-201-850 (Apr. 1, 2019) at 7.

[12] Letter from Howard Smith to Matthew Nicely, re: Certain Fabricated Structural Steel from Mexico: Request for Information, A-201-850 (Apr. 1, 2019) at Attachment 1.

[13] Letter from Howard Smith to Matthew Nicely, re: Certain Fabricated Structural Steel from Mexico: Section A Questionnaire, A-201-850 (Apr. 2, 2019) ("Section A Questionnaire").

[14] BSM's Response to Request for Information, A-201-850 (Apr. 10, 2019) at 2 and Exhibit 1.

[15] Letter from Howard Smith to Matthew Nicely, re: Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel from Mexico, A-201-850 (Apr. 11, 2019) ("Section C-E Questionnaire"), Cover Letter at 1.

dated during 2018 for which the project was also completed during 2018.[16]  Commerce

did not issue Section B of the questionnaire, which pertains to sales in the home market,

because Commerce determined that it would base normal value on constructed value

("CV") instead of using home market sales.[17]

21.     BSM submitted its response to Section A of the antidumping questionnaire on April 30,

2019, providing information regarding its operations, products, and affiliates.[18]  BSM

submitted its responses to Sections C and D of the antidumping questionnaire on June 3,

2019, providing detailed information regarding the sales of BSM-produced PEMB

components made in the United States by BSM's U.S. affiliates as well as BSM's cost of

production.[19]  BSM did not submit a response to Section E of the antidumping

questionnaire, which was required only if merchandise was further manufactured in the

United States by an affiliated company before being sold to an unaffiliated customer.[20]

22.     Throughout June, July, and August of 2019, BSM and Cornerstone timely submitted

responses to three Section A supplemental questionnaires, two Section C supplemental

questionnaires, and two Section D supplemental questionnaires.[21]  Several of these

responses were voluminous and many had compressed response periods.

---

[16] *Id.*, Section C at 3.

[17] *Id.*, Cover Letter at 1.

[18] *See generally* BSM Section A Response.

[19] *See generally* Section C Questionnaire Response of Building Systems de Mexico, A-201-850 (June 3, 2019) ("BSM Section C Response"); Section D Questionnaire Response of Building Systems de Mexico, A-201-850 (June 3, 2019).

[20] Section C-E Questionnaire, Section E at 1; *see also* BSM Section C Response, Cover Letter at 2.

[21] *See, e.g.*, Response of Building Systems de Mexico to Third Section A Supplemental Questionnaire, A-201-850 (Aug. 9, 2019); Response of Building Systems de Mexico to Second Section D Supplemental Questionnaire, A-201-850 (Aug. 13, 2019); Response of Building Systems de Mexico to the August 16, 2019 Section C Supplemental Questionnaire, A-201-850 (Aug. 20, 2019).

23.    Commerce issued its *Preliminary Determination* on September 3, 2019, and published

that determination on September 10, 2019.[22]  In the *Preliminary Determination*,

Commerce calculated a weighted average dumping margin of 10.58 percent for BSM.[23]

24.    Shortly after issuing the *Preliminary Determination*, Commerce conducted verification of

BSM's responses.  Commerce conducted a sales verification of BSM in Mexico from

September 11 through 13,[24] a verification of BSM's affiliated U.S. importer (i.e., its

parent company) in Houston, Texas from September 16 through 20,[25] and a cost

verification of BSM in Mexico from September 23 through 27.[26]  Upon request of

Commerce, BSM submitted revised U.S. sales and cost databases to implement minor

corrections to BSM's responses discussed at verification.[27]

25.    Following the issuance of Commerce's verification reports, the parties submitted briefing

for Commerce's consideration.  BSM submitted a case brief on November 18, 2019

raising a number of issues with respect to the calculation of dumping margin.[28]  BSM

---

[22] *Certain Fabricated Structural Steel From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 84 Fed. Reg. 47,487 (Dep't Commerce Sept. 10, 2019) ("*Preliminary Determination*").

[23] 84 Fed. Reg. at 47,488.

[24] Memorandum from Krisha Hill and Eli Lovely to the File, re: Verification of the Sales Questionnaire Responses of Building Systems de Mexico S.A. de C.V. in the Antidumping Duty Investigation of Certain Fabricated Structural Steel from Mexico, A-201-850 (Oct. 31, 2019) at 1.

[25] Memorandum from Krisha Hill and Eli Lovely to the File, re: Verification of NCI Group, Inc. and Robertson-Ceco II Corporation in the Antidumping Duty Investigation of Certain Fabricated Structural Steel from Mexico, A-201-850 (Oct. 31, 2019) at 1.

[26] Memorandum from Alma (Angie) Sepúlveda and Laurens van Houten to the File, re: Verification of the Cost Response of Building Systems de Mexico S.A. de C.V. in the Antidumping Duty Investigation of Certain Fabricated, A-201-850 (Nov. 1, 2019) at 1.

[27] BSM Response to Post-Verification Request for Revised U.S. Sales and Cost Databases, A-201-850 (Nov. 8, 2019); BSM Response to Request for Revised Post-Verification Cost Database, A-201-850 (Nov. 15, 2019).

[28] Case Brief of BSM, A-201-850 (Nov. 18, 2019) ("BSM Case Brief").

8

submitted a rebuttal brief on November 27 addressing several arguments that Petitioner had raised regarding BSM.[29]  Commerce held a public hearing regarding these arguments on December 18.[30]

26.  Commerce issued the *Final Determination* on January 23, 2020, and published the determination in the Federal Register on January 30, 2020.[31]  In the *Final Determination*, Commerce calculated a weighted average dumping margin of 8.47 percent for BSM.[32]

27.  Below, we describe several decisions by Commerce in the *Final Determination* affecting the calculation of BSM's weighted average dumping margin that BSM contests as unsupported by substantial evidence and/or otherwise not in accordance with law.

## Constructed Value Profit and Selling Expenses

28.  In calculating CV for BSM in its preliminary and final determinations, Commerce added an amount for home market indirect selling expenses and home market profit.  Normally, Commerce is required to use "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country."[33]  However, if Commerce determines that actual data for those amounts are not available, Commerce can rely on one of the following sources for those amounts: (i)

---

[29] Rebuttal Brief of BSM, A-201-850 (Nov. 27, 2019) ("BSM Rebuttal Brief").

[30] *See* Memorandum from James Maeder to Jeffrey I. Kessler, re: Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel from Mexico, A-201-850 (Jan. 23, 2020) ("Final IDM") at 3.

[31] *Certain Fabricated Structural Steel from Mexico: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5390 (Dep't Commerce Jan. 30, 2020).

[32] 85 Fed. Reg. at 5392.

[33] Tariff Act section 773(e)(2)(A), 19 U.S.C. § 1677c(e)(2)(A).

96556184_1

home market data of the specific producer or exporter being examined for the production

and sale of "merchandise that is in the same general category of products as the subject

merchandise"; (2) the weighted average of the home market selling, general, and

administrative expenses incurred and profits realized by other exporters or producers

subject to the investigation in connection with their production and sales of a foreign like

product, in the ordinary course of trade; or (3) "the amounts incurred and realized for

selling, general, and administrative expenses, and for profits, based on any other

reasonable method."[34]  The statute does not establish a hierarchy or preference among the

three alternative sources.[35]

29.     Commerce had several potential sources of home market indirect selling expenses and

profit, including BSM's own home market sales data, the home market sales data of the

other individually examined respondent, Corey S.A. de C.V. ("Corey"), and financial

statements of several Mexican producers of fabricated structural steel or comparable

merchandise.[36]  In the *Final Determination*, Commerce determined that the preferred

methodology of using BSM's own data for its home market sales of fabricated structural

steel was not required because BSM did not have a "viable" home market.[37]  Commerce

instead assigned BSM a combined home market selling expense and profit rate of 45.42

percent calculated using certain of Corey's home market sales data.[38]

---

[34] Tariff Act section 773(e)(2)(B), 19 U.S.C. § 1677c(e)(2)(B).

[35] Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 840 (1994)

[36] *See* BSM Case Brief at 18-19, 21 (discussing sources on the record); Final IDM at 44.

[37] Final IDM at 50.

[38] Memorandum from Alma (Angie) Sepúlveda to Neal M. Harper, re: Constructed Value Calculation Adjustments for the Final Determination - Building Systems de Mexico S.A. de C.V., A-201-850 (Jan. 23, 2020) ("BSM Cost Calculation Memo") at 2.

96556184_1

30. In selecting Corey's home market sales for purposes of calculating a CV indirect selling expense and profit rate, Commerce made arbitrary distinctions between home market sales that were not supported by the record.[39] Commerce eventually ended up with an extremely limited number of home market sales upon which it based the CV indirect selling expense and profit calculation.[40] Commerce's calculation also included a sale with an unusually high profit rate that was outside of the ordinary course of trade.[41]

31. The combined CV indirect selling expense and profit rate calculated using Corey's data was not representative of the profit rates typical in the fabricated structural steel industry. Petitioner admitted that profit rates in the industry are typically low, and other potential sources for CV profit on the record showed much lower profit rates.[42]

32. Commerce had also found in the concurrent CVD investigation that Corey received countervailable subsidies.[43] Commerce's reasoning in the CVD case indicated that Corey could have used subsidized inputs in its home market projects,[44] meaning that Corey's costs, and thus the profit it earned on its sales, were potentially distorted by these countervailable subsidies.

---

[39] *See* BSM Case Brief at 13-16; BSM Rebuttal Brief at 1, 3-5; Final IDM at 10-11, 48; Memorandum from Laurens van Houten to Neal M. Halper, re: Constructed Value Calculation Adjustments for the Final Determination - Corey S.A. de C.V., A-201-850 (Jan. 23, 2020) at 2 and Attachment 2.

[40] BSM Cost Calculation Memo at Attachment 3.

[41] *Id.*

[42] *See* BSM Case Brief at 18-19, 21 (describing record evidence).

[43] *Certain Fabricated Structural Steel From Mexico: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 5381, 5382 (Dep't Commerce Jan. 30, 2020).

[44] *See* Memorandum from James Maeder to Jeffrey I. Kessler, re: Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Fabricated Structural Steel from Mexico (Dep't Commerce Jan. 23, 2020) at Comment 1 (Case No. C-201-851).

33.     The business experience of Corey, as a producer of conventional fabricated structural steel with only a handful of projects each year, was also very different from the business experience of BSM, which produces PEMB components for thousands of projects each year.[45]

## Date of Sale

34.     BSM used the date of substantial completion of the project as the date of sale in its reporting.[46]  BSM's reporting aligned with Commerce's preference to use the earlier of invoice date or shipment date as the date of sale.[47]

35.     In the *Final Determination*, rather than using BSM's reported date of sale, Commerce used the purchase order date or sales order acknowledgement date for the project as the date of sale.[48]  Commerce did so despite the fact that material terms of the agreement, including price, quantity, and delivery, were subject to change—and did in fact change in significant respects for a number of sales—after the purchase order or sales order acknowledgment date.[49]

---

[45] BSM Case Brief at 23-24 (describing record evidence).

[46] BSM Section C Response at 16, 23.

[47] *See* 19 C.F.R. § 351.401(i); Section A Questionnaire, Glossary at I-5-I-6.

[48] Final IDM at 40-41.

[49] BSM Case Brief at 37-38 (describing BSM's reporting and record evidence showing changes in material terms after purchase order or sales order acknowledgement date).

## Constructed Export Price Profit Calculation

36.  In its case brief, BSM identified a number of errors that Commerce had made in the *Preliminary Determination* with respect to calculating a constructed export price ("CEP") profit rate for BSM.[50]  BSM also proposed a revised calculation to correct the errors.[51]

37.  Despite agreeing with BSM regarding the errors BSM had identified in the preliminary CEP profit rate calculation, Commerce did not use BSM's proposed revised calculation.[52] Instead of using the profit rate for NCI's consolidated Buildings Segment, which incorporated costs and revenues from BSM, Commerce calculated a separate profit rate for BSM, backed out the costs and revenues of BSM and NCI's drafting facility in Costa Rica from the Buildings Segment data, and added BSM's profit rate to the modified NCI profit rate.[53]

38.  Commerce's reasoning for calculating and then combining separate profit rates for BSM and NCI instead of relying on the consolidated financial data from NCI rested upon determinations in prior cases that did not contain consolidated financial reports.[54] Commerce's reasoning thus was based on cases that presented a different factual scenario and different issues than those raised by BSM and NCI's financial data.  Moreover,

---

[50] *Id.* at 27-35.

[51] *Id.* at Attachment C.

[52] *See* Final IDM at 35-36.

[53] Final IDM at 36; Memorandum from Krisha Hill to the File, re: Analysis Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Fabricated Structural Steel From Mexico: Building Systems de Mexico S.A. de C.V., A-201-850 (Jan. 23, 2020) ("BSM Analysis Memo") at 3 and Attachment III.

[54] Final IDM at 36.

Commerce's removal of the costs associated with NCI's Costa Rica drafting facility omitted costs that could benefit the sale of subject merchandise.[55]

### Application of Adverse Facts Available

39.    During Commerce's verification of BSM's affiliated U.S. importer, Cornerstone officials noted that when company officials prepared the U.S. sales database, there was a U.S. sale for a project with incomplete phases as of the end of the POI, which BSM and Cornerstone did not report to Commerce because the project was incomplete at the time the sales database was prepared.[56]  In late July 2019, well after the end of the POI and after BSM had filed its questionnaire response establishing the U.S. sales database population, the customer cancelled the remaining material left on the order.[57]  As a result, the non-cancelled phases on the order had all been completed during 2018, [58] but BSM and Cornerstone had already excluded the sale from the sales database that they submitted to Commerce.[59]

40.    In the *Final Determination*, Commerce determined that BSM and Cornerstone failed to act to the best of their ability by neglecting to update its Section C database to include this sale and applied adverse facts available ("AFA") against BSM with respect to this sale.[60]  Having collected certain information about the sale at verification, Commerce

---

[55] *See* Response of Building Systems de Mexico to Questions 1-2, 5-22, 24, 29-36, and 38 through 51 of Section C Supplemental Questionnaire, A-201-850 (Aug. 5, 2019) at 1-2 and Exhibit Revised SA-5.

[56] Final IDM at 54.

[57] *Id.*; BSM Analysis Memo at 4 (identifying sale at issue); BSM's CEP Verification Exhibits, A-201-850 (Sept. 27, 2019) at Exhibit CEP-VE-15 at 82-88.

[58] Final IDM at 54.

[59] *Id.*

[60] *Id.* at 54-55.

included the sale in the weighted average dumping margin calculation for BSM. However, instead of requesting the information to calculate a transaction-specific dumping margin for the sale based on BSM and Cornerstone's records pertaining to that sale, Commerce assigned to the sale the highest non-aberrational transaction-specific dumping margin calculated for BSM's other reported U.S. sales.[61] Beyond identifying the transaction-specific dumping margin it was using as the AFA rate, Commerce did not otherwise explain why the use of the highest non-aberrational transaction-specific dumping margin on the record was appropriate given the circumstances.[62]

## STATEMENT OF CLAIMS

41.    In the following respects, and for other reasons apparent from the administrative record of Commerce's less than fair value investigation of FSS from Mexico, the *Final Determination* is not supported by substantial evidence on the record and is not otherwise in accordance with law.

## CV Indirect Selling Expense and Profit Rate Claims

42.    For purposes of Counts One though Five, paragraphs 1 through 33 are hereby incorporated by reference.

## COUNT ONE

43.    Commerce's determination to use a 45.42 percent combined home market selling expense and profit rate as BSM's CV indirect selling expense and profit rate is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

---

[61] *Id.* at 55; BSM Analysis Memo at 4-5.

[62] *See* Final IDM at 55; BSM Analysis Memo at 4-5.

## COUNT TWO

44.     Commerce's determination to use Corey's CV indirect selling expense and profit rate as the CV indirect selling expense and profit rate for BSM, despite the very different business experiences of the two companies and Corey's receipt of countervailable subsidies, is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## COUNT THREE

45.     Commerce's determination regarding which sales to include in (and exclude from) the calculation of Corey's CV indirect selling expense and profit rate that Commerce applied to BSM is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## COUNT FOUR

46.     Commerce's determination that all of the sales included in the calculation of Corey's CV indirect selling expense and profit rate were in the ordinary course of trade is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## COUNT FIVE

47.     Commerce's inclusion of a sale outside of the ordinary course of trade in the calculation of Corey's CV indirect selling expense and profit rate that Commerce applied to BSM is not in accordance with law.

## Date of Sale Claim

## COUNT SIX

48.     Paragraphs 1 through 27 and 34 through 35 are hereby incorporated by reference.

96556184_1

49. Commerce's determination to use the purchase order date or sales order acknowledgment date as the date of sale for BSM's projects instead of date of substantial completion (as reported by BSM) is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## **CEP Profit Calculation Claims**

50. For purposes of Counts Seven and Eight, paragraphs 1 through 27 and 36 through 38 are hereby incorporated by reference.

## **COUNT SEVEN**

51. Commerce's determination to calculate separate profit rates for BSM and NCI and add those rates together in calculating CEP profit, instead of relying on the consolidated financial information from NCI, is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## **COUNT EIGHT**

52. Commerce's failure to include the costs associated with NCI's Costa Rica drafting facility in the CEP profit calculation is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## **Adverse Facts Available Claims**

53. For purposes of Counts Nine through Eleven, paragraphs 1 through 27 and 39 through 40 are hereby incorporated by reference.

## **COUNT NINE**

54. Commerce's determination that one reasonably omitted sale should have been reported as a sale completed during 2018 and that the use of facts available was necessary because of

96556184_1

the omission of that sale is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## COUNT TEN

55.    Commerce's determination that BSM and Cornerstone failed to act to the best of their ability because of their failure to report the omitted sale and that the use of an adverse inference against BSM was appropriate as a result of that failure is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## COUNT ELEVEN

56.    Commerce's determination to use the highest non-aberrational transaction-specific dumping margin on the record as the AFA rate for the omitted sale is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

## <u>DEMAND FOR JUDGMENT AND RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

1)    hold that the portions of Commerce's *Final Determination* described herein are not supported by substantial evidence on the record and are otherwise not in accordance with law;

2)    remand this matter for Commerce to issue a determination consistent with the final opinion and order of this Court; and

3)    provide such further relief as this Court deems just and proper.

96556184_1

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
**Hughes Hubbard & Reed LLP**
1775 I Street, NW, Suite 600
Washington, DC 20006-2401
*On Behalf of Building Systems de Mexico, S.A. de C.V.*
*("BSM")*

Dated: March 30, 2020

# UNITED STATES COURT OF INTERNATIONAL TRADE

## Building Systems de Mexico, S.A. de C.V. v. United States
## Court No. 20-00069

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Complaint and supporting documents were served on the 30th day of March 2020, by U.S. certified mail, return receipt requested, on the following parties:

Alan H. Price, Esq.
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006

Diana Dimitriuc-Quaia, Esq.
**Arent Fox LLP**
1717 K Street, NW
Washington, D.C. 20006-5344

John R Gilliland, Esq.
**Gilliland & McKinney International Counsellors**
2001 K Street, NW
Washington, D.C. 20006

Kavita Mohan, Esq.
**Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP**
1201 New York Ave NW
# 650
Washington, DC 20005

Richard P. Ferrin, Esq.
**Drinker Biddle & Reath LLP**
1500 K Street, NW
Washington, DC 20005

Rosa S. Jeong, Esq.
**Greenberg Traurig, LLP**
2101 L Street NW
Suite 1000
Washington DC 20037

J. Michael Taylor, Esq.
**King & Spalding LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

Kristen Smith, Esq.
**Sandler, Travis & Rosenberg, P.A.**
1300 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-3002

Kevin Michael O'Brien, Esq.
**Baker & McKenzie LLP**
815 Connecticut Avenue, NW
Washington, DC 20006-4078

Steven B. Zisser, Esq.
**Zisser Customs Law Group**
9355 Airway Road, Suite 1
San Diego, CA 92154

Daniel Cannistra, Esq.
**Crowell & Moring LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

LeVaughn Kaopio
**eComposite Super Structures, LLC**
41-648 Kalanianaole Hwy.
Waimanalo, Hawaii, 96795

Bernd G. Janzen, Esq.
**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street NW
Washington, DC 20006

Attorney in Charge
International Trade Field Office
**U.S. DEPARTMENT OF JUSTICE**
Civil Division 26 Federal Plaza
Room 346, Third Floor
New York, NY 10278

Supervisory Attorney
Civil Division
Commercial Litigation Branch
**U.S. DEPARTMENT OF JUSTICE**
P.O. Box 480
Ben Franklin Station
Washington, DC 20530

General Counsel
Attn: Office of the Chief Counsel for Import
Administration
**U.S. DEPARTMENT OF COMMERCE**
1401 Constitution Ave N.W.
Washington, DC 20230

/s/ Matthew R. Nicely

Dated: March 30, 2020

Matthew R. Nicely
**Hughes Hubbard & Reed LLP**