**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| BUILDING SYSTEMS DE MEXICO, S.A. DE C.V., | ) |
| Plaintiff, | ) |
| v. | )      Consol. Court No. 20-00069 |
| UNITED STATES, | ) |
| Defendant, | ) |
| FULL MEMBER SUBGROUP OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION, LLC, and COREY S.A. DE C.V., | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| GOVERNMENT OF CANADA, | ) |
| Amicus Curiae. | ) |

**ORDER**

Upon consideration of plaintiff's motion for judgment upon the agency record, responses thereto, replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the United States Department of Commerce's final determination is sustained in all respects.

Dated: _____, 2021         _____
       New York, New York                           Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| BUILDING SYSTEMS DE MEXICO, S.A. DE C.V.,                ) )  )  )  Plaintiff, )  )  v. )  )  UNITED STATES, )  )  Defendant, )  )  FULL MEMBER SUBGROUP OF THE )  AMERICAN INSTITUTE OF STEEL )  CONSTRUCTION, LLC, and )  COREY S.A. DE C.V., )  )  Defendant-Intervenors, )  )  and )  )  GOVERNMENT OF CANADA, )  )  Amicus Curiae. )  ) | Consol. Court No. 20-00069  **PUBLIC VERSION** |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

<br>

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

Of Counsel:
SPENCER NEFF
Staff Attorney
Office of Chief Counsel for
Trade Enforcement & Compliance
United States Department of Commerce

PATRICIA M. MCCARTHY
Assistant Director

IN K. CHO
Trial Attorney
United States Department of Justice

*Counsel for Defendant*

July 30, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT PURSUANT TO RULE 56.2 ................................................................... 2

    I.   Administrative Determination Under Review .................................................. 2

    II.  Issues Presented For Review .......................................................................... 2

STATEMENT OF THE FACTS .................................................................................... 2

    I.   Subject Merchandise And Parties ................................................................... 2

    II.  Investigation ................................................................................................... 4

SUMMARY OF ARGUMENT ....................................................................................... 7

ARGUMENT .................................................................................................................. 8

    I.   Standard Of Review ........................................................................................ 8

    II.  Commerce's Calculation Of Constructed Value Profit Based On Corey's
          Home Market Sales Is Supported By Substantial Evidence And Otherwise
          In Accordance with Law ............................................................................... 9

          A.  Commerce's Decision To Rely On The Second Alternative Method Of
               Calculating Constructed Value Using Corey's Home Market Sales Is
               Supported By Substantial Evidence And Otherwise In Accordance With Law ......... 11

          B.  Commerce's Decision To Use Corey's Home Market Sales Within
               The Period Of Investigation Is Supported By Substantial Evidence And
               Otherwise Accordance With Law ................................................................. 13

          C.  Commerce's Finding That Corey's Project Was Within
               The Ordinary Course Of Trade Is Supported By Substantial Evidence And
               Otherwise In Accordance With Law .............................................................. 16

          D.  Commerce's Finding That No Subsidy Distorted Corey's
               Home Market Sales  Is Supported By Substantial Evidence And
               Otherwise In Accordance With Law .............................................................. 18

    III. Commerce's Application Of Partial Facts Available With An
          Adverse Inference To The Unreported Sale Challenged By BSM Is
          Supported By Substantial Evidence And Otherwise In Accordance With Law .............. 20

          A.  Commerce Had A Proper Basis to Use Facts Otherwise Available ........................... 21

          B.  Commerce's Application Of Partial Adverse Facts Available To
               BSM For Its Failure To Report One Of Its Sales Is Supported By
               Substantial Evidence And Otherwise In Accordance With Law ............................... 23

          C.  Commerce Permissibly Assigned The Highest Transaction-Specific
               Dumping Margin Calculated for BSM To BSM's Unreported Sale .......................... 26

    IV. Commerce's Determination Regarding Date Of Sale Is Supported By
          Substantial Evidence And Otherwise In Accordance With Law ...................................... 27

V.  Commerce's Calculation Of BSM's Constructed Export Price Profit Is
Supported By Substantial Evidence And Otherwise In Accordance With Law .............. 30

A.  Commerce Permissibly Calculated Constructed Export Price Profit Rate ................ 30

B.  Commerce Permissibly Excluded The Data From NCI's Costa Rica Facility .......... 32

CONCLUSION ................................................................................................................. 33

# TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1516a ................................................................................................... 8
19 U.S.C. § 1673 ................................................................................................... 9
19 U.S.C. § 1677 ............................................................................................... 16, 17
19 U.S.C. § 1677a ............................................................................................. 13, 32
19 U.S.C. § 1677b ................................................................................... 2, 9, 10, 12, 20
19 U.S.C. § 1677e ........................................................................................ 2, 20, 26

**Regulations**

19 C.F.R § 351.404 ......................................................................................... 9, 10, 12
19 C.F.R § 351.519 ......................................................................................... 18, 19
19 C.F.R. § 351.102 ......................................................................................... 16, 17
19 C.F.R. § 351.401 ........................................................................................... 2, 27
19 C.F.R. § 351.407 ............................................................................................. 10
19 C.F.R. § 401 ................................................................................................... 2

**Cases**

*ArcelorMittal USA LLC v. United States*,
    302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) ................................................. 27
*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)....................................................................... 16
*BMW of N. Am. LLC v. United States*,
    926 F.3d 1291 (Fed. Cir. 2019)....................................................................... 26
*Chevron, U.S.A. v. Natural Resources Defense Council.*,
    467 U.S. 837 (1984)........................................................................................ 8
*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)........................................................................................ 8
*Consolo v. Fed. Mar. Comm'n*,
    ............................................................................................................... 8
*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021)....................................................................... 26
*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    33 C.I.T. 695 (2009) ....................................................................................... 27
*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992)........................................................................................ 8
*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019).................................................................. 9, 10, 12
*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009)....................................................................... 20
*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)................................................................... 8, 20

*NSK Ltd. v. United States*,
  510 F.3d 1375 (Fed. Cir. 2007)..................................................................16, 17
*Peer Bearing Co.-Changshan v. United States*,
  766 F.3d 1396 (Fed. Cir. 2014)..........................................................................20
*Sahaviriya Steel Indus. Pub. Co. v. United States*,
  34 C.I.T. 709 (2010) .........................................................................................27
*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994)..............................................................................................9
*Timken Co. v. United States*,
  354 F.3d 1334, 1342 (Fed. Cir. 2004)..................................................................8
*Torrington Co. v. United States*,
  127 F.3d 1077 (Fed. Cir. 1997)..........................................................................17
*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009).............................................................................................8

**Administrative Determinations**

*Certain Fabricated Structural Steel From Mexico*, 84 Fed. Reg. 47,487
  (Dep't of Commerce Sep. 10, 2019) (preliminary determination) .........................2, 5
*Certain Fabricated Structural Steel From Mexico*, 85 Fed. Reg. 5,381
  (Dep't of Commerce Jan. 30, 2020) (final determination) ...................................18
*Certain Fabricated Structural Steel From Mexico*, 85 Fed. Reg. 5,390
  (Dep't of Commerce Jan. 30, 2020) (final determination) ..........................2, 3, 6
*Certain Frozen Warmwater Shrimp From Thailand*, 73 Fed. Reg. 50,933
  (Dep't of Commerce Aug. 29, 2008) (final determination) ..........................30
*Certain Orange Juice From Brazil*, 75 Fed. Reg. 18,794
  (Dep't of Commerce April 13, 2010) (preliminary determination).........................32
*Concrete Steel Rail Tie Wire From Mexico*, 79 Fed. Reg. 25,751
  (Dep't of Commerce May 5, 2014) (final determination) ...............................32
*Large Newspaper Printing Presses and Components Thereof from Japan*,
  66 Fed. Reg. 11,555 (Dep't of Commerce Feb. 26, 2001) (final determination) ...................29
*Manganese Metal from the People's Republic of China*,
  66 Fed. Reg. 15,076 (Dep't of Commerce Mar. 15, 2001) (final determination)...................31
*Prestressed Concrete Steel Rail Tie Wire From Mexico*,
  79 Fed. Reg. 25,571 (May 5, 2014) (final determination)................................31, 32
*Solid Fertilizer Grade Ammonium Nitrate from the Russian Federation*,
  79 Fed. Reg. 29,417 (Dep't of Commerce May 22, 2014) (preliminary determination).........31

**Other Authorities**

Policy Bulletin 97.1, Calculation of Profit for Constructed Export Price Transactions
(Dep't of Commerce September 4, 1997)...............................................................30, 31

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| BUILDING SYSTEMS DE MEXICO, S.A. DE C.V., | ) |
| Plaintiff, | ) |
| v. | )  Consol. Court No. 20-00069 |
| UNITED STATES, | ) |
| Defendant, | )  **PUBLIC VERSION** |
| FULL MEMBER SUBGROUP OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION, LLC, and COREY S.A. DE C.V., | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| GOVERNMENT OF CANADA, | ) |
| Amicus Curiae. | ) |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Building Systems de Mexico, S.A. de C.V. (BSM).  BSM challenges certain aspects of the final determination made by the United States Department of Commerce (Commerce) in the antidumping investigation of fabricated structural steel from Mexico.  Commerce's final determination is supported by substantial evidence and otherwise in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's final determination.

## STATEMENT PURSUANT TO RULE 56.2

### I.     Administrative Determination Under Review

BSM seeks judicial review of Commerce's final determination in the antidumping

investigation of fabricated structural steel from Mexico.  *See Certain Fabricated Structural Steel*

*From Mexico*, 85 Fed. Reg. 5,390 (Dep't of Commerce Jan. 30, 2020) (final determination) and

accompanying Issues and Decision Memorandum (IDM).  The period of investigation is between

January 1, 2018, and December 31, 2018.

### II.    Issues Presented For Review

1.     Whether Commerce's use of another respondent's home market sales to calculate
       BSM's constructed value profit pursuant to 19 U.S.C. § 1677b(e)(2)(B)(ii) was
       supported by substantial evidence and otherwise in accordance with law.

2.     Whether Commerce's use of the contract date as the date of sale to calculate
       currency conversion rates pursuant to 19 C.F.R. § 401(i) is supported by
       substantial evidence and otherwise in accordance with law.

3.     Whether Commerce's application of partial facts available with an adverse
       inference to an unreported U.S. sale pursuant to 19 U.S.C. § 1677e(a)-(c) is
       supported by substantial evidence and otherwise in accordance with law.

4.     Whether Commerce's calculation of BSM's constructed export price profit rate by
       adding separate profit rates of BSM and its U.S. affiliate and by excluding the
       data from BSM's Costa Rican facility that had incurred a loss is supported by
       substantial evidence and otherwise in accordance with law.

### STATEMENT OF THE FACTS

### I.     Subject Merchandise And Parties

The subject merchandise is fabricated structural steel from Mexico.  *See generally Final*

*Determination*, 85 Fed. Reg. at 5,392-93; *Certain Fabricated Structural Steel From Mexico*, 84

Fed. Reg. 47,487 (Dep't of Commerce Sep. 10, 2019) (preliminary determination) and

accompanying preliminary decision memorandum (PDM), P.R. 579.  Fabricated structural steel

is made from steel in which: "(1) Iron predominates, by weight, over each of the other contained

elements; and (2) the carbon content is two percent or less by weight."  *See Final Determination*,

85 Fed. Reg. at 5,392.  The product can be painted, varnished, or coated with plastics or other substances.  *See id*.  It can be fully assembled, partially assembled, or modularized for various applications, such as erection of structures, including buildings, arenas, and transportation facilities.  *See id*. at 5,393.

For purposes of this action, the most notable characteristic of fabricated structural steel is the lengthy duration necessary for its production, which typically does not occur by the date of sale:

> {F}abricated structural steel is unique in that it is typically custom-made for a specific-project and normally it has not been manufactured by the date of the sale.  All movement charges and adjustments for sales of fabricated structural steel may not be known until the fabricated structural steel has been produced and the project completed.

IDM at 7.  Given this characteristic, some producers such as BSM recognize revenues in phases for building projects constructed with fabricated structural steel.  *See*, *e.g*., IDM at 11, 14; NCI CEP Verification Report, at 5 (Dep't of Commerce Oct. 31, 2019), P.R. 625, C.R. 509.[1]

BSM, plaintiff, is one of the two largest Mexican producers of fabricated structural steel. PDM at 3.  BSM produces fabricated structural steel sold by its U.S. affiliates, NCI Group, Inc. and Robertson-Ceco II Corporation (collectively, NCI).  *See* BSM Section A Responses, at A-5 (May 1, 2019), P.R. 253, C.R. 61; BSM Section A Supplemental Responses, at 5 (June 11, 2019), P.R. 356, C.R. 210.[2]  BSM participated in the underlying investigation as a mandatory respondent.  *See* Respondent Selection Memorandum, at 7 (Dep't of Commerce Apr. 1, 2019),

---

[1] All "P.R." citations refer to the public record.  All "C.R." citations refer to the confidential record.

[2] BSM is a subsidiary of NCI Building Systems, Inc.  BSM Cost Verification Report, at 5, (Dep't of Commerce Nov. 10, 2019) P.R. 510, C.R. 510.  NCI Building Systems, Inc., a U.S. corporation, is now known as Cornerstone Building Brands, Inc.  *Id*.

P.R. 193, C.R. 50.

Full Member Subgroup of the American Institute of Steel Construction, LLC (AISC), defendant-intervenor, is a trade association with members who manufacture or produce a domestic like product in the United States. *See* AISC Motion to Intervene, at 1 (filed Apr. 17, 2020), ECF No. 10. AISC participated in the underlying investigation as the petitioner. PDM at 1.

Corey S.A. de C.V. (Corey), defendant-intervenor, is another Mexican producer of fabricated structural steel. PDM at 3. Corey participated in the underlying investigation as a voluntary respondent. *See* Selection of Voluntary Respondent, at 4 (Dep't of Commerce May 10, 2019), P.R. 310.

The Government of Canada has appeared as *amicus curiae* to support the United States' motion to dismiss this action for lack of jurisdiction, which the Court has denied. *See* Canada Motion to Appear as Amicus, at 1 (filed July 9, 2020), ECF No. 32; Opinion and Order Denying Defendant's Motion to Dismiss, Court No. 20-00069, Slip Op. 20-155 (Ct. Int'l Trade Nov. 3, 2020). The Government of Canada did not participate in the investigation.

## II.   <u>Investigation</u>

On March 4, 2019, Commerce initiated its antidumping investigation of the subject merchandise. *Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 7,330 (Dep't of Commerce Mar. 4, 2019). On April 1, 2019, Commerce requested respondents to report, among other data, all U.S. sales made during 2018. *See* Request for Information (Dep't of Commerce Apr. 1, 2019), P.R. 194. In particular, Commerce requested respondents to report projects "completed during the period January 1, 2018, through December 31, 2018," as well as projects "for which the contract was signed during the period January 1, 2018, through

December 31, 2018 and the project was completed during the period January 1, 2019 through March 31, 2019." *Id*. at 3.  Commerce also requested respondents to report sales "substantially completed" during 2018 to reflect the realities of the fabricated structural steel industry.  *See* Sections C, D, and E Questionnaire, at 13 (Dep't of Commerce Apr. 11, 2019), P.R. 213; PDM at 4, 13-14.

On September 10, 2019, Commerce published its preliminary determination, which assigned a weighted-average dumping margin of 10.58 percent for BSM.  *See Preliminary Determination*, 84 Fed. Reg. at 47,488.  Commerce preliminarily determined to use constructed value to calculate normal value for BSM, explaining that the custom-built nature of fabricated structural steel did not permit price-to-price comparisons.  PDM at 14.  Commerce then calculated BSM's constructed value profit and selling expenses based on Corey's combined constructed value profit and selling expenses derived from Corey's home market sales.  *Id.* at 18-19.  To determine the appropriate exchange rate, Commerce used the contract date as the date of sale for all U.S. sales.  *Id*. at 13.  For all of BSM's sales in the United States, Commerce used constructed export price because BSM's fabricated structural steel was sold by NCI.  *Id.* at 14.  To calculate BSM's constructed export price profit, Commerce used consolidated financial statements from NCI and income statements from two business segments of BSM.  *Id.* at 14.  Commerce then conducted its verification.  *See* BSM Sales Verification Report (Dep't of Commerce Oct. 31, 2019), P.R. 624, C.R. 508; NCI CEP Verification Report, P.R.625, C.R. 509; BSM Cost Verification Report (Dep't of Commerce Nov. 1, 2019), P.R. 626, C.R. 510.  At verification, Commerce learned that BSM had failed to report eight of its U.S. sales.  *See* BSM

Sales Verification Report at 3, P.R. 624, C.R. 508; NCI CEP Verification Report, at 24, P.R. 625, C.R. 509.[3]

On January 30, 2020, Commerce published its final determination, which assigned a weighted-average dumping margin of 8.47 percent to BSM. *Final Determination*, 85 Fed. Reg. at 5,392. To calculate BSM's constructed value profit and selling expenses, Commerce continued using Corey's home market sales. IDM at 47-51. To determine the exchange rate, Commerce continued using the contract date. IDM at 13. As for BSM's constructed export price profit, Commerce explained that NCI's consolidated financial statements had already included revenues and expenses of BSM's operations, so those amounts were double-counted in the preliminary determination. *Id.* at 35-36. Commerce corrected that error by first removing the overlapping revenues and expenses from NCI's consolidated financial statements. *Id.* at 36. Commerce then calculated separate profit ratios for BSM and NCI, before adding the two ratios to calculate an overall constructed export price profit. *Id.* For BSM's eight unreported U.S. sales discovered at verification, Commerce found that BSM had failed to act to the best of its ability to report its U.S. sales. IDM at 55. Commerce then applied facts otherwise available with an adverse inference to the eight unreported U.S. sales. *Id.* Commerce assigned to each of the eight sales an individual margin equal to the highest non-aberrational transaction-specific margin on the record. *Id.*

---

[3] BSM suggests that it had nine unreported U.S. sales. *See* BSM Brief at 5 n.3 (noting that Commerce applied facts otherwise available with an adverse inference to "eight *other* sales" in addition to one unreported sale) (emphasis added). But BSM had a total of eight unreported U.S. sales. BSM Sales Verification Report at 3, P.R. 624, C.R. 508 (noting total of eight unreported sales).

## SUMMARY OF ARGUMENT

The Court should sustain Commerce's final determination in all aspects.  First, Commerce reasonably relied on Corey's home market sales to calculate BSM's constructed value profit rate.  Commerce reasonably selected which of Corey's home market sales to include in the calculation by applying the same parameters used to select relevant U.S. sales: sales made during 2018.  The selected home market sales were within the ordinary course of trade, and no record evidence showed that countervailable subsidies had distorted them.

Second, Commerce's application of partial facts available with an adverse inference for BSM's failure to report U.S. sales is supported by substantial evidence and otherwise in accordance with law.  The record lacked the necessary information, namely the sales data pertaining to the unreported U.S. sales for a project substantially completed — according to BSM's own definition of substantial completion.  BSM failed to comply with Commerce's request to report all U.S. sales despite having had the opportunities to do so.  Commerce has justified its application of partial facts available with an adverse inference, explaining that the agency used a non-aberrational, transaction-specific dumping margin derived from BSM's own sales.

Third, Commerce reasonably used the contract date as the date of sale to determine exchange rate for BSM because the contract date was the date on which the material terms of sales were established.

Finally, Commerce reasonably calculated BSM's constructed export price profit rate. The agency's calculation is consistent with the applicable statutes, its regulations, and its past practice.  BSM has identified no law or standard that has been violated.

**ARGUMENT**

**I.**   <u>**Standard Of Review**</u>

This Court sustains any determination of Commerce unless it is unsupported by substantial evidence or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The possibility of inconsistent conclusions from the record does not make Commerce's finding unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  When an issue is inherently fact-intensive, the Court will set aside Commerce's finding only if the evidence is "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).  Thus, the substantial evidence standard is a "high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Commerce's statutory interpretations are reviewed under the two-part test of *Chevron, U.S.A. v. Natural Resources Defense Council*.  467 U.S. 837, 842-43 (1984).  First, the Court considers whether the statutory text addresses the "precise question at issue," and if so, the agency must follow the statutory text.  *Id*. at 842-43.  If the text is silent or ambiguous, the agency's determination must rely on a "permissible construction of the statute."  *Id*. at 843.  "Any reasonable construction . .  is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation omitted).  Commerce's interpretation "governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S. A*., 555 U.S. 305, 316 (2009).

The Court defers to Commerce's interpretation of its own regulations unless the interpretation is plainly erroneous or inconsistent with the regulation.  *Michaels Stores, Inc. v.*

*United States*, 766 F.3d 1388, 1391 (Fed. Cir. 2014).  The Court affords broad deference

particularly when the regulation at issue concerns a "complex and highly technical regulatory

program."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

## II.    Commerce's Calculation Of Constructed Value Profit Based On Corey's Home Market Sales Is Supported By Substantial Evidence And Otherwise In Accordance with Law

BSM first challenges Commerce's calculation of constructed value profit rate.

Commerce may impose antidumping duties for the amount by which a product's normal value

exceeds its export price.  *See* 19 U.S.C. § 1673.  A product's normal value is ordinarily derived

from its price in the producer's home market or a third country.  *See* 19 U.S.C. § 1677b(a)(1).

But when the "aggregate quantity" of the product sold in either the home market or a third

country is less than five percent of the quantity sold in the United States, Commerce may rely on

the product's constructed value to determine its normal value.  *See id*. § 1677b(a)(1)(B)(ii)(II),

(1)(C)(ii), (4); *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 534-35 (Fed. Cir.

2019); 19 C.F.R. § 351.404(b).

A product's constructed value can be determined using one of four methods: one

preferred method and three alternative methods.  *See* 19 U.S.C. § 1677b(e); *Mid Continent Steel*

*& Wire*, 941 F.3d at 535.  All four methods require Commerce to examine the costs of producing

and packaging the product.  *See* 19 U.S.C. § 1677b(e)(1), (3); *Mid Continent Steel & Wire*, 941

F.3d at 535.  The preferred method requires Commerce to examine the "actual amounts" of

profits, and selling, general, and administrative expenses (SG&A) "in connection with the

production and sale of a foreign like product, in the ordinary course of trade, for consumption in"

the producer's home market.  *Id*. § 1677b(e)(2)(A).  If the data for such "actual amounts" are

unavailable, Commerce can rely on one of the three alternative methods.  *Id*. § 1677b(e)(2)(B).

Each of the three alternative methods requires Commerce to consider a producer's profits and SG&A, but each method relies on a different source of that data. *See Mid Continent Steel & Wire*, 941 F.3d at 535. The first method relies on the data associated with the producer's other products "in the same general category of products as the subject merchandise." *Id.* § 1677b(e)(2)(B)(i). The second method — the one used in this case — relies on the data of other respondents in the investigation. *Id.* § 1677b(e)(2)(B)(ii). Specifically, the statute directs Commerce to calculate the weighted average of SG&A and profits using the actual amounts from other respondents, as incurred and realized in the ordinary course of trade:

> the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country . . . .

*Id.* § 1677b(e)(2)(B)(ii). The third method allows Commerce to use "any other reasonable method" to derive the producer's profits and SG&A. *See id.* § 1677b(e)(2)(B)(iii). The statute provides no preference for which of the three Commerce should choose. *See Mid Continent Steel & Wire*, 941 F.3d at 535.[4]

Here, Commerce applied the second alternative method based on Corey's home market sales. IDM at 47. Commerce used constructed value because BSM's home market sales were less than five percent of BSM's aggregate sales to the United States. IDM at 50; *see also* 19 U.S.C. § 1677b(a)(1)(C); 19 U.S.C. § 1677b(a)(1)(B)(ii)(II); 19 C.F.R. § 351.404(b). Using constructed value was appropriate also because the customized-nature of fabricated structural

---

[4] Once Commerce applies either the preferred method or one of the three alternative methods, the agency then adds constructed value's other components, which are not at issue here. *See* 19 U.S.C. § 1677b(e); 19 C.F.R. § 351.407.

steel sales did not permit a price-to-price comparison. *See* IDM at 28. Commerce relied on an alternative method to calculate constructed value profit because BSM had insufficient sales in its home market and no sales in a third country. *See* IDM at 50. Out of the three available alternatives — for which no hierarchy exists — Commerce relied on the second method and used Corey's home market sales. *See* PDM at 19; IDM at 50. Corey's data reflected the profit of a Mexican fabricated structural steel producer, on comparison market sales of a foreign like product, in the ordinary course of trade. *See* PDM at 19; IDM at 50. This record evidence suffices to sustain Commerce's constructed value profit rate for BSM.

BSM contends otherwise. According to BSM, Commerce erred because the agency: (1) unreasonably decided to use Corey's home market sales, despite other available data; (2) arbitrarily selected which of Corey's home market sales to use; (3) unreasonably relied on Corey's home market sales that were outside the ordinary course of trade; and (4) unreasonably relied on Corey's home market sales distorted by countervailable subsidies. BSM Brief at 9-25. We address each argument in turn.

### A. Commerce's Decision To Rely On The Second Alternative Method Of Calculating Constructed Value Using Corey's Home Market Sales Is Supported By Substantial Evidence And Otherwise In Accordance With Law

BSM contends that Commerce's decision to derive constructed value profit rate using Corey's home market sales was unreasonable as applied to BSM. BSM Brief at 21-25. Specifically, BSM argues that Commerce erred because the agency (1) could have relied on "any other reasonable method" to calculate constructed value and (2) unreasonably relied on home market sales of Corey, a company with "very different experiences," when other sources were

available, such as BSM's own sales data or the financial statements of other companies that produce fabricated structural steel.  *See* BSM Brief at 21-25.[5]  BSM is mistaken.

First, no hierarchy exists among the three alternative methods, *Mid Continent Steel & Wire*, 941 F.3d at 535, so the availability of the third "any other reasonable method," without more, does not invalidate Commerce's reliance on the second alternative method.  BSM cites no authority that would require Commerce to use the third "any other reasonable" method when the second alternative method remains available.

Second, Corey's home market sales were the best available evidence because they reflected another Mexican producer's actual profits and selling expenses on comparison market sales of the foreign like product, in the ordinary course of trade.  *See* IDM at 49-50; PDM at 19; 19 U.S.C. § 1677b(e)(2)(B)(ii).  Commerce reasonably relied on an alternative method because BSM's home market sales were less than five percent of its aggregate U.S. sales, 19 U.S.C. § 1677b(2)(B), and the Federal Circuit has upheld Commerce's practice not to rely on the first alternative method based on such a low quantity of sales, *Mid Continent Steel & Wire*, 941 F.3d at 535.  *See also* 19 C.F.R. § 351.404(b).  And that BSM had insufficient home market sales was the reason Commerce used an alternative method in the first place, so using BSM's home market sales would have made little sense.  Although BSM appears to argue that its sales data were superior because they contained more *projects*, the statute does not require Commerce to choose data based on the number of projects it contains.  *See* 19 U.S.C. § 1677b(e)(2)(B).  Similarly, the

---

[5] BSM also argues that relying on Corey's home market sales was unreasonable given the abnormally high profit rate resulted from Corey's data.  *See* BSM Brief at 22-23.  BSM cites no authority directing Commerce to choose the source of the necessary information based on profit margin.  In any event, we address this argument below in the context of the ordinary course of trade, where BSM repeats the same argument.

statute does not require Commerce to analyze Corey's "experiences," BSM Brief at 23, before choosing the source of necessary information. *See* 19 U.S.C. § 1677b(e)(2)(B). The statute similarly does not require Commerce to examine another producer's financial statements. *See id.* Indeed, those financial statements reflect profits and selling expenses of all products sold — including non-subject merchandise sold to other markets, so relying on such data would have been distortive, as Commerce correctly noted. IDM at 49.

### B. Commerce's Decision To Use Corey's Home Market Sales Within The Period Of Investigation Is Supported By Substantial Evidence And Otherwise Accordance With Law

To select which of Corey's home market sales to use to calculate constructed value profit, Commerce used the same approach it had used to identify relevant U.S. sales: to rely only on sales contracted and substantially completed during 2018. *See* PDM at 20; IDM at 48. Following this approach resulted in the exclusion of all projects from Corey's home market sales data except [

] should have been excluded, BSM Brief at 11-14, the record shows otherwise.

The statute directs Commerce to determine a product's normal value — which is determined by using constructed value here — based on the same parameters used to identify the corresponding U.S. sales. *See* 19 U.S.C. § 1677b(a)(1)(A) ("The normal value of the subject merchandise shall be the price described in subparagraph (B), at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price under section 1677a(a) or (b) of this title."); IDM at 48. Given the statute's mandate, Commerce's reliance on the same parameters — that is, sales contracted and substantially completed during 2018 — to select the basis for constructed value profit rate was in accordance with law.

Substantial evidence supports Commerce's finding that [                              ]
was contracted and substantially completed during 2018.  IDM at 48.[6]  As confirmed at
verification, a purchase order was used to establish the terms for [

].  *See* Corey BPI Memorandum, at 2 (Dep't of Commerce Jan. 23, 2020), P.R.671,
C.R. 540; Corey Sales Verification Report, at 27 (Dep't of Commerce Nov. 5, 2019), P.R. 629,
C.R. 512.  The record contained [                                                    ],
and those [                                                    ].  Corey BPI
Memorandum, at 1-2, P.R. 671, C.R. 540.  Commerce relied on those two purchase orders to find
that [                              ] was contracted in 2018.  *See id*.; IDM at 48.  The record
also reflects that [                              ] was substantially completed in 2018.  *See*
Corey Sales Verification Report, at 27, 37, P.R. 629, C.R. 512; Corey Section D Responses, at
44-45 (June 3, 2019), P.R. 337, C.R. 146; Corey BPI Memorandum, at 2, P.R. 671, C.R. 540.
Given the information confirmed at verification and the two purchase orders in the record,
Commerce's finding that Corey's home market sales were contracted and substantially
completed during 2018 is supported by substantial evidence.

BSM contends that Commerce should not have used [                              ] to
calculate constructed value profit because it was contracted before 2018.  BSM Brief at 11-14.
In support, BSM raises four arguments: (1) Corey's sequential project-numbering system
indicated that Corey's project was contracted before 2018 because another project with a later
project number had revenues booked before 2018; (2) certain expenses for the project were

---

[6] For purposes of identifying the basis for the constructed value profit rate, BSM does not
challenge the "substantial completion" standard.  BSM instead argues that the "substantial
completion" standard was difficult to follow for purposes of applying partial adverse facts
available, and those arguments are discussed below.

booked in 2017, meaning that the contract existed in 2017; (3) that the first purchase order,

[                                    ] was described as [                        ] showed that the purchase order

was [                                                ]; and (4) Corey's description of its sales

process indicates that there was a purchase order issued by a customer when the bid for that

project was accepted in 2017.  *See id.*

 BSM's first three arguments require little discussion.  First,


P.R.671, C.R.540.  Second, the "expenses" booked in 2017 represented certain returns posted on

an incorrect project by mistake, as confirmed at verification.  *See* Corey's Sales Verification

Report at 27, P.R. 629, C.R. 512.  Third, even though the [

                                    ] that was only a label; what mattered was the purchase order's

contents confirmed at verification.  *See id.*

 With respect to the fourth argument, BSM argues that, according to Corey's description

of its sales process, the project at issue here was contracted before 2018.  BSM Brief at 13.  BSM

relies on the following description on how Corey recognizes a proposal's acceptance:

> {a} *proposal* is considered to be 'accepted' when one of the following occurs: (a) a
> contract is signed, (b) the customer signs a final budget proposal issued by Corey or
> (c) the customer issues a purchase order to Corey for the project in question.

Corey Responses to Section A Questionnaire, A-26 (Apr. 30, 2019), P.R. 272, C.R. 81 (emphasis

added).  According to BSM, "If the [                        ] project was sold via purchase order,

Corey's own description of its sales process indicates that there was a [

                                    ] that Commerce did not review." BSM Brief at

13.  That a proposal's acceptance can be shown in three ways, including a purchase order's

issuance, does not mean that [                                                ] In

any event, even if the record supported an inference inconsistent with Commerce's finding, no

evidence cited by BSM invalidates the substantial evidence supporting Commerce's finding

discussed above.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)

(reasoning that evidence detracting from agency's determination does not show lack of

substantial evidence).

### C.   Commerce's Finding That Corey's Project Was Within The Ordinary Course Of Trade Is Supported By Substantial Evidence And Otherwise In Accordance With Law

BSM argues that [                              ] generated an abnormally high profit

margin [                ] to be considered within the ordinary course of trade.  BSM Brief at 14

19.  Commerce rejected this argument for two reasons.  First, other than the high profit margin,

BSM had identified nothing unusual or atypical about Corey's project itself.  IDM at 49.

Second, the project was within the range of profit margins shown in the record.  IDM at 49.

Commerce's finding that the project was within the ordinary course of trade is supported by

substantial evidence and otherwise in accordance with law.

The statute defines the "ordinary course of trade" as "the conditions and practices which,

for a reasonable time prior to the exportation of the subject merchandise, have been normal in the

trade under consideration with respect to merchandise of the same class or kind."  19 U.S.C.

§ 1677(15).  Commerce's regulations add that the agency "may consider sales or transactions to

be outside the ordinary course of trade if the Secretary determines, based on an evaluation of *all

of the circumstances* particular to the sales in question, that such sales or transactions have

characteristics that are extraordinary for the market in question."  19 C.F.R. § 351.102(b)(35)

(emphasis added).  The party seeking to exclude the sales at issue bears the burden of showing

that those sales are outside the ordinary course of trade.  *See NSK Ltd. v. United States*, 510 F.3d

1375, 1384 (Fed. Cir. 2007).  Absent adequate evidence to the contrary, Commerce may treat the

sales as within the ordinary course of trade.  *Id*. (citing *Torrington Co. v. United States*, 127 F.3d 1077, 1081 (Fed. Cir. 1997)).

High profit margins, without more, do not render sales outside the ordinary course of trade.  Indeed, the argument identical to the one raised by BSM has been rejected.  *See NSK*, 510 F.3d at 1384.  As the Federal Circuit has explained:

> Nor does the fact that NTN was able to reap such high profits on these sales take them outside of the ordinary course of trade.  Small-volume sales often yield higher profit margins than large-volume sales, as small-volume customers are typically unable to command volume discounts.

*Id*.  Given this binding precedent, the project here cannot be outside the ordinary course of trade solely because of its high profit margin.

Moreover, Commerce correctly found that Corey's project did not have an abnormally high profit margin.  In support of that finding, Commerce relied on BSM's own sales, among other data.  *See* IDM at 49 n.196.  In particular, BSM had profit margins ranging up to [

] for its sales in the United States.  *See* Petitioner Case Brief Attachment 3 (Nov. 19, 2019), P.R. 643, C.R. 523.  BSM's home market sales had profit margins ranging up to [

.  *See* BSM Section D Supplemental Reponses, Exhibit SD-25 (Nov. 25, 2019), C.R. 271 ([                    ]).  Substantial evidence supports Commerce's finding that the profit rate here was not abnormally high.

BSM contends that the profit rate was abnormally high, but it cites no authority indicating that [                ] has been found outside the ordinary course of trade.  *See* BSM Brief at 15.  BSM also argues that Commerce erroneously considered BSM's U.S. sales, *id*. at 18, but neither the statute nor the regulation requires, as BSM suggests, that Commerce rely exclusively on sales in the same market as the sales being examined.  *See* 19 U.S.C. § 1677(15); 19 C.F.R. § 351.102(b)(35).  And even if Commerce were to rely solely on home market sales,

BSM had profit margins ranging up to [            ], as noted above.

([                    ]).

BSM contends that Corey's project was outside the ordinary course of trade because it was contracted and completed within one year.  BSM Brief at 17.  BSM contradicts its own statements that it typically completes its projects in less than a year.  *See* BSM Scope Comments, at 5-6 (Mar. 25, 2019), P.R. 169.  That Corey completed the project within one year does not make it outside the ordinary course of trade.  BSM has not carried its burden to show that the project is outside the ordinary course of trade.

### D.   Commerce's Finding That No Subsidy Distorted Corey's Home Market Sales Is Supported By Substantial Evidence And Otherwise In Accordance With Law

In its parallel countervailing duty investigation, Commerce determined that certain import charge exemptions received by Corey were countervailable.  *Certain Fabricated Structural Steel From Mexico*, 85 Fed. Reg. 5,381 (Dep't of Commerce Jan. 30, 2020) (final determination) and accompanying Issues and Decision Memorandum (CVD IDM).  Commerce relied on its own regulations, which provide that Commerce will find the entire amount of an import charge exemption to be a countervailing subsidy, subject to certain exceptions.  *See* CVD IDM at 16-21; 19 C.F.R. § 351.519(a)(4).  In this antidumping investigation, Commerce found no record evidence that the import charge exemptions distorted Corey's home market sales. IDM at 49-50.

BSM challenges Commerce's finding, but the only evidence cited by BSM is Commerce's CVD IDM.  *See* BSM Brief at 19-20.  BSM argues:

> Commerce countervailed Corey's use of the {subsidy} specifically because Commerce *could not confirm that the duty exemptions benefitted only exports*; without an adequate inspection system in place, the inputs receiving the duty exemption *could also be used in home market projects*.

*Id*. at 21 (emphasis in original).  BSM is mistaken.  In the countervailing duty investigation, Commerce presumes that the subsidy is being used to produce the merchandise for domestic sales unless the producer's government has a system to ensure otherwise.  19 C.F.R. § 351.519(a)(4).  The same presumption does not apply in this antidumping investigation.  *See id*.  Further, no evidence on the record shows that the subsidy distorted Corey's home market profitability.  *See* IDM at 49-50 ("Consequently, we found no evidence to support BSM's assertion that Corey's HM profitability is distorted by the receipt of a countervailable export subsidy.").

Finally, BSM argues that Commerce does not use financial statements containing known subsidies when selecting surrogate financial ratios for non-market economy investigations.  BSM Brief at 19.  This is accurate, but it is also irrelevant here because Commerce's practice in selecting surrogate countries is unrelated to the issue at hand, and the rationale behind Commerce's practice in selecting surrogate financial ratios does not apply here.  *See* IDM at 49. As Commerce has explained, Commerce in this investigation relied on revenue and cost data *specific to each* of Corey's home market sales.  *Id*.  Further, BSM's argument assumes that Commerce has a wide variety of sources from which to select in this case.  Because Commerce found BSM's home market sales not viable due to insufficient volume, the record contained only limited data from which to calculate BSM's constructed value profit.  Thus, Corey's home market sales data here represented the best information available on the record for calculating constructed value profit in accordance with 19 U.S.C. § 1677b(e)(2)(B)(ii).

**III.    Commerce's Application Of Partial Facts Available With An Adverse Inference To The Unreported Sale Challenged By BSM Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

In its section C questionnaire, Commerce requested BSM to report all of its U.S. sales contracted and "substantially completed" during 2018.  *See* Sections C, D, and E Questionnaire, at 3, 13, P.R. 213; BSM Section C Responses, at 23 (June 4, 2019), P.R. 343, C.R. 164.  BSM failed to report eight sales that met those criteria, and Commerce discovered BSM's failure to report those sales at verification.  *See* NCI CEP Verification Report at 24, P.R. 625, C.R. 509; BSM Sales Verification Report at 3, P.R. 624, C.R. 508.  Commerce applied partial facts available with an adverse inference to all eight unreported sales.  IDM, at 53-55.  Commerce's determination is supported by substantial evidence and otherwise in accordance with law.

When the record lacks necessary information, Commerce uses facts otherwise available to fill the gap in the record.  *See* 19 U.S.C. § 1677e(a)(1); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1254 (Fed. Cir. 2009).  If Commerce finds that an interested party has failed to comply to the "best of its ability" with a request for information, the agency may use an inference adverse to the interests of that party in selecting from the facts available.  19 U.S.C. § 1677e(b)(1).  To comply with the best of its ability standard, an importer must maintain access to the kind of information a "reasonable importer should anticipate being called upon to produce." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014) (internal citations omitted).  Although the best of its ability standard "does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp.*, 337 F.3d at 1382.  When applying an adverse inference, Commerce may rely on any information on the record, 19 U.S.C. § 1677e(b)(2)(D), and the agency need not corroborate information used to support an adverse factual inference if the information is obtained during the investigation, *id*. § 1677e(c)(1).

Here, BSM challenges Commerce's application of partial facts available with an adverse inference as to only one of eight unreported sale. BSM Brief at 25-35. According to BSM, for this one sale for [                    ], Commerce had no basis to use facts otherwise available, erred by finding that BSM had failed to cooperate to the best of its ability, and assigned a punitive dumping margin. BSM Brief at 26-25.

### A.   Commerce Had A Proper Basis to Use Facts Otherwise Available

BSM contends that Commerce had no basis to resort to facts otherwise available because BSM had no obligation to include [                    ] in its U.S. sales data. BSM Brief at 26. According to BSM, the project was not substantially completed in 2018 because it had two incomplete phases as of December 31, 2018. *See id.* at 28.

BSM's argument contradicts its own definition of substantial completion. During the investigation, Commerce requested BSM to report all U.S. sales "substantially completed" during 2018. Sections C, D, and E Questionnaire, at 3, 13, P.R. 213. In response, BSM explained that its Buildings segment considers a sale substantially complete when "the final shipment of the last outstanding phase for a project to be the date of substantial completion:"

> **Date of Substantial Completion of the Terms of All Sales Agreements**
>
> Report the date on which all of the terms of the sales agreements related to this transaction were substantially completed.
>
> **ANSWER**: The Buildings Segment considers the date on which the *final shipment of the last outstanding phase for a project to be the date of substantial completion*. This date is stored as the "Phase Complete" date within the Buildings Segment's data systems, and the Phase Complete date for the last remaining phase of a project has been reported in this field. The Components Segment considers a project to be substantially complete when the last shipment is made as recorded as the "Shipped Complete" date within its data systems, and has reported that date in this field.

BSM Section C Responses, at 23 (June 4, 2019), P.R. 343, C.R. 164 (emphasis added); *see also*

BSM Section A Responses, at A-17, P.R. 253, C.R. 61 (discussing Buildings segment and Components segment).  [                    ] is a project within BSM's Building segment, and at the end of 2018, it still had two incomplete phases.  *See* NCI CEP Verification Report at 24, P.R. 625, C.R. 509.  But in July 2019, the customer cancelled the order of materials for the remainder of the project, and the two phases that had been marked incomplete were deleted. NCI CEP Verification Report at 24, P.R. 625, C.R. 509; IDM at 54.  BSM had no more tasks to complete, and all phases of the project were marked "Phase Complete."  *See* NCI CEP Verification Report at 24, P.R. 625, C.R. 509.  Because the final shipment for the last phase had occurred in 2018, the sale was substantially completed in 2018.

The unreported sale here did not become substantially completed in 2018 due to a mere technicality.  BSM does not argue that the sale should not be recognized at all.  Nor does BSM argue that the sale should be booked in 2019 or any other year.  Indeed, it would be odd for a business to account for a sale when a customer *cancels* the remaining final two phases of a project — not when the business actually earns revenue by contract performance.  *See* NCI CEP Verification Report at 5, P.R. 625, C.R. 509 (discussing BSM's practice of recognizing revenue on "phase-specific basis").[7]  And here is BSM's own statements on revenue recognition:

> BSM recognizes revenues when the invoice to NCI is issued.  Normally, the invoice is issued when the material is shipped from the plant. . . . Because the separate deliverables have value to the customer on a stand-alone basis, they are typically considered separate units of accounting.  Thus, when a specific phase is marked shipped complete in NCI's transportation

---

[7] *See also* BSM Section A Responses, at A-24, P.R. 253, C.R. 61 ("However, because BSM is a wholly owned subsidiary of a U.S. corporation, its financial accounting practices are not in accordance with MFRS but instead follow U.S. GAAP."); Financial Accounting Standards Board, Revenue Recognition, ASU 2014-09, (ASC) 606, at 6 (May 2014) ("For each performance obligation that an entity satisfies over time, an entity shall recognize revenue over time by consistently applying a method of measuring the progress toward complete satisfaction of that performance obligation.").

scheduling and order entry systems, revenue associate with that phase is
recognized.

BSM Section A Responses to, at A-30, P.R. 253, C.R. 61.  And BSM tracks cancelled sales.  *See*

BSM Sales Verification Report, at 10-11, P.R. 624, C.R. 508.  [                    ] was a U.S.

sale substantially completed in 2018 that should have been reported.  Commerce's finding that

the record contained a gap due to the unreported sale is supported by substantial evidence and

otherwise in accordance with law.

### B.    Commerce's Application Of Partial Adverse Facts Available To BSM For Its Failure To Report One Of Its Sales Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce's finding that BSM failed to cooperate to the best of its ability is supported by

substantial evidence and otherwise in accordance with law.  BSM contends that Commerce failed

to clearly and adequately state its request for BSM's sales data.  BSM Brief at 31.  BSM also

argues that it had no opportunity to report the sale because the customer cancelled the remainder

of the project only after BSM's filing of its initial section C responses.  *See id*.  The record

indicates otherwise.

Commerce clearly and adequately explained its request for BSM's sales data, which

included [                    ].  Commerce requested respondents to report sales contracted and

"substantially completed" during 2018 to reflect the realities of the fabricated structural steel

industry.  *See* Sections C, D, and E Questionnaire, at 13, P.R. 213 ("Report the date on which all

of the terms of the sales agreements related to this transaction were substantially completed.");

Request for Information, at 3, P.R. 194; PDM at 4, 13-14.  Further, the meaning of substantially

completed sale was an issue extensively discussed, but Commerce ultimately relied on BSM's

*own* definition of substantial completion for BSM's sales data: "the date on which the final

shipment of the last outstanding phase for a project."  BSM Section C Responses, at 23,

P.R. 343, C.R. 164.  Further, if BSM's own definition of substantially completed sale was not

clear, BSM could have requested clarification in any one of its numerous correspondences with

Commerce.  *See*, *e.g.*, Section C Supplemental Questionnaire, at 6 (Dep't of Commerce July 19,

2019), P.R. 421; Section C Supplemental Questionnaire Clarification and Additional Questions

(Dep't of Commerce July 22, 2019), P.R. 423; BSM Section C Supplemental Responses (Aug. 6,

2019), P.R. 503; BSM Section C Supplemental Responses (Aug. 9, 2019), P.R. 520; Section C

Supplemental Questionnaire, at 4 (Dep't of Commerce Aug. 16, 2019), P.R. 550; BSM Section C

Supplemental Responses (Aug. 21, 2019), P.R. 552; Post-Verification Request for Revised U.S.

Sales and Costs Databases, at 1 (Dep't of Commerce Nov. 6, 2019), P.R. 630.  Indeed, given the

nature of fabricated structural steel and its industry, Commerce decided early in its investigation

to rely on sales substantially completed during the period of investigation.  *See* Sections C, D,

and E Questionnaire, at 3, 13, P.R. 213; PDM at 13-14.  BSM's sudden claim of ignorance when

Commerce used BSM's definition of substantially completed sale should be rejected.

Substantial evidence supports the finding that Commerce requested the unreported sale.

BSM also had several opportunities to provide the missing sales data.  Although BSM

suggests that it could not submit revised U.S. sales data after the cancellation of [

          ]'s remaining phases, that narrative contradicts the record evidence.  As a preliminary

matter, BSM had two months between the July 2019 cancellation and the September 2019

preliminary determination.  Moreover, even after the July 2019 cancellation, Commerce

specifically asked BSM to confirm whether BSM had reported the correct date of substantial

completion for all of its U.S. sales and allowed BSM to resubmit its U.S. sales data.  *See* Section

C Supplemental Questionnaire, at 4, P.R. 550 ("Please confirm that BSM reported . . . the correct

date of substantial completion in the APPROVDTU field for all sales (i.e., both Buildings and

Components segment sales) in the U.S. sales database.  Please revise and resubmit the U.S. sales database, if necessary, and provide an explanation.").  Indeed, after the July 2019 cancellation, BSM continued to discuss the completeness of its sales data with Commerce, and BSM apparently had the ability to provide the missing data, as evidenced by BSM's filing of several supplemental responses along with revised data for U.S. sales.  *See*, *e.g.*, BSM Section C Supplemental Responses, at 9-10 (Aug. 6, 2019), P.R. 503 (discussing substantial completion and filing revised sales data); BSM Section C Supplemental Responses, at 1, P.R. 520; BSM Section C Supplemental Responses, at 1, 4, P.R. 552 (filing revised sales data in response to Commerce's request to confirm that BSM had reported correct date of substantial completion for all U.S. sales).  Further, BSM tracks the company's phase pricing, and BSM had the ability to adjust for cancelled sales.  *See* BSM Sales Verification Report, at 10-11, P.R. 624, C.R. 508; NCI CEP Verification Report, at 5.  BSM's suggestion that having to account for a cancellation of an order presented an unfair surprise contradicts the record evidence.

Further, BSM's pattern of conduct supports Commerce's finding.  Throughout the investigation, BSM insisted that it should be excluded from the investigation entirely, even though no evidence or legal authority supported that position.  BSM maintained that position even after the July 2019 cancellation and during the period leading up to the September 2019 issuance of the preliminary determination — while providing incomplete sales data in response to Commerce's requests.  *See* BSM Preliminary Comments (Aug. 13, 2019), P.R. 533.  At verification, the excuse for failing to report seven of the eight U.S. sales was remarkable: the company officials believed that the date of sale was the *invoice* date — despite BSM's *own* definition of substantially completed sale.  *See* BSM Sales Verification Report at 10, P.R. 624, C.R. 508; NCI CEP Verification Report at 24, P.R. 625, C.R. 509.  The foregoing record

evidence shows BSM's pattern of conduct impeding Commerce's investigation. Commerce's finding that BSM failed to comply to the best of its ability is supported by substantial evidence and otherwise in accordance with law.

### C. Commerce Permissibly Assigned The Highest Transaction-Specific Dumping Margin Calculated for BSM To BSM's Unreported Sale

Commerce applied the highest non-aberrational, transaction-specific dumping margin calculated for BSM in the investigation to BSM's unreported sale. IDM at 55; 19 U.S.C. § 1677e(c)(1). This margin was calculated using BSM's data obtained during the investigation. *See* 19 U.S.C. § 1677e(c)(1). BSM does not contest that the margin assigned to BSM's sale was non-aberrational but rather argues that Commerce failed to explain why it was appropriate to select the highest non-aberrational transaction-specific rate. BSM relies on *BMW of N. Am. LLC v. United States*, which directs Commerce to consider the totality of the circumstances, particularly whether the rate is impermissibly punitive, when applying facts available with an adverse inference. 926 F.3d 1291 (Fed. Cir. 2019).

Here, Commerce considered the totality of circumstances. Commerce explained that it assigned a non-aberrational transaction-specific rate, which happened to be a rate of BSM's own, actual transaction. The application of this adverse inference cannot be punitive. *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1300 (Fed. Cir. 2021) (reasoning that "reliable and relevant" dumping margin cannot be punitive). And without the necessary information regarding BSM's unreported sale, the use of this rate was not only reasonable, but also within the realm of possibility for this sale. *See BMW of N. Am.*, 926 F.3d at 1300 ("The AFA rate is intended to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.").

**IV.     Commerce's Determination Regarding Date Of Sale Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce must convert foreign currencies to U.S. dollars based on a defined date of sale.  19 U.S.C. § 1677b-1.  To identify the date of sale in this context,[8] Commerce ordinarily uses the date of invoice, as recorded in the exporter's records as kept in the ordinary course of business.  *See* 19 C.F.R. § 351.401(i).  Commerce may use a date other than the invoice date when a different date better reflects the time when the exporter establishes material terms of sale.  *Id.*; *see also Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 33 C.I.T. 695 (2009).  Material terms of sale include price, quantity, delivery terms, and payment terms.  *See ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1376 (Ct. Int'l Trade 2018); *Sahaviriya Steel Indus. Pub. Co. v. United States*, 34 C.I.T. 709, 727 (2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011).  One example of when Commerce might rely on a date alternative to the invoice date is when there is large custom-made merchandise.  *See Preamble*, 62 Fed. Reg. at 27,349.  Another example is when there is a long-term contract.  *See Preamble*, 62 Fed. Reg. at 27,350; Section A Questionnaire, Glossary, at I-5 to I-6 ("Commerce may use a date other than the date of invoice (e.g., the date of contract in the case of a long-term contract)."), P.R. 197.  Commerce determines the date of sale on a case-by-case basis, considering an individual respondent's selling processes.  *See Preamble*, 62 Fed. Reg. 27,296 at 27,349.

Here, Commerce correctly used the contract date as the date of sale.  Commerce explained that BSM produces large customized merchandise, fabricated structural steel.  *See* IDM at 40; PDM at 13; BSM Scope Comments, at 3, P.R. 169.  The agency also considered the

---

[8] The date of sale here, which concerns only the conversion of foreign currencies to U.S. dollars, differs from the date of substantially completed sale, which determined the universe of reported U.S. sales.  *See* IDM at 40.

selling processes in two segments of BSM's business: the Buildings segment and the Components segment.  IDM at 40; BSM Section A Responses, at A-6, P.R. 253, C.R. 61.  For the Buildings segment, NCI — BSM's sole channel of trade — considered purchase orders as contracts.  PDM at 13; IDM at 40-41; BSM Sales Verification, at 4, P.R. 624, C.R. 508 ("{A}ll of BSM's U.S. sales are to its affiliate, NCI Group, Inc."); BSM Section A Responses, at A-20, P.R. 253, C.R. 61 ("{P}urchase orders are the principal sales agreements that *define* the Buildings Segment's terms of sale.") (emphasis added).  For the Components segment, NCI considered sales order acknowledgements as contracts.  PDM at 13; IDM at 40-41; BSM Section A Responses, at A-20 (noting that sales order acknowledgment is principle sales agreement), A-21 (describing changes to original agreement as "unusual"), P.R. 253, C.R. 61.  Further, when NCI enters purchase orders or sales order acknowledgements into NCI's data systems, BSM refers to that day as a "contract date."  BSM Section A Supplemental Responses, at 12, P.R. 356.  The contract date is also when NCI considers the order to be "firm" and initiates its work.  *Id*.  That NCI, BSM's sole channel of trade, considered the order "firm" supports the finding that material terms were firmly established on the contract date and that the parties committed themselves "to material aspects of the transaction which would allow production to begin."  IDM at 41.  Thus, Commerce's determination that material terms of sale were established on the contract date is supported by substantial evidence and otherwise in accordance with law.

BSM disagrees, relying on various price changes after contract dates.  BSM cites change orders included in NCI's verifications report, BSM Brief at 35, but the report undermines BSM's argument.  The report indicates that price changes after contract dates were infrequent, unless certain price changes were [                                        ] *See* NCI CEP

Verification Report, 8, 12-13, P.R. 625, C.R. 509.  And even after such [

                                                    ]:

> Prices *typically do not change* unless [                                    ].
> Larger customers tend to be [                                      ].  We
> observed that despite [                        ] announcements from NCI to its
> customers  during  the  POI,  [
>                                                                    ].

Company officials noted that they base frame prices on U.S. costs.

NCI CEP Verification Report, at 12, P.R. 625, C.R. 509 (emphasis added).  The report supports

the finding that price increases were not so common, despite a relatively small number of price

changes discussed in BSM's brief.  *Compare* BSM Brief at 23 ("BSM fabricates components for

thousands of projects each year."), *with id.* at 38-39 (discussing projects with price changes).

Further, Exhibit 4 of the report cited by BSM contains change orders, and the terms of those

change orders do not alter contracting parties' commitment to perform under the contract.  [




                                    ]

BSM next contends that relying on the contract date as the date of sale did not comport

with Commerce's past practice.  BSM Brief at 40-41.  That is not true, either.  Commerce cited

its Final Results in *Large Newspaper Printing Presses from Germany*.  IDM at 41.  Commerce

made similar findings in other proceedings involving large custom-made materials.  *See e.g.*,

*Large Newspaper Printing Presses and Components Thereof from Japan*, 66 Fed. Reg. 11,555

(Dep't of Commerce Feb. 26, 2001); Section A Questionnaire, Glossary, at I-5 to I-6, P.R. 197.

That the facts of those cases were not exactly the same as those here does not mean that

Commerce's reliance on its practice is not reasonable or not supported by substantial record evidence.

## V.     Commerce's Calculation Of BSM's Constructed Export Price Profit Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce calculates constructed export price profit in accordance with its practice articulated in Policy Bulletin 97.1.  *See* Policy Bulletin 97.1, Calculation of Profit for Constructed Export Price Transactions (Dep't of Commerce September 4, 1997).  The agency typically includes profit earned by a respondent on its affiliated party sales in its constructed export profit price calculation, unless the sales were made at non-arm's-length prices.  *See id*. BSM contends that Commerce erred by adding separate profit rates for BSM and its U.S. affiliate and by excluding from the calculation certain data from BSM's facility in Costa Rica.

### A.    Commerce Permissibly Calculated Constructed Export Price Profit Rate

In its preliminary determination, Commerce erred by double-counting BSM's profit and expenses to calculate constructed export price profit, and the agency corrected that error in its final determination by removing the overlapping amounts and then calculating separate profit ratios for BSM and NCI before adding the two ratios.  IDM at 36.  Commerce's calculation is consistent with the agency's practice.  BSM contends that Commerce should have calculated constructed export price profit rate by relying on NCI's consolidated financial statements, but the agency had the discretion, not an obligation, to use those documents.

Commerce's calculation of constructed export price profit, by adding the two separate profit rates derived from BSM's and NCI's data, is consistent with Commerce's practice.  *See* IDM at 36; *Certain Frozen Warmwater Shrimp From Thailand*, 73 Fed. Reg. 50,933 (Aug. 29, 2008) (final determination), and accompanying Issues and Decision Memorandum, cmt. 8; *Prestressed Concrete Steel Rail Tie Wire From Mexico*, 79 Fed. Reg. 25,571 (May 5, 2014)

(final determination), and accompanying Issues and Decision Memorandum, cmt. 1.  Moreover, the method used by Commerce here avoided double-counting, the error that the agency was attempting to address.  *See id.*

BSM contends that, based on Commerce's past practice, Commerce *could* rely on NCI's consolidated financial data to calculate constructed export price profit.[9]  In support, BSM cites Commerce's Policy Bulletin 97/1.  BSM Brief at 42-43.  But Policy Bulletin 97/1 provides that using a consolidated financial statement is an example of a method to calculate constructed export price profit, and the policy does not require Commerce to use consolidated financial statements whenever such documents are available.  BSM also cites two memoranda from Commerce's other investigations, but those sources, too, indicate only that Commerce may use consolidated financial statements when the record contains such documents.  *See Solid Fertilizer Grade Ammonium Nitrate from the Russian Federation*, 79 Fed. Reg. 29,417 (Dep't of Commerce May 22, 2014) (preliminary determination), and accompanying Preliminary Decision Memorandum; *Manganese Metal from the People's Republic of China*, 66 Fed. Reg. 15,076 (Dep't of Commerce Mar. 15, 2001) (final determination), and accompanying Issues and Decision Memorandum, cmt. 24.  Thus, none of the authorities cited by BSM provides that Commerce must use consolidated financial statements to calculate constructed export price profit even when such documents are available.  In sum, BSM has not identified what law or standard, if any, has been violated.

---

[9] Other than arguing what Commerce could have done, BSM does not explain how Commerce's calculation here was incorrect or inaccurate.

**B.    Commerce Permissibly Excluded The Data From NCI's Costa Rica Facility**

Commerce calculated constructed export price profit pursuant to 19 U.S.C.

§ 1677a(f)(2)(C)(iii), which provides that Commerce may incorporate into its calculations all

expenses incurred by a producer with respect to sales of the narrowest category of merchandise

that includes the product at issue.  IDM at 37.  During the investigation, BSM reported certain

data from a facility in Costa Rica as indirect selling expenses.  *See* BSM Section D Supplemental

Responses, Exhibit SSD-1 (Aug. 14, 2019), P.R. 535, C.R. 364.  Commerce removed that data

from its calculation of constructed export price profit because the facility had incurred losses.

*See* BSM Final Analysis Memorandum, Attachment III (Dep't of Commerce Jan. 30, 2020),

P.R. 670, C.R. 535.  The exclusion of the data was consistent with Commerce's practice to

disregard financial data from entities that generate no profit.  *See Prestressed Concrete Steel Rail*

*Tie Wire From Mexico*, 79 Fed. Reg. 25,751 (Dep't of Commerce May 5, 2014) (final

determination); *Certain Orange Juice From Brazil*, 75 Fed. Reg. 18,794, 18,796-97 (Dep't of

Commerce April 13, 2010) (preliminary determination).  Put simply, Commerce does not use

"negative" profit in its calculations for constructed export price profit.  *See id.* at 18,797.

BSM contends that Commerce erred by excluding the data from the facility in

Costa Rica.  BSM argues that the agency unreasonably incorporated the same data into BSM's

indirect selling expenses but not into BSM's constructed export price profit.  BSM Brief at 45-

47.  Although indirect selling expenses should generally be accounted for, that does not mean

that all financial data from a loss-incurring company should be included.  BSM identifies no

legal authority violated by Commerce's practice.  BSM challenges no factual finding as to

Commerce's exclusion of the data.  No other issue remains.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny BSM's Rule 56.2 motion

for judgment on the agency record and sustain the challenged determination in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

Of Counsel:                                    /s/ In. K. Cho
SPENCER NEFF                          IN K. CHO
Staff Attorney                              Trial Attorney
Office of Chief Counsel for         United States Department of Justice
Trade Enforcement & Compliance   Civil Division
United States Department of Commerce   Commercial Litigation Branch
                                                    P.O. Box 480
                                                    Ben Franklin Station
                                                    Washington, DC 20044
                                                    Telephone: (202) 616-0463
                                                    Facsimile:  (202) 305-7644
                                                    Email:      In.K.Cho@usdoj.gov

July 30, 2021                              *Counsel for Defendant*

**CERTIFICATE OF COMPLIANCE**

I certify that the accompanying memorandum, Defendant's Opposition to Plaintiff's Motion for Judgment on the Agency Record, complies with the word-count limitation of the Standard Chambers Procedures of this Court. The memorandum contains 9,825 words according to the word-count function of the Microsoft Word software used to prepare the memorandum.

/s/ In. K. Cho
IN K. CHO
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:     (202) 616-0463
Facsimile:     (202) 305-7644
Email: In.K.Cho@usdoj.gov

July 30, 2021                                              *Counsel for Defendant*