**BEFORE: THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| BUILDING SYSTEMS DE MEXICO, S.A. DE C.V., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **Consol. Court No. 20-00069** |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| FULL MEMBER SUBGROUP OF THE AMERICAN ) | |
| INSTITUTE OF STEEL CONSTRUCTION, LLC, and ) | |
| COREY S.A. DE C.V., ) | |
| ) | |
| Defendant-Intervenors. ) | |

## PLAINTIFF'S NON-CONFIDENTIAL REPLY IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Matthew R. Nicely
Daniel M. Witkowski
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4046
Fax: (202) 887-4288
Email: mnicely@akingump.com

*On Behalf of Building Systems de Mexico,*
*S.A. de C.V.*

Dated:  October 1, 2021

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ...................................................................................................................1

    I.     **Defendants Fail to Show that the CV Profit Rate Applied to BSM Is Supported by Substantial Evidence and in Accordance with Law.** ...............1

        A.    **Commerce Arbitrarily Selected Sales to Include in the CV Profit Calculation.** ....................................................................................2

        B.    **Commerce Used a Sale that Was Outside the Ordinary Course of Trade in Calculating the CV Profit Rate.** ....................................4

        C.    **Assigning Corey's CV Profit Rate to BSM Was Unreasonable Because Corey Received Countervailable Subsidies.** .....................6

        D.    **The CV Profit Rate Based on Corey's Data Is Otherwise Unreasonable as Applied to BSM.** ....................................................7

    II.    **Defendants Fail to Show that Commerce's Application of AFA to a Sale with Cancelled Material Is Supported by Substantial Evidence and in Accordance with Law.** .....................................................................9

        A.    **There Was No Basis to Resort to Facts Available.** ....................9

        B.    **There Was No Basis to Apply an Adverse Inference.** ..............12

        C.    **Commerce Failed to Justify the Partial AFA Rate.** .................16

    III.    **Defendants Fail to Show that Commerce's Determination Regarding the Date of Sale Is Supported by Substantial Evidence and in Accordance with Law.** ..................................................................18

    IV.    **Defendants Fail to Show that Commerce's Calculation of CEP Profit Is Supported by Substantial Evidence and in Accordance with Law.** ...........21

    **CONCLUSION** ..................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arcelormittal USA LLC v. United States*,
302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) ..........................................................19

*BMW of North America LLC v. United States*,
926 F.3d 1291 (Fed. Cir. 2019)....................................................................16, 17

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)..........................................................................................23

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021)........................................................................17

*Glycine & More, Inc. v. United States*,
880 F.3d 1335 (Fed. Cir. 2018).........................................................................18

*Guizhou Tyre Co. v. United States*,
399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) ....................................................14

*Husteel Co. v. United States*,
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ........................................................8

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019).......................................................................................18

*Mid Continent Steel & Wire, Inc. v. United States*,
941 F.3d 530 (Fed. Cir. 2019)...................................................................6, 7, 20

*NSK Ltd. v. United States*,
510 F.3d 1375 (Fed. Cir. 2007).............................................................................5

*Soc Trang Seafood Joint Stock Co. v. United States*,
321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ....................................................23

*Thai I-Mei Frozen Foods Co., Ltd. v. United States*,
572 F. Supp. 2d 1353 (Ct. Int'l Trade 2008) ......................................................8

*Torrington Co. v. United States*,
146 F. Supp. 2d 845 (Ct. Int'l Trade 2001) .........................................................4

*Venus Wire Indus. Pvt. Ltd. v. United States*,
424 F. Supp. 3d 1369 (Ct. Int'l Trade 2019) .............................................20, 23

**Statutes**

19 U.S.C. § 1677(5A)(B) ................................................................................6

19 U.S.C. § 1677b(e)(2)(A) ............................................................................7

19 U.S.C. § 1677b(e)(2)(B)(ii) .......................................................................7

19 U.S.C. § 1677b(e)(2)(B)(iii) ......................................................................7

**Regulations**

19 C.F.R. § 351.401(i) ..................................................................................18

**Agency Determinations and Notices**

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (May 19, 1997) ...................................................8, 18, 19, 20

*Citric Acid and Certain Citrate Salts from Canada: Final Results of Antidumping
    Duty Administrative Review; 2012-2013,*
    79 Fed. Reg. 37,286 (July 1, 2014)...................................................................22

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled
    or Unassembled, From Germany: Final Results of Antidumping Duty
    Administrative Review,*
    66 Fed. Reg. 11,557 (Feb. 26, 2001) .................................................................20

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled
    or Unassembled, From Japan: Final Results Antidumping Duty
    Administrative Review,*
    66 Fed. Reg. 11,555 (Feb. 26, 2001) .................................................................20

## INTRODUCTION

Plaintiff Building Systems de Mexico, S.A. de C.V. ("BSM") hereby replies to the response briefs filed by Defendant United States ("the Government") and Defendant-Intervenor Full Member Subgroup of the American Institute of Steel Construction, LLC ("Petitioner") (together, "Defendants").  *See* Def.'s Opp'n to Pl.'s Mot. for J. upon Agency R., ECF No. 73 (hereinafter "Government Response"); Resp. Br. of Def.-Intvnr. Full Member Subgroup of Am. Inst. of Steel Constr., LLC, ECF No. 69 ("Petitioner Response").  BSM demonstrated in its brief that the Department of Commerce ("Commerce") committed several errors in the *Final Determination* of the antidumping investigation covering fabricated structural steel ("FSS") from Mexico.  *See* Pl.'s Conf. Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 59 ( "BSM Brief").  In their response briefs, Defendants make unpersuasive arguments in support of the final margin calculated for BSM.  The Court should reject those arguments and hold Commerce's *Final Determination* to be unsupported by substantial evidence and otherwise not in accordance with law.

## ARGUMENT

I.      **Defendants Fail to Show that the CV Profit Rate Applied to BSM Is Supported by Substantial Evidence and in Accordance with Law.**

BSM explained in its brief that the constructed value ("CV") profit rate that was applied to BSM was unlawful.  BSM Brief 9-25.  Defendants fail to show that Commerce's determination with respect to the CV profit rate, borrowed from Corey S.A. de C.V. ("Corey) and applied to BSM, is supported by substantial evidence and in accordance with law.

## A.  Commerce Arbitrarily Selected Sales to Include in the CV Profit Calculation.

BSM's CV profit rate was based on an arbitrary decision to include Corey's [

] project in the calculation, while excluding other projects contracted

prior to the POI.  *See* BSM Brief 10-14.

The Government tries to rationalize the [        ] project number for the [        ] project,

claiming that Corey's project numbering system [                      ].  Government

Response 15.  But Commerce itself explained that the numbering system is based on when bids

are *accepted*.  Corey BPI Memorandum at 1-2 (P.R.671/C.R.540).  Thus, the [        ] number

indicates that the RMA bid was accepted in [        ], predating other projects that Commerce

treated as outside the POI.  Defendants assert that the bid acceptance date is not necessarily the

purchase order or contract date.  Government Response 15; Petitioner Response 11.  But

Defendants ignore Corey's explanation that a bid is "'accepted' when one of the following

occurs: (a) a contract is signed, (b) the customer signs a final budget proposal issued by Corey or

(c) the customer issues a purchase order to Corey for the project in question."  Corey Section A

Response at A-26 (C.R.81/P.R.272).  All of these actions reflect the establishment of a contract.

Thus, if the bid for this project was accepted in [        ], which the project number demonstrates,

then there was a contract for that project in [        ] as well.  Defendants also ignore the fact that

Corey reported [        ] as the [          ] for this project, which is consistent with a project

contract year of [        ].  Corey Cost Verification Exhibits, Exhibit CVE-12 (C.R.503).

Expenses were even booked to this project in [        ], but the Government argues that the

expenses were booked to the wrong project.  Government Response 15.  Corey indicated that

project-specific codes are not created in its accounting system until the project has been

2

accepted.  Corey Section A Response at A-34, A-36, A-37 (C.R.81/P.R.272).  Thus, for expenses

to be booked to this project in [         ], whether mistakenly or not, there must have already been a

contract for that project.

Defendants note that the [                         ] for this project that Corey provided at

verification was [            ], but that purchase order was described as a [

    ], which is consistent with all of the other evidence on the record indicating that the original

contract was in [        ].  *See* Corey BPI Memorandum at Note 2 (P.R.671/C.R.540).  Petitioner

says that Corey [

                                        ], Corey Section A Response at A-25

(C.R.81/P.R.272), which Petitioner takes to mean that "the documentation establishing the terms

of an agreement could be [                                        ]."  Petitioner

Response 12-13.  Corey, however, explained that "{c}hanges to the initial agreement for U.S.

sales or home market sales are formalized using a Change Order."  Corey Section A Response at

A-28.  This explanation indicates there was an "initial agreement" [

                                        ], then Commerce's date-of-sale determination for BSM (Section

III, *infra*) *and* its application of AFA to BSM's project with a change order cancelling material in

2019 (Section II, *infra*) must be remanded, because those determinations do not treat change

order date as contract date for BSM's projects.

### B.  Commerce Used a Sale that Was Outside the Ordinary Course of Trade in Calculating the CV Profit Rate.

The CV profit rate calculation also included a Corey project that was outside the ordinary course of trade ("OCT").  *See* BSM Brief 14-19.  Defendants argue the profit rate for this project was not abnormally high by citing the profit rates for BSM's U.S. and home market sales.  Government Response 17; Petitioner Response 17.  Petitioner further cites Ternium's profit rate of 20.25%.  Petitioner Response 17.  BSM has already explained why Commerce's comparison to BSM's U.S. profit rates is arbitrary and inconsistent with the statute, and how the Ternium profit rate is barely [      ] the profit rate for Corey's project.  BSM Brief 18-19.  Defendants' argument based on BSM's home market profit rates focuses on a single project with an extremely small quantity and value that was started in 2017, which would be outside Commerce's reporting parameters; the next highest profit rate for any BSM home market sale was [      ].  BSM First Supplemental Section D Response (Pt. 1), Exhibit SD-25 (C.R.271).

Defendants also cite several cases upholding Commerce determinations declining to treat sales with unusually high or low profit rates as outside the OCT because the claimant did not show the sales were otherwise unusual.  In many of these cases, however, the party seeking to have the sales treated as outside the OCT was the respondent that reported the sales, who had the ability to further develop the factual record with respect to the sales.  *See, e.g.*, *Torrington Co. v. United States*, 146 F. Supp. 2d 845, 859-63 (Ct. Int'l Trade 2001).  The court in *Koenig & Bauer-Albert AG v. United States* explained that although Commerce has discretion to decide under what circumstances highly profitable sales are outside the OCT, "Commerce may not impose this requirement arbitrarily, . . . nor may Commerce impose impossible burdens of proof on

4

claimants."  15 F. Supp. 2d 834, 850 n.8 (Ct. Int'l Trade 1998), *rev'd on other grounds*, 259 F.3d

1341 (Fed. Cir. 2001).  Here, BSM had no control over Corey's reporting of the information

regarding this project, and Commerce solicited minimal information regarding Corey's home

market projects.  BSM could not further develop the record with respect to this sale.

Furthermore, in many of the cases cited, Commerce conducted a detailed comparison of

the sales at issue with other of the respondent's sales, which demonstrated that the sales were

made in the normal course of trade.  *See, e.g.*, *NSK Ltd. v. United States*, 510 F.3d 1375, 1384

(Fed. Cir. 2007) (explaining why high profit sales were part of the company's normal business

and why high profits were expected given nature of sales at issue).  Commerce provided no

detailed explanation for why the [     ] project was otherwise typical despite its abnormally

high profit.

BSM also observed that the compressed time schedule for the [     ] project was in fact

unusual for a conventional FSS producer like Corey, so the abnormally high profit was not the

only evidence of this sale being outside the OCT.  BSM Brief 17.  The Government notes that

BSM often completed projects within one year, Government Response 18, but BSM is not a

conventional FSS producer—it produces components for pre-engineered metal building systems

("PEMBS").   BSM Scope Comments (P.R.169).  Whereas BSM reported thousands of sales,

Corey—a conventional FSS producer—reported [                    ] that

(allegedly) fell within Commerce's reporting parameters.  BSM Brief 17.  Petitioner claims that

it would be absurd to treat the [     ] project as outside the OCT because it met Commerce's

requirement for reportable sales, but Petitioner ignores that exclusion is appropriate because of a

combination of the project's **[        ]** start date *and* its aberrant profit rate.  Petitioner Response

18.

### C. Assigning Corey's CV Profit Rate to BSM Was Unreasonable Because Corey Received Countervailable Subsidies.

The CV profit rate was also distorted by countervailable subsidies.  *See* BSM Brief 19-

21.  Defendants claim that Commerce found no evidence of such distortion.  Government

Response 19; Petitioner Response 19-21.  But that finding was based entirely on Commerce's

observation that Corey received an export subsidy.  Issues and Decision Memorandum ("IDM")

at 49-50 (P.R.663).  This means the subsidy was "contingent upon export performance."  19

U.S.C. § 1677(5A)(B).  That the subsidy is contingent on export performance does not mean it

affects only exports.  The reasoning in the Government's brief actually indicates that the subsidy

must impact Corey's home market sales.  The Government explains that "{i}n the countervailing

duty investigation, *Commerce presumes that the subsidy is being used to produce the*

*merchandise for domestic sales* unless the producer's government has a system to ensure

otherwise."  Government Response 19 (emphasis added).  Commerce determined that the

presumption was not rebutted.  *See* BSM Brief 20-21.  Thus, Commerce must have concluded

that the subsidy was being used to produce merchandise for the home market.

Defendants try to distinguish *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d

530, 544 (Fed. Cir. 2019), which noted subsidies may distort the profit rate used in CV

calculations, by claiming that Commerce relied on Corey's specific reporting of home market

sales instead of a financial statement.  Government Response 19; Petitioner Response 20.  But

the subsidy at issue allowed Corey to obtain inputs at a lower cost by exempting the inputs from

duties.  Cheaper inputs would affect the profit on Corey's individual projects, because the material costs are less than they would have been if Corey had paid the duty.  Thus, the concern expressed in *Mid Continent* that the profit rate may be inflated because of countervailable subsidies is still present.  941 F.3d at 544.

Finally, the Government argues that Commerce had limited sources for choosing a profit rate.  Government Response 19.  This is not true.  Commerce had BSM's home market data and the financial statements of several other Mexican producers of comparable merchandise.

### D.  The CV Profit Rate Based on Corey's Data Is Otherwise Unreasonable as Applied to BSM.

Finally, the CV profit rate is otherwise unreasonable as applied to BSM.  *See* BSM Brief 21-25.  Defendants argue that Commerce's determination is supported by substantial evidence because it reflects the sales of FSS in the ordinary course of trade by a Mexican producer—in other words, because it complies with 19 U.S.C. § 1677b(e)(2)(B)(ii).  Government Response 12; Petitioner Response 26.  But that presumes a hierarchy among the calculation methodologies that does not exist.  *Mid Continent*, 941 F.3d at 535.

In response to BSM's argument that Commerce could have used BSM's own data, Defendants argue that *Mid Continent* upheld Commerce's decision to not rely on a respondent's home market sales to calculate CV profit because their home market was not viable.  Government Response 12; Petitioner Response 25.  *Mid Continent* held only that Commerce was not *required* to rely on the respondent's data under 19 U.S.C. § 1677b(e)(2)(A), the preferred method; *Mid Continent* did not discuss the possibility of using those sales under § 1677b(e)(2)(B)(iii).  The justification for not relying on data from an unviable market is that the volume of sales is insufficient for purposes of a proper and reliable comparison to the U.S.

7

sales.  *See Mid Continent*, 941 F.3d at 538-40.  Commerce has also recognized that "the sales

used as the basis for CV profit should not lead to irrational or unrepresentative results."

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,360 (May 19, 1997)

("*Preamble*").  If the concern is ensuring reliable and representative comparisons, it was arbitrary

for Commerce to reject the profit rate on BSM's home market sales but then rely on [

] by a conventional FSS producer to establish the profit rate used in the normal value

calculations for comparisons with *thousands* of U.S. sales of PEMBS components.  Petitioner

noted that "BSM's U.S. profit levels demonstrate the extraordinary variation in profit levels

common to this industry."  Petitioner Response 17 (internal quotation marks omitted).

Commerce's response to that "extraordinary variation in profit levels" was to base the CV profit

rate on [                    ].  Commerce's decision was patently unreasonable.

    Moreover, the profit rate for [               ] that Commerce used for the CV profit

calculation was abnormally high.  Petitioner argues that the CV profit rate was calculated using

sales that were in the OCT.  Petitioner Response 23-24.  If Defendants are to be believed, sales

with abnormally high profit rates may nonetheless still be within the OCT absent additional

factors showing they are extraordinary.  Thus, the fact that each individual sale is within the OCT

does not mean that any one sale, by itself, would accurately "approximate the home market profit

experience of the respondents," which is the goal of the CV profit calculation.  *Husteel Co. v.

United States*, 98 F. Supp. 3d 1315, 1349 (Ct. Int'l Trade 2015).[1]  Commerce's use of a [

---

[1] Petitioner argues that *Husteel* and *Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 572 F.
Supp. 2d 1353 (Ct. Int'l Trade 2008), which describe the purpose of CV profit, apply only to
cases involving the third alternative ("any other reasonable method") for calculating CV profit.
The statements in these cases regarding the general goal when calculating CV profit are not
limited to calculations using the third alternative.

**]** for BSM's CV profit falls woefully short of that statutory goal.

## II. Defendants Fail to Show that Commerce's Application of AFA to a Sale with Cancelled Material Is Supported by Substantial Evidence and in Accordance with Law.

BSM demonstrated in its brief that Commerce's application of adverse facts available ("AFA") to project **[          ]** is unsupported by substantial evidence and unlawful.  *See* BSM Brief 25-35.  Defendants' response briefs do not show otherwise.

### A. There Was No Basis to Resort to Facts Available.

BSM explained that there was no basis to resort to facts available for project **[          ]**, because this project was not completed until well after the end of the POI.  BSM Brief 26-29.  In response, Defendants rely heavily on statements by BSM in its April 11, 2019 Response to Request for Information (C.R.55/P.R.212) and June 4, 2019 Section C Questionnaire Response (C.R.164/P.R.343) that it considered a Buildings Segment project to be substantially completed on the date of the "final shipment of the *last outstanding phase*" of the project (emphasis added).  *See* Government Response 21; Petitioner Response 27.  These statements do not support a finding that the project should have been reported.

At the end of 2018—and well into 2019—there remained two "outstanding phases" for project **[          ]**.  Government Response 22.  BSM was asked to report all projects that were completed in 2018, Sections C-E Questionnaire at 3 (P.R.213), and the evidence shows that this project had outstanding phases that NCI expected to complete, which were not resolved until July 2019.  BSM Brief 28-29.  Because the final phases of the project remained outstanding as of the end of the POI, there was no requirement to report this project.

The context of the statements is also important.  BSM was asked to provide a database of all sales that were "completed" (not merely "substantially completed") during 2018.  Request for Information at 3 (P.R.194); Sections C-E Questionnaire at 3 (P.R.213).  In April and June 2019, BSM had no reason to anticipate that a single project (out of thousands) would have outstanding phases cancelled in July 2019, that such a sale would have a contract date in 2018, that all other phases of that project would have been completed in 2018, and that Commerce would consider such a sale to have been "completed" in 2018.  BSM's statements do not even address the possibility of the material for "the last outstanding phase" to be cancelled instead of shipped, which is what happened for project [               ], because BSM was reporting and describing sales that had *already* been completed in order to respond to Commerce's request in the Section C Questionnaire for a database of completed projects.  The issue of how to treat sales that were still not yet completed was irrelevant to the exercise.

Moreover, BSM's statement regarding the date of "substantial completion" in the Section C Response was in response to Field 13.4.  The instructions for Fields 9 through 15 requested: "{r}eport the information requested concerning the terms of delivery and payment and the dates of the specific events *of each sale*."  Sections C-E Questionnaire at 11 (P.R.213) (emphasis added).  The instruction with respect to Field 13.4, like the instructions for all of Fields 9 through 15, must be understood as requiring BSM to report a specific date (here, date of substantial completion) only for the sales included in the requested U.S. sales database.  *See id.* at 3. Logically, BSM could not report information in a field for a transaction that was properly excluded from the sales database.  Thus, BSM and NCI had no reason to consider the date of "substantial completion" for project [          ], because project [          ] was incomplete as

of the end of 2018 and was properly excluded from relevant sales universe for purposes of the requested database.

To the extent that field is relevant for defining the universe of sales, Commerce also included in the questionnaire a specific description for what "substantial completion" meant—a description that was inconsistent with the notion that BSM should have reported project

[              ].  Commerce defined the date of substantial completion as "the date on which all of the terms of the sales agreements related to this transaction were substantially completed."  *Id.* at 13.  The last sales agreement setting the final terms for this project was not even issued until *July 22, 2019*, well after the POI.  *See* CEP Verification Exhibit CEP-VE-15 at 86-88 (C.R.445-447).

The Government also argues that BSM has not claimed that "the sale should not be recognized at all" and that "it would be odd for a business to account for a sale when a customer *cancels* the remaining final two phases of a project—not when the business actually earns revenue by contract performance."  Government Response 22.  These arguments are irrelevant. NCI does not use the concept of "substantial completion" for a project in the ordinary course of business.  BSM First Supplemental Section C Response Pt. 2 at 9-10 (P.R.503/C.R.336).  NCI treats each phase of a project as separate units of accounting and recognizes revenue on a phase basis.  NCI CEP Verification Report at 5 (P.R. 625/C.R. 509).  Thus, NCI may "account for" a single project multiple times, over multiple years, because projects sometimes involve numerous phases over two or more calendar years.  The issue of when the "project" is considered substantially completed, which was the subject of Commerce's question, is completely separate from when NCI "accounts for a sale," which in the normal course of business is done on a phase basis.

Furthermore, the fact that particular projects might never be examined by Commerce was an inherent byproduct of Commerce's reporting parameters. Exhibit 1 to BSM's April 11, 2019 Response to Request for Information (P.R.212/C.R.55) contained hundreds of projects that were completed in 2018 but omitted from the Section C database, because they were not also contracted for in 2018. That same list of projects also contained numerous projects that were contracted for but not completed in 2018, and were therefore also omitted from the Section C database. *Id.* By Commerce's own design, only projects contracted *and* completed within a single calendar year were reported in the U.S. sales database, resulting in hundreds (if not thousands) of projects that were not required to be reported in the database. The project at issue here is no different. BSM was not required to be clairvoyant and report this project as completed in 2018 just in case Commerce might one day change its mind and want to examine it.

### B.    There Was No Basis to Apply an Adverse Inference.

Even if Commerce reasonably could conclude that project **[          ]** was completed in 2018, its omission from BSM's sales databases did not stem from a failure of BSM and NCI to cooperate to the best of their abilities. Thus, there was no basis to apply an adverse inference in selecting from among the facts available. *See* BSM Brief 29-32. Defendants' arguments for applying AFA are unavailing.

Defendants note that Commerce requested data for all sales completed during the POI and again cite BSM's statements regarding "substantial completion" as a basis for claiming that BSM understood that project **[          ]** should have been reported. *See* Government Response 23-24; Petitioner Response 30. As explained above, these statements do not even justify resorting to facts available. They certainly do not reflect a clear understanding by BSM and NCI

12

that they would need to revisit sales that were accurately treated as not completed during the POI when BSM and NCI established the sales universe for purposes of the U.S. sales database requested in the Section C Questionnaire.

The Government also claims that BSM and NCI could have sought clarification regarding this project or the reporting requirements. Government Response 23-24. Given that this project was accurately identified as still incomplete when the U.S. sales database was compiled and submitted to Commerce in June 2019, there was no obvious reason for BSM and NCI to further consider this project, or any other sales that were still incomplete at that time, when the relevant sales universe was defined as projects completed by the end of 2018. BSM and NCI were not aware that there was an issue that might require clarification until Commerce applied AFA.

The Government asserts that BSM tracks cancelled sales, insinuating that BSM should have known the project had been deemed complete. Government Response 23, 25. The pages of the verification reports cited by the Government discuss projects that are cancelled entirely and invoices cancelled within BSM's systems, which are not relevant to the tracking of cancelled phases at NCI.[2] Regardless, even though NCI may record the cancellation of material for a particular *phase*, the concept of "substantial completion" of a *project* is not something NCI uses in the ordinary course of business. BSM First Supplemental Section C Response Pt. 2 at 9 (P.R.503/C.R.336). The Government cites no evidence that cancelling material for a particular phase somehow requires a retroactive adjustment to NCI's books and records with respect to the project as a whole. The ability to record cancelled material does not show that NCI knew or

---

[2] BSM and NCI's record keeping systems are separate, as Commerce knows from verification. *See* BSM Sales Verification Report at 4 (P.R.624/C.R.508).

should have known that it needed to continuously monitor every single project that was

incomplete as of June 2019 to ensure that it did not become retroactively "completed" in 2018

because of some event later in 2019.

Defendants also observe that BSM filed several supplemental questionnaire responses

after the material for the last outstanding phases of project [        ] was cancelled.

Government Response 24-25; Petitioner Response 30-31.  While they note that certain questions

generally related to NCI's U.S. sales reporting, they do not identify any questions that "clearly

and adequately," *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1352 (Ct. Int'l Trade

2019), required NCI to revisit the sales accurately identified as incomplete at the time the U.S.

sales database population was first established.  And while NCI and BSM updated certain data to

account for changes or corrections to things like freight expenses, invoice dates, and taxes,

Defendants do not identify any instances where NCI actually added more projects to the

database.  The Government, for example, notes that Commerce asked BSM to "confirm that

BSM reported . . . the correct date of substantial completion in the APPROVDTU field for all

sales . . . in the U.S. sales database.  Please revise and resubmit the U.S. sales database, if

necessary, and provide an explanation."  Government Response 24-25 (quoting Section C

Supplemental Questionnaire at 4 (P.R.550)).  That question asks only for NCI to confirm the

dates reported for the transactions "in the U.S. sales database."  The project at issue had been

properly excluded from the U.S. sales database when it was originally submitted, and NCI had

no reason to check the APPROVDTU field for a transaction that had been properly excluded

from the database.  Petitioner, meanwhile, highlights that NCI reported in response that it

updated the date of substantial completion for one sale because of a typo entered in the

Components' Segment Oracle system, which incorrectly listed a **[          ]** date, instead of the

correct **[          ]** date.  Petitioner Response 31 (citing BSM August 21, 2019 Section C

Supplemental Questionnaire Response at 4 & n.2 (P.R.522/C.R.384)).  But NCI was correcting

an error in a revised U.S. sales database, and this project (**[               ]**) was included in the

original U.S. sales database based on its correct 2018 completion date.  *See* BSM U.S. Sales

Database (June 4, 2019) (C.R.168).  This response merely reflects NCI's compliance with

Commerce's specific request to confirm and make any necessary corrections to the

APPROVDTU field for the sales that were in the database.

Finally, the Government argues that BSM and NCI had a "pattern of conduct impeding

Commerce's investigation."  Government Response 26.  This astonishing accusation borders on

bad faith, as there is zero evidence of any such pattern.  While it is true that BSM argued in

detailed scope comments that its components for PEMBS should be excluded from the

investigation, *see* BSM Scope Comments (P.R.169), counsel has never heard of Commerce

viewing attempts to obtain a scope exclusion as grounds for concluding that a respondent is

impeding the agency's investigation.  This is a disturbing position for the Government take.  In

any event, BSM nevertheless *voluntarily* filed a quantity and value questionnaire so that it could

potentially *participate* in the investigation as a mandatory respondent.  *See* Quantity and Value

Questionnaire (Mar. 13, 2019) (P.R.82); BSM Quantity and Value Questionnaire Response

(P.R.130/C.R.38).  BSM in turn cooperated with the agency's investigation at every turn.

The Government also points to certain sales transactions that BSM failed to report.

Although BSM mistakenly omitted a handful of sales (compared to the thousands that were

reported), the mistake stemmed from using the invoice dates for these projects, which were

outside the POI, instead of the shipment dates that were within the POI.  IDM at Comment 16

(P.R.663).  While an innocent mistake, BSM acknowledged these handful of other sales should

have been reported.  *See id.*  The mistaken treatment of these handful of sales, identified at the

outset of verification, do not demonstrate a "pattern of conduct to impede the investigation."

Indeed, Commerce specifically stated that other than the handful of unreported sales, "BSM

cooperated to the best of its ability in this investigation, from the questionnaire response stage

through Commerce's verifications."  *Id.* at 18.  The Government's attempt to justify the use of

AFA for project **[          ]** based on a supposed "pattern" of conduct by BSM, despite this

statement in the IDM, impugns the Government's credibility with respect to its overall argument.

The omission of project **[          ]** was the result of understandable logic employed by

NCI in responding to Commerce's numerous requests that if a project was not complete when

the U.S. sales database was submitted in June 2019, the project was not relevant to Commerce's

inquiry regarding projects completed in 2018.  To the extent that there was any reporting

deficiency, it was the result of inadvertence or a reasonable misunderstanding that does not

provide substantial evidence for a finding that NCI and BSM failed to cooperate to the best of

their abilities.  *See* BSM Brief 30.

### C.   Commerce Failed to Justify the Partial AFA Rate.

Commerce also did not justify the partial AFA rate chosen for project **[          ]**.  BSM

Brief 32-35.  The essence of Defendants' arguments is that because Commerce recited a basis for

applying AFA somewhere in the IDM, Commerce was not required to further justify or explain

the selection of a non-aberrational AFA rate, no matter how high that rate might be.  *See*

Government Response 26; Petitioner Response 32-33.  This argument is contrary to *BMW of*

*North America LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019).  There, the Federal Circuit

remanded with respect to the selected AFA rate, even though the rate was non-aberrational.  *Id.* at

1297, 1302.  If an AFA rate is lawful and supported by substantial evidence merely because

Commerce articulated a basis to apply AFA and the rate is non-aberrational, there would not (and

could not) have been any basis for the Federal Circuit to remand in *BMW*.

Defendants cite *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021),

but *Deacero* does not support their position.  Indeed, *Deacero* embraced *BMW*'s "totality of the

circumstances" test and underscored that "Commerce's AFA determinations must be reasonable

on the record" when taking account of those circumstances.  996 F.3d at 1300-01.  The court

confirmed that the seriousness of the respondent's actions justified the AFA rate.  In particular,

the respondent "'mischaracterized,' 'misrepresented,' and 'withheld critical information from

Commerce . . . {and} failed to produce any records to support or clarify representations when

given the opportunity to do so," which supported Commerce's decision "that the highest Petition

rate was appropriate."  *Id.* at 1301 (cleaned up).

Here, BSM and NCI allegedly failed to consider retroactively the reporting requirements

for a previously omitted sale with extremely unusual facts (actually incomplete as of June 2019,

but retroactively deemed complete as of December 2018).  This is a far cry from

mischaracterizing, misrepresenting, or withholding critical information.  Given the oddities of

this project and the fact it was properly excluded from the U.S. sales database when it was

initially submitted, Commerce was required to do more to justify the AFA rate besides explaining

that it was non-aberrational, just as Commerce was required to provide more justification in light

of the procedural "irregularities" bearing on the respondent's level of culpability in *BMW*.  926

F.3d at 1301-02.

III.    **Defendants Fail to Show that Commerce's Determination Regarding the Date of Sale Is Supported by Substantial Evidence and in Accordance with Law.**

Commerce erred in using the purchase order date or sales order acknowledgement date as

the date of sale for purposes of selecting the applicable exchange rate.  *See* BSM Brief 35-42.  In

support of Commerce's selected date of sale, Defendants argue that BSM produces large

customized merchandise, that NCI considers purchase orders and sales order acknowledgments

to be "contracts," and that these contracts are considered sufficiently firm for work to commence.

Government Response 27-28; Petitioner Response 35.  Defendants also assert that design

changes, and corresponding price changes, are inevitable with respect to large customized

merchandise, and that the changes made to the agreement after the purchase order or sales order

acknowledgment date did not change the fact that the parties had committed to the transaction

based on the purchase order or sales order acknowledgment.  Government Response 29;

Petitioner Response 35-36.  These arguments do not demonstrate that Commerce acted

consistently with its regulations.

The Court must consider the explanation that Commerce gave when it promulgated 19

C.F.R. § 351.401(i)—the regulation governing date of sale—in interpreting that regulation and

determining whether it has been properly applied.  BSM Brief 37 (citing *Kisor v. Wilkie*, 139 S.

Ct. 2400, 2415 (2019); *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1339-40, 1344-45

(Fed. Cir. 2018)).  In the *Preamble*, Commerce explained that sales involving large customized

merchandise *might* justify using the contract date as the date of sale, but Commerce

"emphasize{d} that in these situations, the *terms of sale must be firmly established* and not

merely proposed. *A preliminary agreement on terms, even if reduced to writing, in an industry*

*where renegotiation is common does not provide any reliable indication that the terms are truly*

*'established" in the minds of the buyer and seller*." 62 Fed. Reg. at 27,349 (emphases added).

BSM's brief cites extensive evidence indicating that the quantity and value of the FSS frequently

changed after the purchase order/sales order acknowledgement date, and that these changes were

often significant. *See* BSM Brief 38-39. The terms of sale were not "firmly established" in these

documents and, although the terms were reduced to writing, renegotiating of material terms was

common.

In the *Preamble*, Commerce also specifically rejected using the first date that there is an

enforceable contract as the date of sale, unless the terms are "finally established" in that

document:

> {A}s a matter of commercial reality, the date on which the terms of a sale are first
> agreed is not necessarily the date on which those terms are finally established. . . .
> The existence of an enforceable sales agreement between the buyer and the seller
> does not alter the fact that, as a practical matter, customers frequently change their
> minds and sellers are responsive to those changes.

62 Fed. Reg. at 27,348-49. Thus, the fact that NCI considers purchase orders and sales order

acknowledgements to be contracts and has committed to producing FSS at that point is not

sufficient under Commerce's regulation to use the date of those documents as the date of sale,

because price and quantity were subject to continued negotiation until the project was completed.

As this Court has previously explained, Commerce will use a date prior to the invoice or

shipment date only if "the material terms of sale were 'firmly' and 'finally' established" at that

earlier date. *Arcelormittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1375-76 (Ct. Int'l

Trade 2018).  Here, the material terms were not "firmly" and "finally" established in the initial

purchase order or sales order acknowledgment.

Defendants go on to claim that Commerce's determination is consistent with its past

findings regarding date of sale in other cases involving large customized merchandise, namely

the proceedings involving large newspaper printing presses from Germany and Japan.

Government Response 29; Petitioner Response 37.  Even if Commerce's determination in this

case was consistent with those cases, it is still not consistent with Commerce's regulation.  *Cf.*

*Venus Wire Indus. Pvt. Ltd. v. United States*, 424 F. Supp. 3d 1369, 1377-78 (Ct. Int'l Trade

2019) ("Merely pointing to what the agency 'has done once before is not, by itself, an

explanation of why its methodology comports with the statute.'" (cleaned up) (quoting *Mid*

*Continent*, 941 F.3d at 537-38)).

In any event, this case is distinguishable from those prior cases.  There is no indication in

any of the cases Defendants cite that the quantity changed after the contract was signed; further,

the design and price changes were described in those cases as minor or not substantial.  *Large*

*Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled,*

*From Germany: Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 11,557

(Feb. 26, 2001), accompanying IDM at Comment 1; *Large Newspaper Printing Presses and*

*Components Thereof, Whether Assembled or Unassembled, From Japan: Final Results*

*Antidumping Duty Administrative Review*, 66 Fed. Reg. 11,555 (Feb. 26, 2001), accompanying

IDM at Comment 2.  Here, the quantity changed in many instances, and the changes in the total

price (as well as the quantity of FSS ordered) were often significant.  *See* BSM Brief 38-39.

Whereas the date-of-sale findings in the *Large Newspaper Printing Presses* cases might have

been at least arguably consistent with Commerce's regulation, as clarified by the *Preamble*, the significant changes in both quantity and price in this case renders Commerce's date-of-sale determination inconsistent with its regulation.

Finally, the Government argues that price changes were actually infrequent and minor, citing passages from Commerce's CEP Verification Report. Government Response 28-29. The passages of the CEP Verification Report cited by the Government address across-the-board price changes announced for Components Segment customers with per-unit (i.e., per pound) pricing schedules. *See* NCI CEP Verification Report at 11-12 (P.R. 625/C.R. 509). This has nothing to do with whether the quantity of FSS or the price for a particular project changed after the purchase order or sales order acknowledgement date because of changes to the project. There is an entirely different section of the CEP Verification Report that specifically addresses date of sale, and the facts cited by the Government do not feature in this discussion at all, because they are not relevant to date of sale. *See id.* at 13-15. As BSM has shown, changes to the price and quantity during the course of the project were in fact relatively common and often significant. *See* BSM Brief 38-39.

## IV.    Defendants Fail to Show that Commerce's Calculation of CEP Profit Is Supported by Substantial Evidence and in Accordance with Law.

Commerce's calculation of constructed export price ("CEP") profit is unreasonable and not in accordance with law. BSM Brief 42-47.

Defendants argue that Commerce's decision to calculate separate profit rates for BSM and NCI and then add those rates together was within Commerce's discretion and consistent with Commerce's practice. Government Response 30-31; Petitioner Response 39-41. But as BSM's brief explained, Commerce's Policy Bulletin 97/1 and prior cases indicate a practice of using

consolidated financial data, rather than reverse engineering separate profit rates and adding them together.  BSM Brief 42-43.

Defendants cite *Certain Frozen Warmwater Shrimp from Thailand*, *Rail Tie from Mexico*, and *Citric Acid and Certain Citrate Salts from Canada* as determinations supposedly supporting Commerce's methodology.  Government Response 30-31; Petitioner Response 39-41.  BSM has already explained that the reasoning in those cases was premised on the lack of truly consolidated financial data, which cannot justify Commerce's approach here.  BSM Brief 43-46.  Defendants do not point to a single case in which Commerce had consolidated financial data, but instead sought to reverse engineer the consolidated data in order to calculate separate profit rates and then add them together.  The explanation in *Rail Tie from Mexico* and *Citric Acid from Canada* that Petitioner cites (Petitioner Response 39-41)—the fact that the affiliates operated as separate companies with separate profit rates—actually supports why the data in those cases should not be treated like consolidated financial data; namely, because the total profit earned by the affiliated companies would otherwise be understated.  Petitioner also cites a claim by Commerce in *Citric Acid and Certain Citrate Salts from Canada* that the methodology used supposedly was consistent with the Policy Bulletin.  Petitioner Response 41.  But the passage that Petitioner cites did not discuss the issue here (use of separate profit rates instead of consolidated data); instead, it merely referred to the inclusion of profit earned on affiliated party sales.  *Citric Acid and Certain Citrate Salts from Canada: FinalRresults of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 37,286 (July 1, 2014), accompanying IDM at Comment 2.

Defendants also fail to show that Commerce reasonably and lawfully excluded the expenses from NCI's Costa Rica drafting facility in the CEP Profit calculation.  Petitioner's response brief is noticeably silent on this issue, while the Government asserts that the data were excluded because the Costa Rica facility was not profitable.  Government Response 32. Commerce never provided such reasoning for excluding the data from the Costa Rica facility; Commerce's decision memoranda do not mention the Costa Rica facility at all.  The Government's *post hoc* rationalization cannot be used to sustain Commerce's determination. *See, e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept . . . counsel's post hoc rationalizations for agency action{.}").

Moreover, the Government merely notes that it is supposedly Commerce's practice not to use negative profit rates in CEP profit calculations.  The Government, however, does not explain how that supposed practice is consistent with the statute or why Commerce reasonably could treat the expenses of the Costa Rica drafting facility as incurred in order to support the U.S. sales of subject merchandise but not consider them expenses affecting the profitability of U.S. sales of subject merchandise.  *See* BSM Brief 46-47 (arguing that exclusion of these expenses violated statute and is unreasonable).  The Government also does not explain how excluding these expenses (which were described by BSM as shared expenses) from the CEP profit calculation is consistent with Commerce's own acknowledgment that "accounting for shared indirect selling expenses in the CEP profit calculation is in keeping with the statute."  BSM Brief 45-46 (quoting IDM at 37 (P.R.663)).  A mere citation to the agency's prior practice does not demonstrate that the methodology is reasonable and comports with the statute.  *See Venus Wire*, 424 F. Supp. 3d at 1377-78; *Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329, 1352-53 (Ct.

Int'l Trade 2018).  The Government's reasoning, even if considered, does not establish that

Commerce's determination is supported by substantial evidence and in accordance with law.

## CONCLUSION

For the above reasons and for those set forth in BSM's opening brief, Commerce's *Final Determination* is unsupported by substantial evidence and not in accordance with law.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4046
Fax: (202) 887-4288
Email: mnicely@akingump.com

*On Behalf of Building Systems de Mexico, S.A. de C.V.*

Dated:  October 1, 2021

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that

Plaintiff's Reply in Support of Rule 56.2 Motion for Judgment on the Agency Record, dated

October 1, 2021, complies with the word-count limitation set forth in 2(B) of the Standard

Chambers Procedures of this Court, as amended on October 3, 2016.  The memorandum of law

contains 6,936 words according to the word-count function of the word-processing software used

to prepare the memorandum.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4046
Fax: (202) 887-4288
Email: mnicely@akingump.com

*On Behalf of Building Systems de Mexico,*
*S.A. de C.V.*

Dated:  October 1, 2021