Slip Op. 22-25

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BUILDING SYSTEMS DE MEXICO, S.A. DE C.V.,**<br><br>     **Plaintiff,**<br><br>v.<br><br>**UNITED STATES,**<br><br>     **Defendant,**<br><br>**and**<br><br>**FULL MEMBER SUBGROUP OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION, LLC and COREY S.A. DE C.V.,**<br><br>     **Defendant-Intervenors.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 20-00069**<br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final determination in the less-than-fair-value investigation of certain fabricated structural steel from Mexico.]

Dated: March 21, 2022

<u>Matthew R. Nicely</u> and <u>Daniel M. Witkowski</u>, Akin Gump Strauss Hauer & Feld LLP, of Washington, D.C., for plaintiff.

<u>In K. Cho</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for defendant. Also on the brief were <u>Patricia M. McCarthy</u>, Assistant Director, <u>Brian M. Boynton</u>, Acting Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director. Of counsel on the brief was <u>Spencer Neff</u>, Staff Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Stephanie M. Bell</u>, Wiley Rein LLP, of Washington, D.C., argued for defendant-intervenor Full Member Subgroup of the American Institute of Steel Construction, LLC.  Also on the brief were <u>Alan H. Price</u>, <u>Christopher B. Weld</u>, and <u>Adam M. Teslik</u>.

Kelly, Judge:  Before the court is plaintiff Building Systems de Mexico, S.A. de C.V.'s ("BSM") U.S. Court of International Trade Rule 56.2 Motion for Judgment on the Agency Record.  [BSM's] R. 56.2 Mot. for J. on the Agency R., Feb. 23, 2021, ECF No. 60 ("Pl. Br.").  BSM asserts numerous deficiencies in the final results of the U.S. Department of Commerce's ("Commerce") less-than-fair-value investigation into certain fabricated structural steel ("FSS") from Mexico, including purported errors in Commerce's calculation of BSM's constructed value profit rate, Commerce's application of adverse facts available, Commerce's determination to use the purchase order date or sales order acknowledgment date as the date of sale for purposes of currency conversion, and Commerce's calculation of BSM's constructed export price. <u>See generally</u> Pl. Br. at 9–47; [BSM's] Non-Confidential Reply in Supp. of [Pl. Br.], Oct. 1, 2021, ECF No. 77 ("Pl. Reply");[1] <u>see also</u> <u>Certain [FSS] from Mexico</u>, 85 Fed. Reg. 5390 (Dep't Commerce Jan. 30, 2020) (Final Determination of Sales at Less Than Fair Value) ("<u>Final Determination</u>"), and accompanying Issues and Decision Memo., Jan. 24, 2020, ECF No. 21-6 ("Final Decision Memo").  Defendant United States and Defendant-Intervenor Full Member Subgroup of the American Institute of Steel

---

[1] Any confidential information in Pl. Br. or Pl. Reply cited in this opinion may be found at the corresponding page of the confidential version of Pl. Br. or Pl. Reply, ECF Nos. 59 and 76, respectively.

Construction, LLC ("AISC") oppose BSM's motion.  See Def.'s Opp'n to [Pl. Br.], July 30, 2021, ECF No. 71 ("Def. Br."); Resp. Br. of [AISC], July 30, 2021, ECF No. 70 ("AISC Br.").[2]  For the following reasons, BSM's motion is granted.

## BACKGROUND

On February 1, 2019, AISC filed petitions requesting the imposition of antidumping duties ("ADD") and countervailing duties ("CVD") on imports of FSS from Canada, the People's Republic of China ("China"), and Mexico.[3]  Petitions for the Imposition of [ADD and CVD] on Certain [FSS] from Canada, Mexico, and [China], PD 1, CD 1, A-201-850, Bar Codes 3789352-01 and 3789335-01 (Feb. 1, 2019) (as amended, the "Petition").[4]  Commerce initiated an ADD investigation into FSS from Mexico on February 25, 2019.  See Certain [FSS] from Canada, Mexico, and [China], 84 Fed. Reg. 7330 (Dep't Commerce March 4, 2019) (Initiation of Less-Than-Fair-Value Investigations).  The period of investigation was January 1, 2018 through December 31, 2018 ("POI").  See Final Determination, 85 Fed. Reg. at 5390.  BSM

---

[2] Any confidential information in Def. Br. or AISC Br. cited in this opinion may be found at the corresponding page of the confidential version of Def. Br. or AISC Br., ECF Nos. 73 and 69, respectively.

[3] This action only involves ADD on FSS from Mexico.

[4] On May 8, 2020, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination.  See ECF No. 21-1–2.  Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "CD" to denote public or confidential documents.

and Defendant-Intervenor Corey S.A. de C.V. ("Corey")[5] were selected as mandatory

respondents.  Id. at 5391.

    In its Final Determination, Commerce finds that certain FSS from Mexico is

being, or is likely to be, sold in the United States at less than fair value.  See Final

Decision Memo at 1.  As a result, Commerce imposes on BSM an estimated weighted-

average dumping margin of 8.47%.  Final Determination, 85 Fed. Reg. at 5392.  In

calculating BSM's dumping margin, Commerce makes several determinations which

BSM now disputes.  See Pl. Br. at 9–47.  BSM challenges Commerce's: (i) calculation

of BSM's constructed value profit rate,  Pl. Br. at 9–25; see also Final Decision Memo

at 43–51; (ii) use of adverse facts available with respect to one of BSM's sales that

BSM did not report to Commerce,  see Final Decision Memo at 53–55; Pl. Br. at 25–

35;  (iii) use of the purchase order date or sales order acknowledgment date as the

date of sale for the purposes of converting foreign currency into U.S. dollars,  Pl. Br.

at 35–42; Final Decision Memo at 38–41; and (iv) calculation of BSM's constructed

export price. Pl. Br. at 42–47; see also Final Decision Memo at 32–38.  The court now

remands Commerce's Final Determination.

---

[5] Further references in this opinion to Corey are to the collapsed entity of Corey S.A. de C.V. and Industrias Recal S.A. de C.V.  See Final Determination, 85 Fed. Reg. at 5391 n.2.  Corey S.A. de C.V. did not file a brief in support of or in opposition to this motion.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i),[6] and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting a final affirmative less-than-fair-value determination. "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Constructed Value

BSM asserts three challenges to Commerce's reliance on Corey's home market sales data in Commerce's calculation of BSM's constructed value profit rate. <u>See</u> Pl. Br. 9–25; <u>see also</u> Final Decision Memo at 47. First, BSM challenges a particular sale and asserts that Commerce acts arbitrarily by including the sale, which BSM contends was contracted for in 2017, not 2018, and made outside the ordinary course of trade.[7] Pl. Br. at 10–19. Second, BSM contends that Commerce fails to account for Corey's receipt of countervailable subsidies. <u>Id.</u> at 19–21. Finally, BSM asserts Commerce acts arbitrarily by rejecting BSM's home market data in favor of Corey's

---

[6] Further citations to the Tariff Act of 1930 will be to the relevant sections of the U.S. Code, 2018 edition.

[7] [[                                                                                          ]]
Final Decision Memo at 48; Constructed Value Calculation Adjustments for the Final Determination – [Corey], Attachment 2, PD 673, CD 543, A-201-850, Bar Codes 3937094-01, 3937093-01 (Jan. 30, 2020) ("Corey CV Calc. Memo"); Pl. Br. at 10.

because of the allegedly insufficient volume of Corey's home market sales data.  Id. at 21–25.  The court remands Commerce's calculation of BSM's constructed value profit for the following reasons.

In an investigation to determine if merchandise is being or is likely to be sold in the United States at less than fair value, Commerce compares the "normal value" of the merchandise to the U.S. price, which, as discussed below, is calculated as the "export price" or "constructed export price" under 19 U.S.C. §§ 1677a(a) or (b), respectively.  19 U.S.C. § 1677b(a).  Normal value is the price for which a producer or exporter sells its merchandise in the ordinary course of trade in its home country or, in certain circumstances, a third country.  Id. § 1677b(a)(1).  However, if Commerce concludes that normal value cannot be determined under § 1677b(a)(1) using a producer or exporter's home market or third-country sales, Commerce will calculate "constructed value" to use as normal value.  Id. §§ 1677b(a)(4), (e).

Under 19 U.S.C. § 1677b(e)(2), Commerce may calculate constructed value pursuant to one of four methods, a preferred method set forth in § 1677b(e)(2)(A), and three alternative methods set forth in § 1677b(e)(2)(B).  The preferred method requires Commerce to use the actual amounts of selling, general, and administrative expenses and profits from the respondent's home market sales of the foreign like product.  Id. § 1677b(e)(2)(A).  If the preferred method is unavailable, there is no hierarchy among the alternative methods. Mid Continent Steel & Wire, Inc. v. United

<u>States</u>, 941 F.3d 530, 535 (Fed. Cir. 2019).   Section 1677b(e)(2)(B)(ii) permits

Commerce to calculate a respondent's constructed value using

> the weighted average of the actual amounts incurred and realized by
> exporters or producers that are subject to the investigation or review
> (other than the [respondent]) for selling, general, and administrative
> expenses, and for profits, in connection with the production and sale of
> a foreign like product, in the ordinary course of trade, for consumption
> in the foreign country.

19 U.S.C. § 1677b(e)(2)(B)(ii).   Section 1677b(e)(2)(B)(iii) provides that Commerce

may calculate "the amounts incurred or realized for selling, general, and

administrative expenses, and for profits, based on any other reasonable method,"

with the limitation that the amount cannot exceed "the amount normally realized by

exporters or producers . . . in connection with the sale, for consumption in the foreign

country, of merchandise that is in the same general category of products as the

subject merchandise."[8]  <u>Id.</u> § 1677b(e)(2)(B)(iii).

In  calculating  constructed  value,  Commerce  seeks  to  obtain  a  fair

approximation of the sales price and the profits realized by a respondent's home

market sales, <u>Mid Continent</u>, 941 F.3d at 542, and to avoid "irrational or

unrepresentative results." <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg.

27,296, 27,360 (Dep't Commerce May 19, 1997) ("<u>Preamble</u>").   Commerce must

consider whether the data it uses to calculate constructed value profit results in a fair

---

[8] The other alternative method, set forth in 19 U.S.C. § 1677b(e)(2)(B)(i), is not
relevant to this action.

comparison between normal value and export price.  See Husteel Co. v. United States,

39 CIT __, __, 98 F. Supp. 3d 1315, 1349 (2015), aff'd, 710 F. App'x 890, 891 (Fed. Cir.

2018).  Commerce's calculation must be supported by substantial evidence, which is

"such evidence that a reasonable mind might accept as adequate to support a

conclusion."  Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318,

1326 (Fed. Cir. 2020) (internal quotation marks removed).

Here, Commerce uses Corey's in-scope home market sales that were made in

ordinary course of trade to calculate BSM's constructed value profit.  Final Decision

Memo at 47.  Commerce defines in-scope sales as projects that were both contracted

for and completed within the POI.  Id. at 5–8.  Commerce further explains that it

includes Corey's home market sales data "for projects with a contract or purchase

order date and completion date during the POI."  Id. at 11.  Commerce's decision to

use Corey's home market sales data is unsupported by substantial evidence because

Commerce (1) does not adequately address whether the sale that BSM challenges was

contracted for during the POI; and (2) relies on Corey's home market sales data

without sufficiently explaining its reasoning.[9]

Commerce's determination that Corey's sale that BSM now challenges was in-

scope is not supported by substantial evidence because Commerce does not

sufficiently address how a project could be assigned a project number in Corey's

---

[9] BSM argues that its home market data should be used pursuant to Section
1677b(e)(2)(B)(iii).  Pl. Br. at 24.

accounting system outside the POI and still be in-scope.  See id. at 10–11; Proprietary

Info. in the Final Determination of the [ADD] Investigation of Certain [FSS] from

Mexico: [Corey], Note 2, PD 671, CD 540, A-201-850, Bar Codes 3937089-01, 3937088-

01 (Jan. 30, 2020) ("Corey Final BPI Memo").  Corey's project numbering system

creates a project number when a bid is accepted.  [Corey's] Section D Questionnaire

Resp., 10, PD 337, CD 146, A-201-850, Bar Codes 3843383-01, 3843362-01 (June 4,

2019) ("Corey Sec. D Resp.") ("projects are coded using the year of the accepted bid

along with . . . a sequential number tracking the number of projects").  Commerce

concludes that the date a bid is accepted is not necessarily the date a project is

contracted, which, in addition to being completed within the POI, is the relevant

criterion for a project being in-scope.  Corey Final BPI Memo at Note 2; [Corey's] Cost

Verification Exhibits, CVE-13, CD 505–06, Bar Codes 3898903-13–14 (Oct. 10, 2019)

("Corey Cost Verification Exhibits"); see also Final Decision Memo at 6–8.  Commerce

finds that the project is in-scope because although the bid was accepted in 2017, the

contract for the project was not concluded until 2018.  Corey Final BPI Memo at Note

2.  In support of its conclusion, Commerce relies solely on two purchase orders that

Corey submitted for the project, both of which are from the POI.[10]  Id.

---

[10] The court rejects BSM's argument that the sale is out of scope because the
[[            ]] was labelled a [[        ]].  Pl. Br. at 12–13.  The [[     ]] purchase
orders on the record for the project are dated [[                        ]].
Corey Final BPI Memo at Note 2; Verification of Sales Resp. of [Corey], 27, PD 629,

(footnote continued)

Court No. 20-00069                                                                    Page 10
**PUBLIC VERSION**

     However, Corey explains that there are only three ways a bid is accepted: (1) "a contract is signed"; (2) "the customer signs a final budget proposal issued by Corey"; or (3) "the customer issues a purchase order to Corey." [Corey's] Section A Questionnaire Resp., A-26, PD 272, CD 81, A-201-850, Bar Codes 3828561-01, 3828472-01 (May 1, 2019) ("Corey Sec. A Resp."). Thus, the three ways Corey accepts bids all appear to be forms of contracts: Either a formal contract, a signed proposal, or a purchase order (which Commerce treats as a contract). Given Commerce's statement that it considers projects with "a contract or purchase order date" during the POI to be in-scope, Commerce does not satisfactorily explain why the challenged sale is in scope when it appears that a contract was entered into in 2017.[11] See Final

---

CD 512, A-201-850, Bar Codes 3908072-01, 3908070-01 (Nov. 6,2019) ("Corey Sales Verification Memo") (citing [Corey's] Sales Verification Exhibits, SV-24, CD 483, Bar Code 3897091-26 (Oct. 4, 2019) ("Corey Sales Verification Exhibits")). There is no evidence that any prior purchase order exists, and Corey certified that the [[                ]] for the project is the [[                        ]]. Corey Sales Verification Memo at 27; Corey Sales Verification Exhibits at SV-24. Moreover, any alleged prior purchase order could have been issued between [[                        ]].

[11] Likewise, AISC's reliance on Corey's Supplemental Section A Response is misplaced and its argument is unpersuasive. See AISC Br. at 11–12 (citing [Corey's] Supplemental Section A Questionnaire Resp., 3–4, PD 327, CD 136, A-201-850, Bar Codes 3838349-01, 3838344-01 (May 22, 2019) ("Corey Supp. Sec. A Resp."). AISC asserts that another of Corey's projects supports the contention that acceptance of a bid does not necessarily entail a contract. AISC Br. at 11–12. In that project, Corey states that the customer [[                            ]], but that the customer did not authorize Corey to place mill orders until October 2014, and that the parties did not finalize formal contracts until [[        ]]. Corey Supp. Sec. A Resp. at 3. Corey

(footnote continued)

Decision Memo at 11, 47–48.  Even accepting Commerce's conclusion that the

purchase orders for the project were issued during the POI, the bid was accepted some

time in 2017.  Commerce's reliance on the purchase orders ignores record evidence

that Corey treats a bid as accepted when a contract is formed.[12]  Therefore the court

---

provides no information regarding when the bid was considered accepted. Corey
states that the relevant date of sale (which AISC claims is the "acceptance" date) was
when Corey "began incurring expenses for [the] project." Id. at 4; see also AISC Br.
at 12. AISC's example is inapposite. Here, Commerce does not find that the bid was
accepted through performance and specifically finds that Corey did not begin
production on or record costs for the challenged sale prior to the POI. Final Decision
Memo at 48 (determining amounts that appeared to be booked in 2017 were applied
to the challenged sale in error, and amounts booked in 2019 represented returns to
the warehouse); Verification of Cost Resp. of [Corey], 17, PD 627, CD 511, A-201-850,
Bar Codes 3907204-01, 3907165-01 (Dep't Commerce Nov. 4, 2019) ("Corey Cost
Verification Memo"). Thus, Corey used different criteria to treat the bid for the
challenged sale as accepted. On remand, if Commerce continues to rely on Corey's
challenged sale, Commerce must explain how Corey could assign a project number
without a contract and without commencing work.

[12] However, Commerce reasonably finds that the challenged sale was made within
the ordinary course of trade. See Final Decision Memo at 49. The ordinary course of
trade means "the conditions and practices which, for a reasonable time prior to the
exportation of the subject merchandise, have been normal in the trade under
consideration with respect to merchandise of the same class or kind." 19 U.S.C.
§ 1677(15). Sales made outside the ordinary course trade include "merchandise sold
at aberrational prices or with abnormally high profits." 19 C.F.R. § 351.102(b)(35).
Commerce determines that the Corey's [[     ]] profit is "within the range" of profits
realized by other Mexican producers in their home market sales. Final Decision
Memo at 49. Specifically, Commerce cites Mexican producer Ternium's average profit
rate of 20.25%. Id. (citing Case Brief of BSM, 19, PD 642, CD 524, A-201-850, Bar
Codes 3912338-01, 3912336-01 (Nov. 19, 2019); Submission of New Factual Info.,
Attachment 3, PD 494, A-201-850, Bar Code 3874205-07 (Aug. 5, 2019)). Although
BSM argues that Ternium's average profits are "barely [[     ]]" of Corey's profits on
the sale in question, and therefore are not "within the range" of Corey's profits, an

(footnote continued)

must remand Commerce's determination that the challenged sale was contracted for

in 2018, and in scope, for reconsideration or further explanation.

However, the court sustains Commerce's choice to disregard a Mexican subsidy

program in its calculation of BSM's constructed value profit rate.[13] Id. at 49–50.

Commerce must determine, based on record evidence, whether an exporter's home

market sales benefitted from the export subsidy program. Here, Commerce finds that

there is "no evidence to support BSM's assertion that Corey's [home market]

profitability is distorted by the receipt of a countervailable export subsidy." Id. at 49.

In coming to that conclusion, Commerce relies on "the revenue and cost data specific

to each of Corey's [home market] sales," not Corey's financial statements. Id. BSM

essentially argues that Commerce should apply a presumption of subsidy use. Pl. Br.

at 20–21; see also Oral Arg., 22:43, Jan. 6, 2022, see ECF No. 85 ("Oral Arg.")

---

average of 20.25% profit implies individual sales of greater than 20.25%. See Pl. Br.
at 18–19. Even assuming none of Ternium's individual sales generated a profit equal
to or greater than Corey's sale, it is not unreasonable to conclude, as Commerce does,
that even a profit rate that is higher than that of other comparable sales can fall short
of "abnormally high profits." 19 C.F.R. § 351.102(b)(35). Moreover, BSM itself
reported a home market sale of more than [[      ]] the profit rate of the Corey sale in
question. AISC Br. at 17; see also Pl. Reply at 4. BSM's second contention—that the
Corey sale was not made in the ordinary course of trade because it was contracted for
and completed within one year—must also be rejected. Given Commerce's obligation
to calculate a representative constructed value that fairly approximates BSM's sales
price and profits for its home market sales "at a time reasonably corresponding," 19
U.S.C. § 1677a(1)(A), to BSM's export sales, it would be absurd to discard Corey's
home market sales that meet the criteria for in-scope export sales.
[13] The subsidy in question is an export subsidy pursuant to which Mexican producers
are permitted to import certain materials duty free if those materials are used in the
production of goods that are subsequently exported. See Pl. Br. at 20–21.

(conceding that there is no clear-cut proof that Corey's home market sales benefitted

from the export subsidies).[14]  Commerce reasonably finds that there was no evidence

to support the conclusion that Corey's home market sales were distorted by the export

subsidies it received.  Indeed, BSM does not point to any evidence that Corey used

materials that it imported duty free in FSS that Corey sold in Mexico.[15]

---

[14] In the CVD context, Commerce presumes that export subsidies will also benefit home market sales unless the foreign government has an adequate system in place to track the raw materials and make sure they are only used in the production of exported goods.  19 C.F.R. § 351.519(a)(4).  In the related CVD investigation, Commerce concluded that Mexico did not have an adequate system in place, so Commerce presumed that Corey's home market sales also benefitted from the export subsidies.  Certain [FSS] from Mexico, 84 Fed. Reg. 33,227 (Dep't Commerce July 12, 2019) (Prelim. Affirmative [CVD] Determination, and Alignment of Final Determination with Final [ADD] Determination), and corresponding Preliminary Decision Memo., 17, C-201-851, Bar Code 3857684-01 (July 8, 2019).

[15] Although BSM argues that it is Commerce's burden to analyze the data on the record, BSM offers no other reasonable alternative interpretation of the data.  Oral Arg. at 32:35.  At argument, BSM cited four record documents that it contends Commerce should have analyzed to find Corey's home market sales benefitted from a countervailable export subsidy.  Oral Arg. at 19:00–22:30 (citing Corey Sec. D Resp., Ex. D-27, CD 155, A-201-850, Bar Code 3843362-10; [Corey's] First Supp. Section D Resp., Ex. SD-28, CD 324, A-201-850, Bar Code 3870922-18 (July 30, 2019) ("Corey 1st Supp. Sec. D Resp.")); Corey Cost Verification Exhibits at CVE-5, CVE-7).  These documents reflect, inter alia, line item costs related to Corey's home market sales, including taxes and duties paid.  See Corey Sec. D Resp. at Ex. D-27; Corey 1st Supp. Sec. D Resp. at Ex. SD-28; Corey Cost Verification at Ex. CVE-5, CVE-7.  BSM does not provide any analysis as to why those inputs reflected lower costs than would be expected had Corey paid import duties on such inputs or why BSM believes that the taxes and duties Corey reported paying were too low.  Commerce is not obligated to make any presumption that Corey's home market sales benefitted from the export subsidies in the ADD context, and therefore it is reasonable to conclude, in the absence of any evidence to the contrary, that Corey's home market sales did not benefit from a subsidy that explicitly applies to export sales.

The court also remands Commerce's decision to use Corey's home market sales data to calculate BSM's constructed value profit because Commerce rejects BSM's home market data for insufficient volume but relies on Corey's indisputably fewer home market sales. Commerce determines that the preferred method is not available because BSM's home market sales constituted less than five percent of BSM's U.S. sales.[16] Final Decision Memo at 50. Having determined not to use the preferred method, Commerce chooses to use Corey's home market sales data pursuant to 19 U.S.C. § 1677b(e)(2)(B)(ii). Id. Although there is no hierarchy among the three alternative methods, Commerce's decision to use Corey's data must be supported by substantial evidence. Mid Continent, 941 F.3d at 535, 537.

Commerce's sole explanation for rejecting BSM's home market data is that BSM did not have a sufficient volume of home market sales in comparison with BSM's U.S. sales. Final Decision Memo at 50. Having rejected BSM's data for insufficient

---

[16] Commerce borrows the viability standard from 19 U.S.C. §§ 1677b(a)(1)(B)(ii) and (C)(ii), which apply when Commerce calculates normal value under § 1677b(a)(1), not when Commerce bases normal value on constructed value pursuant to § 1677b(e). However, BSM does not contest Commerce's use of the viability standard to exclude the preferred method of calculating constructive value. Pl. Br. at 22. Therefore, the court does not analyze whether Commerce's explanation for not using the preferred method is supported by substantial evidence or otherwise in accordance with law. See Mid Continent, 941 F.3d at 538 ("we do not think the five percent standard applies [in the context of calculating constructed value]"); see also Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I, at 840 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4175 (alternatives to the preferred method should only be used when the preferred method is unavailable "either because there are no home market sales of the foreign like product or because all such sales are at below-cost prices").

volume, Commerce chooses Corey's data which consists of indisputably fewer sales.[17]

Id.; see also Pl. Br. at 24; Def. Br. at 12.  Even though Corey's sales meet the viability

standard as they make up more than five percent of Corey's U.S. sales, without

further explanation, it is unclear why it is reasonable for Commerce to conclude that

Corey's home market sales are representative of the Mexican market.[18]

Moreover, BSM points to several other factors that call into question the

reasonableness of Commerce's decision to rely on Corey's data.  Corey's business

model is to produce FSS for a small number of large projects each year, while BSM

produces FSS for pre-engineered metal building systems ("PEMBS"), which are

typically smaller projects, and as such, BSM produces FSS for thousands of projects

per year.  Pl. Br. at 23.  Corey also offers services such as design and erection that

are ancillary to the production and sale of FSS, while BSM does not.  Id.  These

differences between Corey's and BSM's businesses detract from the reasonableness

of using Corey's home market data and must be addressed by Commerce.  See

Husteel, 98 F. Supp. 3d at 1349.  Finally, although Commerce reasonably concludes

---

[17] BSM reported [[  ]] profitable home market sales contracted and completed during
the POI, while Commerce calculates BSM's constructed value based on [[        ]]
reported by Corey.  Pl. Br. at 24; Def. Br. at 12; Corey CV Calc. Memo at Attach. 2.
[18] Although Commerce states that the Court of Appeals "upheld Commerce's practice
not to calculate [constructed value] profit based on sales from a non-viable market,"
Final Decision Memo at 51 (citing Mid Continent, 941 F.3d at 539), in that case the
Court of Appeals held only that Commerce was permitted to make a "practical,
function-based" determination of when home market data is "available" for the
purposes of 19 U.S.C. § 1677b(e)(2)(A), including taking volume of sales into account.
Mid Continent, 941 F.3d at 538–40.

that Corey's home market sales were made within the ordinary course of trade, the fact that Corey's home market profits were higher than any other Mexican producer on the record also factors into the representativeness of Corey's data.  See Pl. Br. at 23–24.

Commerce asserts that the statute does not obligate Commerce to analyze Corey's operations in comparison to BSM's, Final Decision Memo at 50; however, this assertion ignores Commerce's interpretation of its own regulations, which require Commerce to avoid "unrepresentative" results.  Preamble, 62 Fed. Reg. at 27,360. Commerce may not simply ignore the record evidence highlighted by BSM that detracts from Commerce's conclusion that Corey's home market data provides a reasonable surrogate to use for BSM's constructed value.

## II.   **Adverse Facts Available**

Commerce uses facts available with an adverse inference with respect to one of BSM's projects that BSM did not report during Commerce's investigation.  Final Decision Memo at 54–55.  When Commerce is missing information necessary to make an ADD determination, it must use facts otherwise available to fill the gap in the record created by the missing information.  See 19 U.S.C. § 1677e(a); Nippon Steel Corp. v. United States, 337 F.3d 1373, 1380–81 (Fed. Cir. 2003).  If a gap exists because a party failed to cooperate to the best of its ability, Commerce may use an adverse inference when selecting facts available to fill the gap.  19 U.S.C. § 1677e(b); Nippon, 337 F.3d at 1380–83.

The project in question was contracted for in 2018 and consisted of multiple phases.  Final Decision Memo at 54.  BSM treated projects as substantially complete only after the FSS for the last phase of the project had been shipped.  Section C Questionnaire Resp. of [BSM], 23, PD 343, CD 164, A-201-850, Bar Codes 3843685-01, 3843677-01 (June 4, 2019) ("BSM Sec. C Resp.").  At the end of 2018, the project at issue had two phases remaining, so BSM did not consider the project to be substantially completed during the POI and thus treated the project as out of scope.  Final Decision Memo at 55; Pl. Br. at 25.  However, in July 2019, after the deadline for responding to Commerce's inquiries regarding in-scope projects had passed, BSM's client canceled the last two phases of the project.  Pl. Br. at 25, 31.

Commerce finds that because the final two phases of the project were cancelled, the last phase was shipped during the POI and the project was in-scope.  Final Decision Memo at 55.  Thus, Commerce concludes that BSM had an obligation to submit data about the project but did not.  Id.  Therefore, Commerce identifies a gap in the record that it must fill with facts otherwise available.  Id. at 54–55.  Commerce further finds that BSM failed to cooperate to the best of its ability by not alerting Commerce of the sale.  Id. at 55.

Commerce's conclusion that BSM's project was completed during the POI is not supported by substantial evidence.  Commerce does not dispute that in June 2019 the project was not complete but contends that a change order in July 2019 makes

the project retroactively complete in 2018.  Id. at 54–55; Verification of [NCI][19], 23–

24, PD 625, CD 509, A-201-850, Bar Codes 3907048-01, 3907047-01 (Nov. 4, 2019)

("BSM CEP Verification Memo"); Def. Br. at 22.  This conclusion is not reasonable

because a project cannot be both incomplete in June 2019 and complete prior to

January 1, 2019.  Commerce disregards the contract modification in July 2019 and

the final two phases of the project.  However, Commerce may not simply ignore the

evidence that the final two phases of the project remained incomplete until BSM's

client cancelled them in July 2019, which is when BSM fulfilled its obligations for the

project.  BSM CEP Verification Memo at 23–24.  The court remands Commerce's

determination for reconsideration or further explanation.[20]

## III.    Date of Sale

BSM challenges Commerce's decision to use the date of the purchase order or

sales order acknowledgement as the date of sale for the purposes of converting foreign

currency into U.S. dollars.  Pl. Br. at 35.  Commerce's regulations provide that it will

normally use the invoice date as the date of sale unless Commerce is satisfied that

---

[19] NCI refers collectively to BSM's U.S. affiliates, NCI Group, Inc. and Robertson-
Ceco II Corporation.

[20] Given the unique facts of this case, it is likewise unclear how BSM does not meet
the standard for acting to the best of its ability.  See 19 U.S.C. § 1677e(b); Nippon,
337 F.3d at 1380–83.  Commerce provides no explanation for applying an adverse
inference other than disagreeing with BSM's conclusion regarding the need to report
the sale.  Final Decision Memo at 55; see also Nippon, 337 F.3d at 1383 ("An adverse
inference may not be drawn merely from a failure to respond, but only under
circumstances in which it is reasonable for Commerce to expect that more
forthcoming responses should have been made").

the material terms of the transaction were established as of a different date.
19 C.F.R. § 351.401(i).  Although Commerce does have a certain degree of discretion
in choosing the date of sale, the invoice date is presumed to be the date of sale.  Id.;
see also Preamble, 62 Fed. Reg. at 27,349.  Commerce will only use an alternative
date if there is "satisfactory evidence that the material terms of sale are finally
established," and that  "the terms of sale must be firmly established and not merely
proposed" in order to rebut the presumption of using the invoice date.  Preamble, 62
Fed. Reg. at 27,349.

Here, Commerce uses the date of the purchase order or the sales order
acknowledgement as the date of sale, not the invoice date.  Final Decision Memo at
40.    Commerce  states  that  NCI  regards  the  purchase  orders  and  sales  order
acknowledgments as contracts.[21]  Id.  Commerce further finds that FSS is "large
custom-made merchandise," which the Preamble identifies as a situation in which
Commerce might deviate from using the invoice date as the date of sale.  Id.;
Preamble 62 Fed. Reg. at 27,349.  Commerce contends that design changes and
related price changes are "inevitable with respect to large-customized products," and
that "[s]uch changes do not mean that parties did not commit themselves to material
aspects of the transaction which would allow production to begin."  Final Decision
Memo at 41.

---

[21] FSS is "produced by BSM and sold by NCI . . . using purchase orders/sales order
acknowledgments."  Final Decision Memo at 40.

However, Commerce's regulations provide that Commerce may rebut the presumptive use of the invoice date only when Commerce is satisfied that the material terms of a transaction are established on a different date.  19 C.F.R. § 351.401(i); see also Preamble, 62 Fed. Reg. at 27,349.  The material terms of a transaction are established when they are not subject to revision, not when an enforceable contract is concluded.  See Preamble, 62 Fed. Reg. at 27,349 ("The existence of an enforceable sales agreement between the buyer and the seller does not alter the fact that as a practical matter, customers frequently change their minds and sellers are responsive to those changes.  [Commerce] also has found that in many industries, even though a buyer and seller may initially agree on the terms of a sale, those terms remain negotiable and are not finally established until the sale is invoiced").

Here, the parties do not disagree about the meaning of Commerce's regulations, only whether the material terms of the transactions at issue are established on the purchase order or sales order acknowledgement date.  Compare Pl. Br. at 35–39; with Def. Br. at 27–29; AISC Br. at 34–38.  Commerce asserts that post-purchase-order changes are inevitable due to the nature of the subject merchandise.  Final Decision Memo at 41 (citing Preamble, 62 Fed. Reg. at 27,349).  This argument ignores the plain language of Commerce's own regulations: Commerce has discretion to use a date other than the invoice, but only when there is satisfactory evidence that such other date is when the terms of a sale are established.

19 C.F.R. § 351.401(i); see also Preamble, 62 Fed. Reg. at 27,349 (even in the case of

"large custom-made merchandise . . . the terms of the sale must be firmly

established"). The material terms of FSS sales frequently changed between the

purchase order and invoice, and, therefore, a purchase order generally does not

establish the terms of a sale.[22] See, e.g., Analysis Memo. for the Final Determination

in the [ADD] Investigation of Certain [FSS] from Mexico: [BSM], Attachment II, CD

534, A-201-850, Bar Code 3937072-02 (Jan. 30, 2020); BSM Sec. C Resp., Ex. C-13,

CD 166, A-201-850, Bar Code 3843677-03 (June 4, 2019); BSM's CEP Verification

Exhibits, CEP-VE-4, CD 429, A-201-850, Bar Code 3894918-02 (Sept. 27, 2019); see

also BSM CEP Verification Memo at 14 ("Company officials explained that the scope

of a project or terms of sale may change up until a project is completed"). Thus, the

evidence demonstrates that material terms are not established as of the date of the

purchase order or sales order acknowledgment.

Commerce's reliance on LNPP from Germany fares no better. See Final

Decision Memo at 41 (citing Large Newspaper Printing Presses and Components

Thereof, Whether Assembled or Unassembled, From Germany, 66 Fed. Reg. 11,557

(Dep't Commerce Feb. 26, 2001) (Final Results of [ADD] Admin. Review) ("LNPP from

---

[22] Indeed, BSM cites record evidence that post-purchase-order changes to material terms occurred in approximately [[   ]] of its transactions comprising approximately [[   ]] of BSM's sales volume. Pl. Br. at 39 (citing Resp. of [BSM] to Aug. 16, 2019 Sec. C Supplemental Questionnaire, Ex. SSC-1, CD 384, A-201-850, Bar Code 3881744-01 (Aug. 21, 2019)).

Germany"), and accompanying Issues and Decision Memo ("LNPP from Germany

IDM").  In that review, Commerce specifically noted that the changes at issue were

"minor" changes to specifications.  Final Decision Memo at 41 (citing LNPP from

Germany IDM at Comment 1).  Here, the changes in question, many of which could

not be described as "minor," were to the material terms of the contract, including

price and quantity.  See Pl. Br. at 38–39.  Commerce must further explain or

reconsider its determination that the date of sale for purposes of currency conversion

should be the date of the purchase order or sales order acknowledgement.

## IV.   Constructed Export Price

Finally, BSM challenges two aspects of Commerce's calculation of BSM's

constructed export price profit rate.   First, BSM challenges Commerce's

determination to calculate separate profit rates for BSM and NCI and add them

together, arguing that Commerce should have relied on NCI's consolidated financial

statements.  Pl. Br. at 42–45.  Second, BSM asserts that Commerce improperly

removed expenses from NCI's Costa Rican drafting facility, which Commerce

determined were properly included in BSM's indirect selling expenses under

19 U.S.C. § 1677a(d)(1).  Id. at 45–47.  For the following reasons, Commerce's

calculation of BSM's constructed value export price is remanded.

### A.   Constructed Export Price Profit Rate Methodology

When determining U.S. price for purposes of a less-than-fair-value

investigation, Commerce either uses the "export price" or the "constructed export

price" pursuant to 19 U.S.C. §§ 1677a(a) or (b), respectively, and subject to certain adjustments set forth in subsections (c) and (d).  19 U.S.C. § 1677a.  Here, Commerce calculates a constructed export price for BSM's U.S. sales because BSM's U.S. sales were made through its affiliate, NCI.  Decision Memo. for the Prelim. Determination in the Less-Than-Fair-Value Investigation of Certain [FSS] from Mexico, 14, PD 566, A-201-850, Bar Code 3886770-01 (Sept. 4, 2019); see also Final Decision Memo at 11.

Commerce calculates BSM's constructed export price profit rate pursuant to 19 U.S.C. § 1677a(f)(2)(C)(iii), which provides that Commerce calculate "expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise."  Final Decision Memo at 35; 19 U.S.C. § 1677a(f)(2)(C)(iii).  Commerce calculates separate profit ratios for BSM and NCI and then adds those together to determine BSM's constructed export price profit. Final Decision Memo at 36.  Commerce cites past investigations and reviews in which Commerce calculated separate rates and added them together.  Id.

BSM asserts that Commerce should calculate BSM's constructed export price profit rate based on NCI's consolidated financial statements.  Id. at 42–45.  BSM relies on Policy Bulletin 97/1 for the proposition that it is reasonable for Commerce to use consolidated financial statements to calculate constructed export price profit rate.  Id. at 42–43 (citing Import Admin. Policy Bulletin No. 97/1, Calc. of Profit for Constructed Export Price Transactions (Dep't Commerce Sept. 4, 1997) ("Policy Bulletin 97/1").  However, although it may have been reasonable for Commerce to

rely on NCI's consolidated financial statements, nothing in Policy Bulletin 97/1 requires Commerce to do so.

BSM asserts that Commerce's explanation of its methodology is insufficient because in the prior investigations and reviews on which Commerce relies Commerce rejected the consolidated financial reports because of double counting, which is not an issue here. Pl. Br. at 44. However, BSM does not provide any reason why Commerce's chosen methodology is unreasonable. BSM does not identify any error that resulted from Commerce's methodology. BSM does not identify any statute, regulation, or caselaw that precludes Commerce from employing the methodology it relies on here. At most, BSM identifies an alternative reasonable method that Commerce has sometimes employed in the past. Although BSM's preferred method may be reasonable, BSM fails to demonstrate that Commerce's method is unreasonable.

## B.    Exclusion of NCI Costa Rican Data

Commerce's decision to remove NCI's Costa Rican data from Commerce's calculation of BSM's constructed export price profit rate must be remanded. Defendant concedes that Commerce did not address BSM's arguments related to NCI's Costa Rican facility. Oral Arg. at 1:11:15. Moreover, Defendant fails to explain how its arguments in support of Commerce's determination are not precluded by the statute. <u>See</u> Def. Br. at 32.

To calculate a constructed export price, 19 U.S.C. § 1677a(d)(3) mandates that Commerce reduce the constructed export price by "the profit allocated to the expenses described in paragraphs (1) and (2)." The statute directs that Commerce shall calculate that profit by multiplying "total actual profit" by the "applicable percentage." 19 U.S.C. § 1677a(f)(1). "Total actual profit" is defined as "the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph." Id. § 1677a(f)(2)(D). The applicable percentage is in turn calculated by dividing "total United States expenses" by "total expenses." Id. § 1677a(f)(2)(A). "Total United States expenses" is defined as "the total expenses described in subsection (d)(1) and (2)." Id. § 1677a(f)(2)(B). Finally, "total expenses," as used in §§ 1677a(f)(2)(A) and (B), is defined as

> [A]ll expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise: . . .
>
> > (iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise

Id. § 1677a(f)(2)(C). Thus, the statute requires that the agency include indirect selling expenses included under § 1677a(d)(1) when Commerce calculates constructed export price profit. Id. § 1677a(f).

Here, Defendant does not dispute that Commerce properly classifies NCI's Costa Rican facility's expenses as indirect selling expenses under subsection (d)(1), but rather argues that it is Commerce's practice to exclude data from facilities that are not profitable when calculating constructed export price profit rate.  Def. Br. at 32.  Defendant argues that this practice is reasonable because the statute provides that profit is "allocated" to the expenses described in 19 U.S.C. § 1677a(d)(1)–(2), which presupposes that there is profit to be allocated.  Oral Arg. at 1:11:58.  Nothing in the plain text of the statute or regulations supports Defendant's interpretation. See 19 U.S.C. §§ 1677a(d), (f); 19 C.F.R. § 351.402(d)(1).

Instead, the statute explicitly requires Commerce to include "all" expenses incurred that have been properly classified as indirect selling expenses under subsection (d)(1).  19 U.S.C. §§ 1677a(f)(2)(B)–(C).  Likewise, the regulations provide that Commerce "normally will use the aggregate of expenses and profit for all subject merchandise sold in the United States and all foreign like products sold in the exporting country, including sales that have been disregarded as being below the cost of production."  19 C.F.R § 351.402(d)(1).  Thus, the regulations contemplate Commerce including sales that do not generate profits.  On remand, if Commerce continues to exclude NCI's Costa Rican data, Commerce must explain why the statute and regulations permit such an exclusion.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's final determination is remanded for further explanation or reconsideration consistent with this Opinion and Order; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of the date of this Opinion and Order; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of the filing of its remand redetermination.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:        March 21, 2022
                New York, New York