A-201-850
Remand
Slip Op. 22-25
POI:  01/01/2018 – 12/31/2018
**Public Version**
E&C/OIV:  KH

**This Remand Contains Business Proprietary Information from both Building Systems de Mexico, S.A. de C.V and Corey S.A. de C.V./Industrias Recal S.A. de C.V**

***Building Systems de Mexico, S.A. de C.V. v. United States***
**Court No. 20-00069, Slip Op. 22-25 (CIT March 21, 2022)**
**Fabricated Structural Steel from Mexico**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.  SUMMARY

Pursuant to the U.S. Court of International Trade's (the Court) March 21, 2022 remand order,[1] we prepared these final results of redetermination concerning the final determination in the less-than-fair-value (LTFV) investigation of fabricated structural steel (FSS) from Mexico.[2] In its ruling, the Court remanded the following decisions to the U.S. Department of Commerce (Commerce) to reconsider, or further explain:  (1) using Corey S.A. de C.V.'s (Corey) home market sales to calculate the amount of profit included in Building Systems de Mexico, S.A. de C.V's (BSM) constructed value (CV); (2) basing the dumping margin for one unreported sale discovered at verification on adverse facts available (AFA);[3] (3) using the date of the purchase order or sales order acknowledgement as the date of sale;[4] and (4) excluding the operating results for one business unit from its calculation of BSM's constructed export price (CEP) profit rate.[5]

---

[1] *See Building Sys. de Mex., S.A. de C.V. v. United States*, Slip Op. 22-25, Consol. Court No. 20-00069 (CIT March 21, 2022) (*Remand Order*).
[2] *See Notice Certain Fabricated Structural Steel From Mexico:  Final Determination of Sales at Less Than Fair Value*, 85 FR 5390 (January 30, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 16-18.
[4] *Id.* at 18-22.
[5] *Id.* at 24-26.

In accordance with the Court's remand order, in this final redetermination, we:  (1) reconsidered, but did not change, the methodology that we used to calculate profit for BSM's CV; (2) determined that the sale to which we applied AFA in the underlying investigation is not a reportable sale and, thus, application of AFA is unwarranted; (3) used the date of substantial completion of a FSS project as the date of sale rather than the date of the purchase order or sales order acknowledgement; and (4) did not exclude the operating results of the business unit in question from our calculation of the CEP profit rate.

## II.     BACKGROUND

On January 30, 2020, Commerce published an affirmative final determination in the LTFV investigation of FSS from Mexico.[6]  On March 16, 2020, the U.S. International Trade Commission (ITC) notified Commerce of its final determination that an industry in the United States is not materially injured or threatened with material injury by reason of imports of such merchandise that are sold in the United States at LTFV and subsidized by the government of Mexico.[7]  Accordingly, Commerce instructed U.S. Customs and Border Protection (CBP) to liquidate entries of subject merchandise without regard to antidumping duties.[8]  The ITC's final determination was upheld by the Court.[9]  The American Institute of Steel Construction Full Member Subgroup (the petitioner) appealed the Court's determination, and the appeal is pending before the U.S. Court of Appeals for the Federal Circuit.[10]

---

[6] *See Final Determination.*
[7] *See* ITC's Letter, dated March 16, 2020; *see also Fabricated Structural Steel from Canada, China, and Mexico*, 85 FR 16129 (March 20, 2020); and *Fabricated Structural Steel From Canada, China, and Mexico*, Investigation No. 701-TA-616-617 and 731-TA-1432-1434, USITC Pub. 5031 (March 2020) (Final).
[8] *See* CBP Message No. 0083403, dated March 23, 2020.
[9] *See Full Mbr. Subgroup of the Am. Inst. of Steel Constr. v. United States*, 547 F. Supp. 3d 1211 (CIT 2021).
[10] *See Full Member Subgroup of the American Institute v. United States*, Federal Circuit Appeal No. 2022-1176.

On March 21, 2022, the Court remanded to Commerce for further explanation or reconsideration the issues identified in the summary above.[11]  On June 29, 2022, Commerce issued its draft results of redetermination pursuant to the Court's order and provided interested parties with an opportunity to comment on the results.[12]  On July 7, 2022, BSM and the petitioner commented on Commerce's draft results of redetermination.[13]

## III.    REMANDED ISSUES

### A.  Constructed Value

Because the unique, custom-built nature of FSS does not permit price-to-price comparisons for determining the margin of dumping, in accordance with sections 773(a)(4) and 773(e) of the Tariff Act of 1930, as amended (the Act), we based normal value (NV) for BSM on CV.[14]  However, because BSM's home market sales were not viable for comparison purposes, and BSM did not sell the merchandise under consideration in third-country markets during the period of investigation (POI),[15] we were unable to calculate CV profit for BSM using the preferred method under section 773(e)(2)(A) of the Act (*i.e.*, based on the respondent's own home market or third-country sales made in the ordinary course of trade).[16]  Thus, we calculated BSM's CV profit and selling expenses under section 773(e)(2)(B)(ii) of the Act, by using the

---

[11] *See Remand Order*.

[12] *See* Memorandum "Draft Results of Redetermination Pursuant to Court Remand" filed on the record on June 29, 2022 (Draft Remand).

[13] *See* BSM's Letter "Fabricated Structural Steel from Mexico:  BSM's Comments on Draft Remand Redetermination" (BSM's Comments on Draft Remand), and Petitioner's Letter "Certain Fabricated Structural Steel from Mexico:  Petitioner's Comments on Draft Remand Redetermination" (Petitioner's Comments on Draft Remand) both dated July 7, 2022.

[14] *See Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel from Mexico*, (September 10, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 14.

[15] *Id.* at 18.

[16] *Id*.

only other mandatory respondent's, Corey, combined CV profit and selling expenses based on its POI home market sales made in the ordinary course of trade.[17]

The Court found that Commerce's calculation of CV profit for BSM was unsupported by substantial evidence because Commerce:  (1) did not adequately address BSM's claim that the project related to one of Corey's home market sales of FSS, which Commerce used to calculate CV profit, was not contracted for during the POI (and thus, the sale should not have been used in the calculation); and (2) failed to sufficiently explain its decision.[18]  Specifically, the Court found that Commerce failed to sufficiently explain its decision in light of the fact that:  (1) the project in question has a 2017 project number which indicates that it was contracted for before the POI began (the POI is January 1, 2018, through December 31, 2018);[19] (2) Corey made fewer home market sales of FSS during the POI than BSM, and yet, Commerce did not use BSM's home market sales in its CV profit calculation because it found the volume of those sales insufficient; (3) Commerce did not address BSM's arguments that its operations differ from those of Corey in terms of the nature of the projects (smaller projects versus larger projects) and the types of services provided; and (4) Corey's home market profit was higher than that of any other Mexican producer on the record.[20]  Therefore, the Court remanded those matters to Commerce for reconsideration or further explanation.[21]

**Analysis**

Commerce selected Corey's home market sales on which it based BSM's CV profit using the same approach that it required respondents to use to identify reportable U.S. sales.

---

[17] *See Final Determination* IDM at Comment 13.
[18] *See Remand Order* at 8.
[19] *Id*. at 10-11 (footnote 11).
[20] *Id*. at 14-16.
[21] *Id*. at 11-12.

Specifically, it based CV profit only on Corey's home market sales of FSS for projects contracted and substantially completed during the POI (calendar year 2018).[22]

The Court found that Commerce's decision to base BSM's CV profit on Corey's sales of FSS for the project in question was unsupported by substantial evidence because the number assigned to the project indicated that Corey entered into the contract for the project before the POI began.  The Court, citing Corey's section D questionnaire response, noted that Corey creates a project number when a bid is accepted and that "projects are coded using the year of the accepted bid along with . . . a sequential number tracking the number of projects."[23]  Given the number of the project at issue, and record evidence that acceptance of a bid forms a contract, the Court stated that it appears that the sales at issue are for a project for which the contract was entered into in 2017.[24]  The Court also stated that if Commerce continues to use sales for this project in its CV profit calculation, it must explain why Corey would assign a project number to a job when there was not a signed contract for the job and no work had been performed on the job (record evidence indicates no work was done on the project before the POI began (2018)).

BSM argued that Corey's sequential project-numbering system indicated that the project at issue was contracted before 2018 because another project with a later project number had revenues booked before 2018.[25]  BSM claimed that logic would suggest that if a subsequently booked project pre-dated the POI, then so would the challenged project.[26]

However, BSM's logic fails to consider all of the facts.  According to Corey, there are only three ways a bid is accepted:  (1) "a contract is signed"; (2) "the customer signs a final

---

[22] *See Preliminary Determination* PDM at 20; and *Final Determination* IDM at 48.
[23] *Remand Order* at 9 (citing Corey's Letter, "Certain Fabricated Structural Steel from Mexico:  Corey S.A. de C.V.'s Section D Questionnaire Response," dated June 3, 2019 (Corey's DQR), at 10)).
[24] *Remand Order* at 10.
[25] *See* BSM's U.S. Court of International Trade Rule 56.2 Motion for Judgment on the Agency Record, dated February 23, 2021 (BSM Brief), at 12.
[26] *Id.*

budget proposal issued by Corey"; or (3) "the customer issues a purchase order to Corey."[27] Commerce confirmed during the sales verification of Corey that, for the project in question, purchase orders were used, rather than a contract. Commerce reviewed all of the purchase orders for this project and found that they were all dated during the POI (2018).[28] Because Commerce did not find evidence at Corey's sales verification of a signed contract or a signed final budget proposal issued by Corey,[29] the only method remaining to accept a bid is through a purchase order. Herein, record evidence shows that all of the purchase orders received by Corey for this project were dated in 2018. Therefore, Commerce finds that this fact points to the project in question being both contracted and completed in 2018. Moreover, these facts were presented in the sales verification report issued prior to the final determination, and Corey itself, the party that possesses this information, did not dispute these facts in its case briefs for Commerce's final determination. Thus, following Corey's bid acceptance criteria above, Commerce's verification of the evidence on the record supports the conclusion that the bid for the project in question was accepted in 2018 (the date of the purchase orders) and, therefore, the project was contracted in 2018.

   We agree with the Court that the record has contradictory evidence regarding the project in question being a 2018 project. Corey stated that it creates a project number when a bid is accepted and "projects are coded using the year of the accepted bid along with . . . a sequential number tracking the number of projects."[30] The project in question has a 2017 project number. However, a project number is just an identifier used to record and track all transactions related to

---

[27] *See Remand Order* at 10.
[28] *See* Memorandum, "Verification of the Sales Response of Corey S.A. de C.V., and Industrias Recal S.A. de C.V.," dated November 5, 2019 (Corey Sales Verification Report), at 27.
[29] *Id*.
[30] *See* Corey's DQR at 10.

a project.  Although Corey's procedures intend for the project number to only be created when the bid is accepted, it is plausible that this is not always the case because, in this instance, the documents that were used to set the terms and conditions of this project and establish the bid acceptance (*i.e.*, the purchase orders) were all dated in 2018.  Therefore, it is a reasonable assumption that a 2017 project number was established when the bid was submitted in 2017 or prematurely established when a Corey employee assumed the bid was accepted.  While project numbers can be mistakenly established in an accounting system, and voided if necessary or carried over from year to year if needed, herein, the record evidence (*i.e.*, purchase orders), other than the project number, all points to the fact that this project was contracted and completed in 2018 and that no work was performed on this project prior to 2018.[31]  As stated by Corey, the bid is not accepted until specific paperwork is signed or a purchase order is issued, and in this case the latter occurred for the project in question.[32]  These facts were submitted by Corey, which is the owner of the information, they were verified by Commerce, and they were not challenged by Corey or the petitioner during the proceeding.

Regarding the Court's additional concerns with using Corey's sales to calculate BSM's CV profit, we believe it is instructive to examine the statutory alternatives for calculating CV profit.  Where the preferred method (*i.e.*, using the respondent's own sales and costs) for calculating CV profit and selling expenses is unavailable, Commerce must instead rely on one of the three alternatives outlined in sections 773(e)(2)(B)(i) through (iii) of the Act.  Those alternatives are:

---

[31] *See Remand Order* at 11 (footnote 11); and Memorandum, "Verification of the Cost Response of Corey S.A. de C.V. in the Antidumping Duty Investigation of Fabricated Structural Steel from Mexico," dated October 31, 2019 (Corey Cost Verification Report), at 17 (where Company officials explained, and Commerce verified, that there was no production during 2017 for this project and that the amounts posted to this project in 2017 represented returns to the warehouse posted to this project by mistake.).
[32] *Id.* at 10.

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review … for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise, (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) … for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or (iii) the amounts incurred and realized … for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise {(*i.e.*, the "profit cap")}.[33]

The statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit and selling expenses.[34]  According to the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."[35]  Thus, Commerce has discretion to select from any of the three alternative methods, depending on the information available on the record.  In this case, Commerce was faced with choosing among several alternatives for CV profit based on available data that reflect at least one of the criteria noted above.  Therefore, Commerce had to weigh the pros and cons of the available data and, in particular, determine which requirement was more relevant for this case based upon the record data.

In conducting this analysis, we note that the specific language of both the preferred and alternative methods appear to show a preference that the profit and selling expenses reflect production and sales in the foreign country of the foreign like product, *i.e.*, the merchandise

---

[33] *See Preliminary Determination* PDM at 18-19.

[34] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").

[35] *Id.* at 840.

under consideration.  However, when selecting a profit rate from available record evidence, we may not be able to find a source that perfectly reflects these preferences.  In addition, there may be varying degrees to which a potential profit source reflects the merchandise under consideration.  Consequently, we must weigh the quality of the data against these preferences. Determining how specialized the foreign like product is, what percentage of sales are of the foreign like product or general category of merchandise, what portion of sales are to which markets, *etc.*, judged against the above criteria, may help to determine which profit source to rely upon.

As discussed above, Commerce could not rely on BSM's home market sales of FSS because they were not viable and BSM did not sell FSS in third country markets during the POI.  BSM argues that it reported [

].[36]  However, viability is calculated based on volume of sales, not number of sales. Although BSM's number of sales were greater than Corey's, the volume of BSM's home market sales of FSS was less than five percent of its sales of FSS in the United States. Therefore, BSM's volume of home market sales of FSS during the POI was too insignificant to reflect a meaningful home market profit rate.  If BSM's low volume of home market sales of FSS is inadequate for use as NV,[37] it is likewise inappropriate to rely on the profit on those same home market sales to construct a NV.  As cost plus profit equals sales prices, use of the profit from BSM's non-viable home market sales of FSS would result in constructing a NV that reflects those non-viable home market sales.  Although smaller in number, the volume of Corey's home market sales of FSS exceeds five percent of the volume of BSM's sales of FSS

---

[36] *See* BSM Brief at 24.
[37] *See* section 773(a)(1)(C) of the Act (stating that home market sales are insufficient for purposes of comparison if they comprise less than five percent by quantify of the aggregate sales to the United States).

in the United States.[38]  Accordingly, Corey's home market sales of FSS were robust enough to use as a basis for Corey's CV profit, and likewise, robust enough to use as a basis for BSM's CV profit.

Commerce evaluated the other alternatives for calculating BSM's CV profit that were on the record, which included:  (1) the fiscal year (FY) 2018 audited financial statements of Grupo Carso, S.A.B. de C.V. and Subsidiaries, a diversified conglomerate in Mexico comprised of four sectors (Commercial, Industrial, Infrastructure & Construction, and Energy); (2) the FY 2018 audited financial statements of Arcosa, Inc. and Subsidiaries, a U.S. provider of infrastructure related-products and solutions in the construction, energy and transportation markets; (3) the FY 2018 audited financial statements of Altos Hornos de Mexico, S.A.B. de C.V., an integrated producer of flat steel and structural profile products in Mexico; and, (4) the FY 2018 audited financial statements of Ternium, S.A., an integrated producer of flat and long steel products in Mexico.[39]  However, we found Corey's profit information to be superior to that of these surrogate financial statements.  Corey's combined selling expenses and profit closely approximates the statutory preference for calculating CV profit and selling expenses because Corey is a Mexican producer of FSS and the profit and selling expenses that we used in our calculation are from Corey's home market sales of FSS in the ordinary course of trade.  Thus, Corey's profit is specific to FSS.  Basing BSM's CV profit and selling expenses on Corey's sales eliminates some of the inherent flaws that occur with using surrogate financial

---

[38] *See* BSM's Letter, "Certain Fabricated Structural Steel from Mexico:  Section A Questionnaire Response of Building Systems de Mexico," dated May 1, 2019 (BSM's AQR), at A-1; Corey Cost Verification Report at CVE-13; and Memorandum, "Constructed Value Calculation Adjustments for the Final Determination - Corey S.A. de C.V.," dated January 23, 2020, at Attachment 2.
[39] *See Preliminary Determination* PDM at 19.

statements to calculate CV profit (*e.g.*, profits reflecting products that are not in the same general category of FSS).

The Court also found that "differences between Corey and BSM's businesses {(*i.e.*, differences in the sizes and number of project sold, and in the services provided)} detract from the reasonableness of using Corey's home market data {to calculate CV profit} and must be addressed by Commerce."[40]  We recognize the fact that Corey's business model is to produce FSS for a small number of large projects each year, while BSM produces FSS for typically smaller projects.[41]  However, record evidence does not indicate that there is a pattern of profit on Corey's sales of FSS for [

                                ] that would overstate the profit rate that Commerce assigned to BSM's CV.  In the end, regardless of project size, design, *etc.*, both BSM and Corey sold FSS, which is the merchandise under consideration.  The Court also stated that although Commerce reasonably concluded that Corey's home market sales were made within the ordinary course of trade, the fact that Corey's home market profit was higher than that of any other Mexican producer on the record also factors into the representativeness of Corey's data.[42]  However, the evidence on the record supports the representativeness of Corey's profit.  Specifically, [

                        ] of FSS during the POI had a profit of [      ] percent, which exceeds the profit of [      ] percent on Corey's home market sales.[43]

Therefore, for purposes of these final results of redetermination, and consistent with the *Final Determination*, we continue to find that the combined profit and selling expenses of

---

[40] *See Remand Order* at 15.
[41] *Id.* at 15.
[42] *Id.* at 15-16.
[43] *See* BSM's Letter, "Certain Fabricated Structural Steel from Mexico:  Section D Supplemental Questionnaire Response of Building Systems de Mexico," dated July 25, 2019 (BSM's SDQR), at Exhibit SD-25.

Corey's home market sales of FSS for projects contracted and completed during the POI constitute the best information available on the record for valuing BSM's CV profit and selling expenses in the underlying investigation.

**Interested Parties' Comments:**

*BSM:*[44]

- Commerce improperly and unreasonably determined BSM's CV profit in its draft results of redetermination.

- Although Commerce stated that it based CV profit only on Corey's home market sales of FSS for projects contracted and substantially completed during the POI (calendar year 2018), record evidence shows that in the draft results of redetermination, Commerce based its CV profit calculation on a Corey project contracted for in 2017 which is before the POI began.

- That evidence includes:  (1) the fact that Corey assigns numbers to projects when a bid is accepted and a contract formed and the project in question has a 2017 contract number. This indicates the contract was formed in 2017; (2) in Corey's records, the [

];(3) the fact that Corey assigned costs to the project in question in 2017 (although this was done in error), indicates that an account existed for the project in 2017.  Corey only establishes accounts for projects when there is a contract for the project; and (4) the earliest purchase order for the project ([                                       ]), is labeled a [                                ].  This is [

] and would explain the 2017 project number.

---

[44] *See* BSM's Comments on Draft Remand.

- Commerce's explanation for the 2017 project number, namely that Corey may have mistakenly assigned the project a 2017 number, is merely speculation that is not supported by record evidence.

- Although Corey did not explain why it assigned the project a 2017 number, it certified to the accuracy of the records that it submitted to Commerce in which it identified the [                              ].

- The CV profit rate that Commerce determined is unreasonable because it is based on a [              ], with an unusually high profit, by a company other than BSM (Corey) that has an entirely different business model than that one that BSM uses.

- The CV profit rate of [    ] percent that Commerce determined is aberrational when compared to the average profit rate on BSM's [  ] profitable home market sales of FSS during the POI ([    ] percent); the average profit rate on all of Corey's profitable sales for projects completed during the POI (approximately [    ] percent); and the simple average of the profit rates from the financial statements of the four Mexican producers of comparable merchandise that are on the record ([    ] percent).

- If the profit rate on BSM's [  ] profitable home market sales of FSS during the POI is not an appropriate profit rate for constructing a value (CV) to compare to the prices of BSM's U.S. sales, then the profit rate on a separate company's (Corey's) [              ] of a type of FSS and design/build services that differ from those provided by BSM, cannot be an appropriate CV profit rate.

- While Commerce may take sales volume into account when determining whether a profit rate is representative, Commerce's viability standard need not be applied when calculating CV profit.

- BSM's aberrational profit rate of [     ] percent on [     ] of its home market sale of FSS during the POI, does not support the CV profit rate determined by Commerce because the volume and value of the sale are [          ] and the sale was for a project produced outside of the POI (the project was produced in 2017).

- Commerce has a number of more reasonable alternatives to basing CV profit on a [          ] by Corey with an unusually high profit.  Commerce could base CV profit on BSM's home market profit rate, the profit rate of four Mexican producers of comparable merchandise, or it could include additional sales by Corey in its calculation of CV profit, including [

          ].

*Petitioner*:[45]

- Commerce fully responded to the Court's concerns in its draft results of redetermination.

- There is no evidence of a signed contract or a signed bid for the project in question that has a 2017 contract number and all of the purchase orders for this project are dated in 2018.  Thus, record evidence demonstrates that the contract for this project was in 2018 (during the POI).

- Commerce fully considered alternative sources for CV profit that are on the record and found the profit rate for Corey's [          ] preferable to the alternative sources.

- In contrast to the volume of Corey's home market sales of FSS during the POI, the volume of BSM's home market sales of FSS during the POI demonstrates that its home market is not viable and thus it is inappropriate to base CV profit on BSM's home market profit rate.

---

[45] *See* Petitioner's Comments on Draft Remand.

- Corey's profit rate is more specific than the profit rate derived from the four Mexican producers of comparable merchandise because it is the profit rate on sales of FSS in Mexico in the ordinary course of trade.

- Corey's profit rate is within the range of profit rates on the record and is [


    ]

- There is no evidence that business differences between Corey and BSM would result in overstating BSM's CV profit rate if Commerce based that profit rate on Corey's profit.

**Commerce's Position:**

We have continued to include the profit that Corey earned on its home market sales of FSS for the project in question in our calculation of BSM's CV profit.  While concerns have been raised regarding whether the contract for the project at issue was executed in 2017, and thus profit on the project should not be used to calculate BSM's CV profit, Commerce specifically examined whether the project in question was contracted during the POI at verification.  Under "Completeness Test 4" in the verification report, "we reviewed the contract and purchase order for {the} [                              ] projects in Mexico to determine whether these projects were contracted during the POI …"  Commerce found that "{f}or the [              ] project, purchase orders were used rather than a contract.  The purchase orders for this project were dated {in 2018}."[46]  Corey reported that a proposal is considered to be "accepted" (and thus a contract formed) when either a contract is signed, the customer signs the proposal, or the customer issues a purchase order for the project.[47]  As noted above, Corey officials explained at

---

[46] *See* Corey Sales Verification Report at 27 and Exhibit SVE-24.
[47] *See* Corey's Letter, "Certain Fabricated Structural Steel from Mexico:  Corey S.A. de C.V.'s Section A Questionnaire Response," dated April 30, 2019, at A-26.

verification that purchase orders, rather than a contract, were used for the [          ] project.
Corey officials never indicated that a signed proposal formed a contract for the [          ]
project when Commerce examined this issue at verification.  Therefore, the only record evidence
that indicates when a contract was formed for the [          ] project are the purchase orders
that Commerce obtained at verification, all of which are dated in 2018.

    Although BSM noted that Corey reported a [

],[48] the weight of the evidence on the record demonstrates that Corey did not [

].  Corey reported that it did not [

].[49]  At verification, Corey "officials explained
that there was no production during 2017 for the [          ] project …."[50]  In its
rebuttal brief, Corey did not dispute the information in Commerce's verification report, but
instead restated Commerce's finding "that there was a negative amount booked in 2017 for
another project, ([          ] project), which Corey demonstrated that it {sic} was a
booking error reversed in 2018 and that there was no production during 2017 for this project."[51]
The only record evidence of a start date that we were able to find that is associated with work
done on the [          ] project is the start date for the bidding process.  Corey provided
documentation showing that it started the bidding process for the [          ] project on
[          ].[52]  However, work would not have started on the [          ] project at
that time since the proposal had not even been submitted at that point and there was no
agreement between the parties regarding the project.

---

[48] *See* Corey's Letter "Certain Fabricated Structural Steel from Mexico:  Corey S.A. de C.V.'s Section C
Questionnaire Response," dated June 3, 2019, at Exhibit C-3b.
[49] *See* Corey's DQR at Exhibit D-4.
[50] *See* Corey Cost Verification Report at 17.
[51] *See* Corey's Letter "Certain Fabricated Structural Steel from Mexico:  Corey S.A. de C.V.'s Rebuttal Brief," dated
November 27, 2019, at 8 (footnote 20).
[52] *See* Corey Sales Verification Report at Exhibit SVE-17.

BSM focuses its argument primarily on the fact that Corey assigned project number [    ] to the [                    ] and it reported that "projects are coded using the year of the accepted bid along with … a sequential number tracking the number of projects."[53]  However, Corey also reported that "{w}hen purchases of raw materials are made, the purchases are recorded in the accounting system under the corresponding *project* code."[54]  While BSM contends that Commerce's explanation for the 2017 project number, namely that Corey may have mistakenly assigned the project a 2017 number, is merely speculation that is not supported by record evidence, the record shows that:  (1) Corey personnel mistakenly believed that Corey had undertaken the [                    ] in 2017; (2) Corey personnel assigned materials from the warehouse to the project; and (3) a project number had to be created in order to record costs associated with the materials that Corey personnel mistakenly believed were purchased for the [                    ].[55]  Therefore, there is record evidence to support Commerce's position that Corey personnel may have prematurely assigned a 2017 project number to the [                    ] in error.  Because this error was not discovered until later in 2018, projects for which the bids were subsequently awarded, or contracts subsequently executed, would receive the next sequential project number after the project number assigned to the [                    ].  Hence, the [                    ] could have been contracted in 2018 and still have a project number preceding the numbers of other projects that were awarded in 2017.

BSM claims the fact that the earliest purchase order on the record for the [         ] ([                    ]) is labeled as a [                    ] is [

---

[53] *See* Corey's DQR at 10.
[54] *Id*. (emphasis added).
[55] *See* Corey Cost Verification Report at 17; *see also* Memorandum, "Proprietary Information in the Final Determination of the Antidumping Duty Investigation of Certain Fabricated Structural Steel from Mexico:  Corey S.A. de C.V.," dated January 23, 2020, at Note 2.

] that would explain the 2017 project number.
However, there is no reference to a [

] in the purchase order that is labeled as a [                ].  The only
reference in the [                    ] to similar documents is a reference to [

].[56]  Thus, the record does not demonstrate that the purchase order that is labeled
as a [             ] is a [              ] to a previous purchase order, as BSM claims, rather
than simply the first purchase order which [                    ] the original job that was put
out to bid.

   BSM claims that the CV profit rate determined by Commerce is unreasonable and
aberrational based on a number of comparisons, including a comparison with the profit rate on its
own home market sales of FSS during the POI.  However, we find those comparisons do not
provide a reasonable basis for determining a representative profit for a manufacturer of FSS in
Mexico.  BSM compared the CV profit rate determined by Commerce to the profit rates of the
following companies:  (1) Grupo Carso, S.A.B. de C.V. and Subsidiaries – a multinational
company with 78% of its 2018 sales in Mexico that operates department and electronic stores
and restaurants, produces products for the telecommunications, construction, electrical, energy,
automotive, and mining industries, provides natural gas transportation services, and services with
respect to the exploration and production of hydrocarbons and the exploration of geothermal
energy, and that engages in infrastructure construction (with business segments in the chemical
and oil industry, pipeline installation, infrastructure, and civil construction and housing
development (these segments, which, among other things, construct metal structures, earned only

---

[56] *See* Corey Sales Verification Report at Exhibits SVE-17 and SVE-24.

16.0 percent of Grupo Carso, S.A.B. de C.V.'s 2018 sales revenue));[57] 2) Arcosa, Inc. and Subsidiaries – a Delaware corporation headquartered in Dallas, Texas with a Construction Products Group that produces and sells construction aggregates, including natural aggregates and specialty materials, and construction site support equipment, including trench shields and shoring products, an Energy Equipment Group that manufactures structural wind towers, utility steel structures for electricity transmission and distribution, and storage and distribution tanks (the company is one of the leading manufacturers of structural wind towers in the United States and Mexico), and a Transportation Products Group that manufactures and sells inland barges, fiberglass barge covers, and marine hardware, and steel components for railcars and other transportation and industrial equipment.  Revenue from Arcosa, Inc. and Subsidiaries' Mexican operations, including intercompany revenue, was only approximately 11 percent of the company's total revenue in 2018;[58] (3) Altos Hornos de Mexico, S.A.B. de C.V. – one of the largest manufacturers of steel products in Mexico, whose principal activity is the production and sale of flat steel and structural profiles.  This company has two completely unrelated segments, steel and coal. The steel segment manufactures steel products through a fully integrated process, starting from its own sources of raw materials to the distribution and sale of its finished goods. The coal segment includes the extraction and sale of thermal coal for the generation of electric power;[59] and (4) Ternium, S.A., a Luxembourg company with operations in Mexico, Brazil, Argentina, Colombia, the southern United States and Central America.  Ternium, S.A. claims to be Latin America's leading producer of flat steel.  The company has iron ore mines, steelmaking

---

[57] *See* Petitioner's Letter, "Certain Fabricated Structural Steel from Mexico:  Petitioner's Submission of Other Factual Information," dated August 5, 2019, at Exhibit 3.
[58] *See* BSM's Letter, "Certain Fabricated Structural Steel from Mexico:  Submission of New Factual Information," dated August 5, 2019, at Attachment 1.
[59] *Id.* at Attachment 2.

facilities, finishing facilities, service centers, and a broad distribution network through which it sells slabs, hot-rolled products, cold-rolled products, galvanized and electrogalvanized sheets, pre-painted sheets, tinplate, welded pipes, rebars, wire rods, and slit and cut-to-length products.[60] These companies have disparate operations compared to BSM, which purchases pre-shaped steel parts (including steel flat bars, hot rolled steel coils, cut-to-length hot-rolled sheet, discrete plate, and steel beams) from third parties that it further fabricates or welds together.[61]  Given the wide range of products that these companies produce and the difference between their production processes and those of a company that solely produces FSS, we have concluded that their profit ratios are not sufficiently comparable to the profit rate of a Mexican producer of FSS to be appropriate benchmarks for gauging how representative a profit ratio is for a Mexican producer of FSS.

BSM also compared the CV profit rate determined by Commerce with the profit rate on its own home market sales of FSS during the POI.  However, as explained above, because BSM did not have a viable home market during the POI, the volume of its home market sales is too insignificant to derive a reliable profit rate for CV that would permit a proper comparison to the prices of its sales of subject merchandise.  Section 773(a)(1) of the Act provides that NV shall not be based on the price at which the foreign like product is sold for consumption in the exporting country where the volume of such sales in the exporting country is less than five percent of the volume of sales of subject merchandise.  Section 773(a)(1)(C)(ii) specifically describes the volume of such home market sales as "insufficient to permit a proper comparison with the sales of the subject merchandise to the United States."  If such a low volume of home market sales is insufficient for calculating NV based on price, it follows that this low volume of

---

[60] *Id.* at Attachment 2.
[61] *See* BSM's AQR at A-31 and A-34.

home market sales is insufficient for calculating a component of CV which is being used as NV. This is consistent with Commerce's practice when calculating CV profit for respondents without a viable home market.  Commerce has a longstanding practice of disregarding both non-viable markets and non-profitable sales as sources for CV profit and selling expenses under section 773(e)(2)(A) of the Act.[62]  Thus, BSM's argument that the CV profit rate calculated by Commerce is unreasonable because it [

] is fallacious because it is based on a comparison to BSM's profit rate, which Commerce has already determined is unreliable because of the small volume of sales on which it is based.  In support of its argument that the profit rate on its own home market sales of FSS is a better source of CV profit than the profit rate on Corey's home market sales of FSS, BSM notes that it made [                 ] home market sales of FSS during the POI, ([

]) compared to [

] on which Commerce based BSM's CV profit rate.  However, the volume of BSM's home market sales do not pass the threshold volume used in the viability test, whereas the volume of Corey's [

]  Moreover, although BSM made [

---

[62] *See Certain Oil Country Tubular Goods From the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*; 2017-2018, 85 FR 41949 (July 13, 2020), and accompanying IDM at Comment 3.

].  Hence, BSM's home market sales do not

provide [                                                                            ].

Lastly, even if the profit rate comparisons discussed above are found to be valid, the CV

profit rate that Commerce derived from Corey's home market sales ([      ] percent) is supported

by those comparisons.  The profit rate [

].[63]  The overall profit rate from [

].  While these comparisons

involve production/operations in calendar year 2017, their proximity to the POI make them

relevant for purposes of benchmarking.  Moreover, although BSM contends that the [



].

Section 773(e)(2)(B) of the Act permits Commerce to base CV profit for a respondent on

the weighted average of the profit that other exporters or producers that are subject to the

investigation or review realized in connection with the production and sale of a foreign like

product, in the ordinary course of trade, for consumption in the home market.  Corey was a

mandatory respondent in the underlying investigation that sold the foreign like product in the

ordinary course of trade for consumption in the home market during the POI.  Thus, Corey's

profit rate can be used to construct CV for BSM.  Moreover, unlike other profit rates on the

record, Corey's profit rate is representative of the profit rates experienced by producers of FSS in

Mexico because Corey *is* a producer of FSS in Mexico.  For the reasons explained above, we do

not find that the other profit rates on the record demonstrate that Corey's profit rate is

---

[63] *See* BSM's SDQR at Exhibit SD-25.

unreasonable. Finally, despite any differences between BSM's and Corey's business models, both companies are FSS producers and the only profit rates on the record for a company that primarily produces FSS in Mexico that demonstrated that it has a viable home market are Corey's profit rates. Therefore, consistent with the Draft Remand, in these final remand results, we continue to find that the combined profit and selling expenses of Corey's home market sales of FSS for projects contracted and completed during the POI constitute the best information available on the record for valuing BSM's CV profit and selling expenses in the underlying investigation.

### B. Adverse Facts Available

Although Commerce normally instructs respondents to report all sales made during the POI based on the date of sale, it did not follow that practice in the underlying investigation, because of the unique nature of FSS. FSS is typically custom-made for a specific project,[64] and normally is not fully manufactured at the date of the sale or contract. All movement charges and adjustments for sales of FSS may not be known until the FSS has been produced and the project completed.[65] Given these facts, Commerce determined that the universe of U.S. sales examined should be based on contracted sales for project/orders that were substantially completed during the POI.

All of BSM's reported U.S. sales were made by its CEP affiliates (*i.e.*, NCI Group, Inc. and Robertson-Ceco II Corporation (collectively, NCI)), through either the Buildings or Components business segments.[66] The Buildings Segment designs pre-engineered metal buildings for customers and then produces and sells to the customer all of the metal components

---

[64] *See Preliminary Determination* PDM at Section XI.
[65] *Id.*
[66] *See Final Determination* IDM at 14.

required to construct the shell of the building.  These buildings are produced, shipped, and invoiced to unaffiliated U.S. customers in phases.  The Components Segment does not design pre-engineered metal buildings for customers, but sells metal structural building components to customers based on the customers' orders.  BSM reported the date of substantial completion for its U.S. sales as the final "Phase Complete" date for any phase of the project for Buildings Segment sales and the later of the Oracle 10.7 system Load Date or the Oracle 11i Phase Complete date for Components Segment sales.[67]

During verification of NCI, Commerce officials examined several categories of sales that BSM did not report in its U.S. sales database.  One of those categories covered sales related to incomplete projects.[68]  While examining sales related to incomplete projects, company officials identified one order (*i.e.*, [       ]) for which FSS for certain phases of the project had been completed and shipped to the customer/job site in 2018 (during the POI), but FSS for other phases of the project were to be completed in April 2019 and FSS for those phases had not been shipped to the customer/job site.[69]  These incomplete project phases were later canceled in July 2019.[70]  As a result of this cancellation, all phases of the project for order [       ] had been completed, and the FSS shipped to the customer/job site, in 2018 (*i.e.*, phase complete dates in 2018).  However, because order [       ] had incomplete phases of the project in April 2019, and BSM created the U.S. sales database in April 2019,[71] it considered this order incomplete (*i.e.*, not substantially completed in 2018 (the POI)), and thus, it did not report sales related to this order in

---

[67] *See* Memorandum, "Verification of NCI Group, Inc., and Robertson-Ceco II Corporation in the Antidumping Duty Investigation of Certain Fabricated Structural Steel from Mexico," dated October 31, 2019 (BSM's CEP Verification Report), at 14.
[68] *Id.* at 22-24.
[69] *Id.* at 24.
[70] *Id.* at 24 and Exhibit CEP-VE-15.
[71] *Id.* at 22-24.

the U.S. sales database (reportable sales are sales for projects/orders contracted and substantially completed during the POI).[72]

In the underlying investigation, Commerce based the dumping margin for the unreported sale discovered at verification that relates to order [      ] on AFA because "{s}ales of {FSS} for projects completed during the POI were to have been reported in the U.S. sales database. However, the U.S. sales database did not include this sale."[73]  Commerce believed that the project specified in order [      ] was completed during the POI (calendar year 2018), because NCI completed, and shipped, all of the FSS that it ultimately sold pursuant to this order (after partial cancellation of the order) in 2018.

However, the Court found that Commerce's decision to apply AFA to this sale was not supported by substantial evidence because the project remained incomplete until July 2019 when the customer canceled the remaining incomplete phases of the project and relieved BSM of any further obligations under the agreement (if the project was not substantially complete during the POI, sales of FSS for the project were not reportable).[74]  The Court remanded this matter to Commerce for reconsideration or further explanation.[75]

**Analysis**

In light of the Court's *Remand Order*, we reconsidered our determination and find that order [      ] was not substantially complete during the POI, and thus, BSM properly excluded sales of FSS pursuant to this order from the U.S. sales database.  As noted above, in the underlying investigation, Commerce considered the project specified in order [      ] substantially complete in 2018 because NCI finished manufacturing, and shipped, all of the FSS

---

[72] *See Final Determination* IDM at Comment 16.
[73] *Id.*
[74] *See Remand Order* at 15-16.
[75] *Id.* at 26.

that it supplied to the customer under this order, in 2018.  Yet this decision is inconsistent with the manner in which Commerce described the date of substantial completion in section C of the questionnaire.  Commerce included a database field in section C of the questionnaire, called "Date of Substantial Completion of the Terms of All Sales Agreements."[76]  We instructed  BSM to report in this field "the date on which all of the terms of the sales agreements related to this transaction were substantially completed."[77]  Based on this instruction, the date of substantial completion for the project specified in order [      ] was not until July of 2019, when the remaining phases of the project were canceled, at which point all of the terms of the sales agreement were fully satisfied and, thus, completed (*i.e.*, there was nothing more to be done on the project at that point and BSM had fulfilled all of its obligations under the agreement).  Order [      ] was not complete in 2018, as there were open phases of the project yet to be completed.  Accordingly, for these final results of redetermination, we have not applied AFA with respect to the sale pursuant to order [      ].

**Interested Parties' Comments:**

*BSM*:[78]

- Commerce correctly concluded in its draft results of redetermination that partial AFA is unwarranted since U.S. sales related to project [      ] did not need to be reported.

- BSM did not fulfill all of its obligations related to the project until the project agreement was modified in the middle of 2019.  Thus, the project was not completed during the POI and BSM did not need to report sales related to the project in its U.S. sales database.

---

[76] *See* BSM's Letter, "Certain Fabricated Structural Steel from Mexico:  Section C Questionnaire Response of Building Systems de Mexico," dated June 4, 2019 (BSM's CQR), at 23.
[77] *Id.*
[78] *See* BSM's Comments on Draft Remand.

*Petitioner:*[79]

- Because project [      ] was completed during the POI and sales related to the project should have been reported to Commerce, but they were not reported, Commerce should continue to base the dumping margin for these sales on AFA.

- Project [      ] was completed during the POI (calendar year 2018) because:  (1) BSM considers the date of the last shipment of FSS for a project to be the date of substantial completion of the project and the date of the last shipment for project [      ] was during the POI; and (2) BSM did nothing on the project between the last shipment in 2018 and cancellation of the outstanding phases of the project in 2019.  Thus, BSM fulfilled all of its obligations under the agreement for this project, and all terms of the agreement were completed, in 2018 (during the POI).

- Commerce's approach in the draft remand redetermination may result in inconsistent sales reporting.  BSM reported sales in its U.S. sales database based on whether or not orders were complete when it created the database in April 2019.  Thus, inconsistent with the draft remand redetermination, BSM would have reported U.S. sales for projects for which the outstanding phases of the projects had been cancelled between January 2019 and April 2019.  This fact also demonstrates that BSM considers projects complete, and its obligations fulfilled, when the last shipment for the project is made, even if there were outstanding phases of the project that were subsequently cancelled.

- If Commerce does not base the dumping margin for sales related to project [      ] on AFA, given that the information needed to calculate a dumping margin for these sales is not on the record, Commerce must base the dumping margin for these sales on facts

---

[79] *See* Petitioner's Comments on Draft Remand.

available (FA).  As FA, Commerce should assign a dumping margin of [       ] percent to sales for project [        ], which is half of the highest non-aberrational dumping margin calculated for BSM ([        ]) percent.

**Commerce's Position:**

In section C of the antidumping duty (AD) questionnaire that Commerce issued to BSM in the underlying investigation, Commerce instructed BSM to "report sales of subject merchandise to the United States for each contract dated during the POI for which the project was **completed** during the POI … ."[80]  The petitioner explained that substantial completion of a contract/project means "the date on which the terms of the principal and any ancillary agreements that are an integral part of the contract (including side agreements negotiated along with the principal sales agreements, as well as amendments and change orders) are considered substantially filled by both parties and all payments that can be reasonably expected have been received."[81]  BSM explained that its "Buildings Segment considers the date on which the final shipment of the last outstanding phase for a project {is made} to be the date of substantial completion"[82] (the Buildings Segment made the sales for project [        ]).  Under either definition of completion, BSM did not complete project [        ] during the POI (*i.e.*, during calendar year 2018) because there were outstanding phases of the project that BSM had not completed on December 31, 2018.  Thus, the terms of the principal and any ancillary agreements for project [        ] could not be considered substantially filled by both parties during the POI, nor had BSM made the final shipment for the last outstanding phase of project [        ] by

---

[80] *See* Commerce's Letter, "Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel from Mexico," dated April 11, 2019, at page 3 of section C of the questionnaire.

[81] *See* Petitioner's Letter, "Certain Fabricated Structural Steel from Canada, Mexico, and the People's Republic of China:  Petitioner's Comments on Questionnaire Modifications," dated March 22, 2019, at 4.

[82] *See* BSM's CQR at 23.

December 31, 2018, since there were still outstanding, incomplete phases of the project on that

date.  The fact that BSM did nothing on the project between the last shipment in 2018 and

cancellation of the outstanding phases of the project in 2019, and that BSM's last shipment for

the project was in 2018, do not mean that it completed the project in 2018.  BSM continued to

have obligations under the contract, and had unfinished work on the project that would have

required final shipments of products for the last outstanding phases, until the remaining phases of

the project were cancelled in 2019.

Therefore, consistent with the Draft Remand,[83] we continue to find that BSM did not

complete project [          ] during the POI and thus it was not required to report sales for this

project to Commerce.  Because BSM was not required to report sales for this project to

Commerce, there is no basis to apply partial AFA to BSM for not reporting such sales.

## C.  Date of Sale

The Court remanded to Commerce for further explanation, or reconsideration, its

decision to use purchase order, or sales order acknowledgement, date (depending on the sale) as

the date of sale.[84]  While Commerce argued that post-purchase-order changes are inevitable due

to the nature of the production of subject merchandise (*i.e.*, long term production contracts),[85] the

Court noted that "the material terms of FSS sales frequently changed between the purchase order

and invoice, and, therefore, a purchase order generally does not establish the terms of a sale"[86]

(Commerce may consider when the material terms of a sale were established to identify the date

of sale).  Hence, the Court held that Commerce ignored the plain language of its own regulations

---

[83] *See* Memorandum, "Certain Fabricated Structural Steel From Mexico:  Draft Remand Redetermination Analysis Memorandum," dated June 28, 2022, unchanged and adopted for this final remand redetermination (Draft Analysis Memorandum).
[84] *See Remand Order* at 22.
[85] *See Final Determination* IDM at Comment 10.
[86] *See Remand Order* at 21.

which gives it the discretion to use a date other than the invoice date as the date of sale, but only when there is satisfactory evidence that such other date is the date when the terms of a sale were established. The Court did not find Commerce's reliance on *LNPPs from Germany* persuasive, because that case involved minor changes to specifications, whereas the Court noted that many of the changes in question here were not minor.[87]

**Analysis**

19 CFR 351.401(i) states that, "{i}n identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business." The regulation provides further that Commerce may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[88] Commerce has a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established.[89]

In the *Preamble* to is regulations,[90] Commerce explained that the date of sale for custom-made merchandise must reflect the date when the terms of sale are firmly established:

> {i}f {Commerce} is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, {Commerce} will use that alternative date as the date of sale. For example, in situations involving large custom-made merchandise in which the parties engage

---

[87] *Id.* at 20-22 (citing *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany: Final Results of Antidumping Duty Administrative Review*, 66 FR 11557 (February 26, 2001) (*LNPPs from Germany*)).

[88] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)) (*Allied Tube*).

[89] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 10; and *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[90] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296 (May 19, 1997) (*Preamble*).

in formal negotiation and contracting procedures, {Commerce} usually will use a date other than the date of invoice.  However, {Commerce} emphasizes that in these situations, the terms of sale must be firmly established and not merely proposed. A preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly "established" in the minds of the buyer and seller.  This holds even if, for a particular sale, the terms were not renegotiated.[91]

The Court has held that "a party seeking to establish a date of sale other than invoice date bears the burden of producing sufficient evidence to 'satisfy' Commerce that a different date better reflects the date on which the exporter or producer establishes the material terms of sale."[92]  Alternatively, Commerce may exercise its discretion to rely on a date other than invoice date if it "provides a rational explanation as to why the alternative date 'better reflects' the date when 'material terms' are established."[93]  The date of sale is generally the date on which the parties establish the material terms of the sale.  This normally includes the price, quantity, delivery terms and payment terms.

All of BSM's reported U.S. sales are CEP sales made by NCI through the Buildings or Components business segments.[94]  The Buildings segment designs pre-engineered metal buildings for customers and then produces and sells to the customer all of the metal components required to construct the shell of the building.  These buildings are produced, shipped, and invoiced to unaffiliated U.S. customers in phases.  The Components segment does not design pre-engineered metal buildings for customers, but sells metal structural building components to customers based on the customers' orders.  The Components segment does not use phases in its sales accounting.  For Components segment sales, NCI issues invoices when the components are shipped.

---

[91] *Id.*
[92] *See Allied Tube*, 132 F. Supp. 2d at 1090-92.
[93] *See SeAH Steel Corp. v. United States*, Court No. 00-04-00157, Slip Op. 01-20 (CIT 2001).
[94] *See Final Determination* IDM at Comment 3.

In the underlying investigation, Commerce used the date of the purchase order as the date of sale for Buildings segment sales and the date of the sales order acknowledgement as the date of sale for Components segment sales.[95]  We explained in the final determination that while "design changes and related price changes are inevitable with respect to large-customized products, … important material aspects of the sale were established on the purchase order/sales order acknowledgment date."[96]

NCI regards the purchase order and sales order acknowledgment as contracts.[97]  While the *Preamble* states that "in situations involving large custom-made merchandise in which the parties engage in formal negotiation and contracting procedures, {Commerce} usually will use a date other than the date of invoice" as the date of sale, it continues by noting that "the terms of sale must be firmly established and not merely proposed."[98]

Record evidence indicates that the purchase order and the sales order acknowledgment do not firmly establish the terms of sale.  BSM reported that "{c}hanges in the price of subject FSS are often made after sales order agreements, and {NCI} does not know the actual quantity of FSS being sold until the material is weighed before shipment."[99]  During BSM's CEP verification, company officials,

> explained that the scope of a project (FSS was custom made for a specific project)[100] or terms of sale may change up until a project is completed.  Change orders can affect the quantity sold and other aspects of the sale.  Officials indicated that because they do not know how an order will change until all phases {of the project} have been completed, they used the dates described above as the date of sale (*i.e.*, the date of substantial completion).[101]

---

[95] *Id.* at Comment 10.
[96] *Id.*
[97] *See* BSM's Letter, "Certain Fabricated Structural Steel from Mexico:  Section A Supplemental Questionnaire Response of Building Systems de Mexico," dated June 11, 2019, at 12.
[98] *See Preamble*, 62 FR at 27349.
[99] *See* BSM's AQR at A-17.
[100] *See* BSM's CQR at 5.
[101] *See* BSM's CEP Verification Report at 14.

During BSM's CEP verification, we reviewed change orders related to prices in purchase orders, and the scope of the work or design.[102]  For example, during the CEP verification, we examined change orders for order [        ], which showed that the original price for the order, [        ], was ultimately revised to [        ] due to changes in design.[103]  The corresponding quantity of the order was revised from [     ] metric tons (MT) to [     ] MT.[104]

Additionally, comparing the INSALVALU (*i.e.*, total initial complete sales agreement value which is reflected in the purchase order or sales order agreement) and FINSALVU (*i.e.*, total final complete sales agreement value) fields in BSM's U.S. sales database shows numerous sales where [

                                                                                        ].  Changes which result in significant differences in quantity or price, as well as design or scope changes, may be considered "major" changes.  The Court previously stated that "the existence of … one sale beyond contractual tolerance levels suggests sufficient possibility of changes in material terms of sale so as to render Commerce's date of sale determination {use of a date other than contract date} supported by substantial evidence."[105]

Given the record evidence above, and the Court's *Remand Order*, we have reconsidered our determination and find that the date of substantial completion is the appropriate date of sale because this is the earliest date on which the materials terms of sale were firmly established. BSM reported the date of substantial completion as the final "Phase Complete" date for any phase of the project for Buildings Segment sales and the later of the Oracle 10.7 system Load

---

[102] *Id.*
[103] *Id.* at Exhibit VE-4.
[104] *Id.*
[105] *See Allied Tube*, 132 F. Supp. 2d at 1090.

Date or the Oracle 11i Phase Complete date for Components Segment sales.  Thus, in these final results of redetermination, we have used those dates as the dates of sale.

**Interested Parties' Comments:**

*BSM*:[106]

- Commerce correctly determined in the draft results of redetermination that the date of substantial completion of a project is the date of sale for the project.

- Commerce's regulations and practice dictate that the date of sale is the date on which the material terms of an agreement are firmly established.  Because the scope and terms of BSM's projects could change until they were completed, the material terms of the agreements for BSM's projects were not firmly set until the date of substantial completion of the project.

*Petitioner*:[107]

- Commerce should use the date of the purchase order or the date of the sales order acknowledgement as the date of sale because, according to BSM, these "are the principle sales agreements that define {its} terms of sale"[108] and the order date is when it "considers an order to be firm and initiates work on the project."[109]

- Thus, the purchase order and the sales order acknowledgment establish an agreement between BSM and the customer in which the material terms of a project are established. Any changes to the order are simply done to effectuate that agreement.

---

[106] *See* BSM's Comments on Draft Remand.
[107] *See* Petitioner's Comments on Draft Remand.
[108] *See* BSM's Letter, "Certain Fabricated Structural Steel from Mexico:  Section A Questionnaire Response of Building Systems de Mexico," dated May 1, 2019, at A-20.
[109] *See* BSM's Letter,"Certain Fabricated Structural Steel from Mexico:  BSM's Response to Request for Information," dated April 11, 2019, at I-3.

- The Court previously held that Commerce's "date of sale analysis cannot begin and end with a simple, cut-and dried, 'yes/no' determination as to whether there was any change to any material term of any contract at issue."[110]  Rather, "{e}ven when there is evidence of change in a material term, {Commerce} still must consider whether —as evidenced by their understanding of the sales process, as well as their course of conduct—the parties had the expectation that the material terms of sale were fixed on the date of contract."[111]

- Here, the record confirms that BSM and its customers understood that the material terms of sale were established in the purchase order or in the sales order acknowledgement.

**Commerce's Position:**

We disagree with the petitioner.  As noted above, the date of sale is generally the date on which the parties establish the material terms of the sale.[112]  Those terms normally include the price, quantity, delivery terms, and payment terms.[113]  The Court has explained that the "'key element to consider" in determining date of sale is which date best reflects the point at which the parties had a meeting of the minds on the material terms of sale."[114]  Thus, the Court noted that Commerce's date of sale analysis should be "a reasoned, case-specific, fact-intensive analysis as to when the parties had a meeting of the minds on the material terms of sale, which is what the law requires."[115]

---

[110] *See Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1312 (Ct. Int'l Trade 2009) (*Nucor Corp*) (quoting *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000)).
[111] *Id*.
[112] *See* 19 CFR 351.401(i).
[113] *See, e.g., Hardwood and Decorative Plywood From the People's Republic of China:  Antidumping Duty Investigation*, 78 FR 25946 (May 3, 2013), and accompanying PDM under "Date of Sale" section (citing *Carbon and Alloy Steel Wire Rod From Trinidad and Tobago:  Final Results of Antidumping Duty Administrative Review*, 72 FR 62824 (November 7, 2007), and accompanying IDM at Comment 1; and *Notice of Final Determinations of Sales at Less Than Fair Value; Certain Cold-Rolled Flat-Rolled Carbon Quality Steel Products from Turkey*, 65 FR 15123 (March 21, 2000), and accompanying IDM at Comment 1).
[114] *See Nucor Corp* 612 F. Supp. 2d 1264, 1307.
[115] *Id*. at 1303.

While the purchase order and the sales order acknowledgment may be evidence of a firm order, and may establish the terms of the agreement between BSM and the customer, record evidence does not demonstrate that BSM and its customers had a meeting of the minds on the material terms of sale when those documents were executed.  Rather, record evidence shows that the material terms of sale often changed after the initial agreement between the parties.  As noted above, BSM reported that "{c}hanges in the price of subject FSS are often made after sales order agreements, and {NCI} does not know the actual quantity of FSS being sold until the material is weighed before shipment."[116]  BSM reported that for the Buildings Segment "{c}hanges to the project made after the purchase order agreement are detailed in "Change Order" documents"[117] and it provided a list of a significant number of change orders.[118]  While BSM explained that "change orders are less frequent {for the Components Segment} than in the Buildings Segment," it noted that "customers {of the Components Segment} occasionally make changes to the building project before production commences."[119]  Finally, as noted above, Commerce's CEP verification of BSM and BSM's U.S. sales database provide evidence of changes in the material terms of a number of sales, including sales where [

].

Hence, while the purchase order and the sales order acknowledgment may establish an initial agreement between BSM and its customers, the evidence does not show that the final material terms of sale were established when these documents were executed.  Commerce described a similar fact pattern in the *Preamble* to its regulations and noted that in such

---

[116] *See* BSM's AQR at A-17.
[117] *Id.* at A-20.
[118] *See* BSM's CQR at Exhibit C-13.
[119] *See* BSM's AQR at A-20.

situations, the date on which the buyer and seller appear to agree on the terms of a sale is not

necessarily the date on which the terms of sale were actually established.  Specifically,

Commerce stated that:

> … as a matter of commercial reality, the date on which the terms of a sale are first
> agreed is not necessarily the date on which those terms are finally established. In
> {Commerce's} experience, price and quantity are often subject to continued
> negotiation between the buyer and the seller until a sale is invoiced.  The
> existence of an enforceable sales agreement between the buyer and the seller does
> not alter the fact that, as a practical matter, customers frequently change their
> minds and sellers are responsive to those changes.  {Commerce} also has found
> that in many industries, even though a buyer and seller may initially agree on the
> terms of a sale, those terms remain negotiable and are not finally established until
> the sale is invoiced.  Thus, the date on which the buyer and seller appear to agree
> on the terms of a sale is not necessarily the date on which the terms of sale
> actually are established.[120]

The Court case that the petitioner relied upon to support its position is inapposite.

Although the Court in *Nucor Corp* stated that the "date of sale analysis cannot begin and end

with a simple, cut-and-dried, 'yes/no' determination as to whether there was any change to any

material term of any contract at issue,"[121] the Court was addressing the specific facts in that case,

which are unlike the facts in the instant case.  *Nucor Corp* involved an "extraordinarily low

frequency of change … —a single price increase, in a single contract, over the course of a full

year," which the Court found did not clearly indicate "that either ICDAS or its buyers could have

had any reasonable expectation that the material terms of sale for the made-to-order rebar that

ICDAS sold to the U.S. would vary in any respect from those specified in the parties' contracts

…."  The Court in *Nucor Corp* stated that:

> {t}he fairly compelling evidence documenting ICDAS' course of conduct …
> leaves little room to suggest that ICDAS "perceived any flexibility in the terms of
> the contract. … {I}t is abundantly clear that ICDAS believed that the contract

---

[120] *See Preamble*, 62 FR at 27348-49.
[121] *See Nucor Corp.* 612 F. Supp. 2d 1264, 1312.

terms were firm and binding, without regard to its attempt to negotiate a modest increase in price after it had rendered substantial performance.

In contrast to *Nucor Corp*, as noted above, there is evidence documenting flexibility in the material terms of the purchase orders and the sales order acknowledgments for BSM's U.S. sales of FSS during the POI. The material terms identified in those purchase orders and sales order acknowledgments often changed. This indicates that the contracting parties did not have a "meeting of the minds" establishing the material terms of sale when they executed the purchase orders and the sales order acknowledgments, and thus, the date of those documents is not the appropriate date of sale.

Given the record evidence above, consistent with the Draft Remand, we used the final "Phase Complete" date for any phase of the project for Buildings Segment sales and the later of the Oracle 10.7 system Load Date or the Oracle 11i Phase Complete date for Components Segment sales as the date of sale in these final remand results.

## D. Constructed Export Price Profit

Section 772(d)(3) of the Act directs Commerce to calculate CEP by reducing the sales price of subject merchandise by the profit allocated to U.S. selling expenses for, and any cost of further manufacturing, subject merchandise. Section 772(f)(1) of the Act directs Commerce to calculate CEP profit using the following formula: Total Actual Profit x (Total U.S. Expenses/Total Expenses). The statue defines: (1) *total actual profit* as the total profit earned by the foreign producer and its U.S. affiliated reseller on sales of the merchandise under consideration (section 772(f)(2)(D) of the Act); (2) *total U.S. expenses* as the total selling expenses (and further manufacturing costs) that are subtracted from the gross unit price pursuant to section 772(d)(1) and (2) of the Act (primarily direct and indirect selling expenses incurred with respect to economic activity in the United States related to subject merchandise and the cost

38

of further manufacturing subject merchandise in the United States) (772(f)(2)(B) of the Act); and (3) *total expenses* as all expenses incurred by the foreign producer and its U.S. affiliate with respect to the production and sale of such merchandise (section 772(f)(2)(C) of the Act).

In the underlying investigation, Commerce calculated profit for BSM's CEP sales based on the operating results of divisions/units of NCI Building Systems, Inc. (the company whose subsidiaries made the CEP sales) that were involved with the merchandise under consideration.[122]  However, we excluded the operating results of NCI Building Systems, Inc.'s Costa Rica drafting facility from our profit rate calculation because [

].[123]  Since the statute directs Commerce to calculate [

], we determined that it was not appropriate to include its operating results, including its expenses, in our CEP profit rate calculation.

However, the Court found:

{n}othing in the plain text of the statute or regulations supports {Commerce's} interpretation. … Instead, the statute explicitly requires Commerce to include "all" expenses incurred that have been properly classified as indirect selling expenses under subsection (d)(1). {Section 772(f)(2)(B)–(C) of the Act}. Likewise, the regulations provide that Commerce "normally will use the aggregate of expenses and profit for all subject merchandise sold in the United States and all foreign like products sold in the exporting country, including sales that have been disregarded as being below the cost of production." {19 CFR 351.402(d)(1)}.[124]

Therefore, the Court ordered Commerce, on remand, to explain why the statute and regulations permit it to exclude the operating results of the Costa Rica drafting facility from its profit rate calculation.

---

[122] *See Final Determination* IDM at Comment 9.
[123] *See* Memorandum, "Analysis Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Fabricated Structural Steel From Mexico:  80 Building Systems de Mexico S.A. de C.V.," dated January 23, 2020, at Attachment III.
[124] *See Remand Order* at 25-26.

**Analysis**

As noted above, section 772(f)(1) of the Act defines the "total expenses" that are used in the CEP profit rate calculation as *all* production and selling expenses incurred by the foreign producer and its U.S. affiliate with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country (or, alternatively, if applicable, the narrowest category of merchandise that includes subject merchandise sold in those countries or in all countries). Because the drafting and engineering services provided by the Costa Rica facility could be for U.S. projects for which BSM fabricated subject merchandise, BSM included the expenses from the Costa Rica facility in the engineering, selling, and general and administrative expenses that it reported as part of its CEP indirect selling expenses (field INDIRSU).[125] Because these expenses reflect "shared" expenses[126] related to U.S. sales of subject merchandise, Commerce concluded that these expenses are indirect selling expenses. Thus, the expenses of the Costa Rica facility are selling expenses incurred by the foreign producer and its U.S. affiliate with respect to the subject merchandise sold in the United States.[127] As the Court states, the statute directs Commerce to include *all* such expenses in its CEP profit rate calculation without any exclusions. Moreover, since we included the expenses of the Costa Rica facility in the indirect selling expenses that form the numerator of the profit rate ratio (*i.e.*, total U.S. expenses), we find it proper to include those expenses in the denominator of that ratio.

---

[125] *See* BSM's Letter, "Response of Building Systems de Mexico to Second Section D Supplemental Questionnaire," dated August 14, 2019, at Exhibit SSD-1; *see also* BSM's CQR at Exhibit C-24.
[126] *See* BSM's CQR at 65.
[127] *See Final Determination* IDM at Comment 9.

In light of the foregoing, and the Court's *Remand Order*, we have reconsidered our determination and have included expenses from the Costa Rica facility in the CEP profit rate calculation for these final results of redetermination.

**Interested Parties' Comments:**

*BSM*:[128]

- Commerce properly included the expenses of NCI's Costa Rica drafting facility in its CEP profit calculation for the draft results of redetermination.

- Since those expenses were incurred to sell subject merchandise and were included in the numerator of the profit rate ratio, those expenses should be included in the denominator of the profit rate ratio.

*Petitioner:*[129]

- Commerce's calculation of the CEP profit rate in its draft results of redetermination is consistent with the Court's order.

**Commerce's Position:**

Consistent with the Draft Remand,[130] and for the reasons explained above, we included expenses from NCI's Costa Rica drafting facility in our calculation of BSM's CEP profit in these final remand results.

## IV.    FINAL RESULTS OF REDETERMINATION

Based on the above analysis, we:  (1) excluded the sale related to order [        ] from our analysis and calculation of BSM's dumping margin; (2) used the date of substantial completion as the date of sale for BSM's sales; and (3) included expenses from NCI's Costa Rica

---

[128] *See* BSM's Comments on Draft Remand.
[129] *See* Petitioner's Comments on Draft Remand.
[130] *See* Draft Analysis Memorandum.

drafting facility in our calculation of BSM's CEP profit.  After making these changes, BSM's estimated POI weighted-average dumping margin is 0.36 percent.[131]  Because the all-others rate is based on BSM's dumping margin, we also revised the all-others rate.

Should the Court affirm these final results of redetermination, we intend to amend the final determination in the underlying investigation to reflect the results of this redetermination. However, because there currently is no AD order in place, we will not issue customs instructions to CBP.  Should an AD order be imposed in the future, we will issue appropriate customs instructions to CBP at that point.

7/20/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[131] *Id.*