## BEFORE: THE UNITED STATES COURT OF INTERNATIONAL TRADE
## HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| BUILDING SYSTEMS DE MEXICO, S.A. DE C.V., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| FULL MEMBER SUBGROUP OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION, LLC, and COREY S.A. DE C.V., | ) |
| | ) |
| Defendant-Intervenors. | ) |

**Consol. Court No. 20-00069**

## PLAINTIFF'S NON-CONFIDENTIAL COMMENTS ON REMAND REDETERMINATION

Matthew R. Nicely
Daniel M. Witkowski
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, DC 20006
Tel: (202) 887-4046
Fax: (202) 887-4288
Email: mnicely@akingump.com

*On Behalf of Building Systems de Mexico, S.A. de C.V.*

Dated: August 19, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................. ii

COMMENTS ON REMAND REDETERMINATION ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

STANDARD OF REVIEW .................................................................................................. 2

ARGUMENT ........................................................................................................................ 3

I.  The Court Should Sustain Commerce's Ultimate Conclusion that Any
Dumping by BSM During the POI Was *De Minimis* ............................................ 3

II.  The CV Profit Rate Applied to BSM Remains Unsupported by Substantial
Evidence and Not in Accordance with Law ............................................................ 7

A.  The Record Shows that the CV Profit Rate Calculation Includes
Data for a Project Contracted Prior to the POI ......................................... 7

B.  The CV Profit Rate Is Otherwise Unreasonable as Applied to BSM ........ 10

CONCLUSION .................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AL Tech Specialty Steel Corp. v. United States*, 366 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) ........6

*Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000)..............16

*Bldg. Sys. de Mex., S.A. de C.V. v. United States*, 463 F. Supp. 3d 1344 (Ct. Int'l Trade 2020)......5

*Bldg. Sys. de Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306 (Ct. Int'l Trade 2022). ........................................................................................................ *passim*

*Bldg. Sys. de Mexico, S.A. de C.V. v. United States*, No. 20-00069, 2022 WL 1692974 (Ct. Int'l Trade May 26, 2022)..........................................................................5

*CC Metals and Alloys, LLC v. United States*, 222 F. Supp. 3d 1303 (Ct. Int'l Trade 2017)...........6

*CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014)...........................6

*Husteel Co. v. United States*, 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ....................................11

*Intercargo Ins. Co. v. United States*, 83 F.3d 391 (Fed. Cir. 1996)..................................................6

*Int'l Custom Products, Inc. v. United States*, 878 F. Supp. 2d 1329 (Ct. Int'l Trade 2012)............6

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ............................................9

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019).................11, 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)................15, 16

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ............................................2

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)...................................................15

*Thai I-Mei Frozen Foods Co. v. United States*, 572 F. Supp. 2d 1353 (Ct. Int'l Trade 2008).......11

*Thai Plastic Bags Indus. Co. v. United States*, 904 F. Supp. 2d 1326 (Ct. Int'l Trade 2013)..........9

*Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990)............................................................5

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014). ................................................................................................................3

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011)....................2

STATUTES

5 U.S.C. § 706.................................................................................................................................5

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................................2

19 U.S.C. § 1673b(b)(3)..............................................................................................................2, 4

19 U.S.C. § 1673d(a)(4)...............................................................................................................2, 4

19 U.S.C. § 1677b(a)(1)................................................................................................................12

19 U.S.C. § 1677b(e)(2)(A)..........................................................................................................12

19 U.S.C.§ 1677b-1(a)...................................................................................................................3

19 U.S.C. § 3512(d).......................................................................................................................4

REGULATIONS

19 C.F.R. § 351.401(i) ...................................................................................................................3

AGENCY DETERMINATIONS AND NOTICES

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997)....................11

*Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 7330 (Mar. 4, 2019) .....14

*Certain Fabricated Structural Steel From Mexico: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,390 (Jan. 30, 2020) ...............................................................1

*Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010 (Oct. 24, 2019). ..............................4

OTHER SOURCES

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, Vol. 1 (1994)............................................................................................4

USCIT Rule 54(b).........................................................................................................................6

USCIT Rul 56.2(h)(2) ................................................................................................................3

## COMMENTS ON REMAND REDETERMINATION

Plaintiff Building Systems de Mexico, S.A. de C.V. ("BSM") hereby comments on the

U.S. Department of Commerce's ("Commerce's") Final Results of Redetermination Pursuant to

Court Remand, ECF No. 101-1 ("Final Remand Results").

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case arises from Commerce's final determination in the antidumping duty

investigation regarding Fabricated Structural Steel ("FSS") from Mexico.  *Certain Fabricated*

*Structural Steel From Mexico: Final Determination of Sales at Less Than Fair Value*, 85 Fed.

Reg. 5,390 (Jan. 30, 2020).  In its opinion remanding Commerce's final determination, the Court

identified four issues for Commerce to reconsider or further explain: (1) Commerce's use of

Corey S.A. de C.V.'s ("Corey's") home market sales to calculate the constructed value ("CV")

profit rate for BSM;  (2) Commerce's application of adverse facts available ("AFA") to a project

with phases that were cancelled after the period of investigation ("POI") and that was not

included in BSM's U.S. sales database; (3) Commerce's use of the purchase order or sales order

acknowledgement date as the date of sale; and (4) Commerce's exclusion of the operating results

for the NCI Costa Rica drafting facility in the calculation of BSM's constructed export price

("CEP") profit rate.  *Bldg. Sys. de Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306,

1313-18, 1320-21 (Ct. Int'l Trade 2022).

In the Final Remand Results, Commerce continued to use the same CV profit rate based

on Corey's home market sales for BSM, but Commerce determined that the use of AFA for the

project with phases cancelled after the POI was no longer appropriate, selected the date of

substantial completion of NCI's projects as the date of sale, and included the operating results of

the Costa Rica drafting facility in the CEP profit rate.  Final Remand Results at 2.  As a result of

the changes, Commerce recalculated a weighted average dumping margin of 0.36 percent for

BSM, which is *de minimis*.  Final Remand Results at 45; 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4) (defining *de minimis* margins as margins less than 2 percent for purposes of investigations).

BSM agrees with Commerce's conclusions with respect to the project with phases cancelled after the POI, date of sale, and CEP profit, and with Commerce's ultimate conclusion that any dumping margin by BSM during the POI was, at most, *de minimis*.  Commerce's determination with respect to the CV profit rate applied to BSM, however, remains unsupported by substantial evidence and otherwise not in accordance with law.  In particular, Commerce's CV profit calculation continues to include a Corey project that record evidence indicates was contracted prior to the POI.  The rate also remains unreasonable as applied to BSM, and Commerce failed to adequately consider alternatives to obtain a more representative CV profit rate.  But even if the Court agrees that Commerce has not addressed the concerns in the Court's remand order and opinion regarding the CV profit issue, it does not need to remand that issue again if it concludes that the remaining aspects of Commerce's Final Remand Results are supported by substantial evidence and otherwise in accordance with law.  Instead, the Court should issue a judgment sustaining Commerce's redetermination to the extent that Commerce found any dumping by BSM during the POI to be *de minimis*, without remanding on the CV profit issue again.

## **STANDARD OF REVIEW**

The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The substantial evidence standard requires Commerce to base its determinations upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir.

2003)).  The Court also reviews Commerce's remand redeterminations for compliance with the

Court's remand order.  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d

1255, 1259 (Ct. Int'l Trade 2014).

## ARGUMENT

**I.     The Court Should Sustain Commerce's Ultimate Conclusion that Any Dumping by BSM During the POI Was *De Minimis***

Commerce made three changes to its final determination in the Final Remand Results.

First, Commerce determined that the project with phases cancelled after the POI was not a

reportable transaction and, accordingly, there was no basis to apply AFA to BSM for not

including the project in the U.S. sales database.  Final Remand Results at 28-29.  Second,

Commerce changed the date of sale for purposes of 19 U.S.C.§ 1677b-1(a) and 19 C.F.R.

§ 351.401(i) from the purchase order or sales order acknowledgment date to the date of

substantial completion of the project.  Final Remand Results at 30-34.  Third, Commerce

included the operating results for NCI's Costa Rica drafting facility in the calculation of BSM's

CEP profit rate.  Final Remand Results at 40-41.  BSM supports each of these determinations, as

they are supported by substantial evidence, in accordance with law, and comply with the Court's

remand order.  Because the primary purpose of initial comments on a remand determination is to

address potential deficiencies in the remand determination, USCIT R. 56.2(h)(2), BSM will not

address the merits of these determinations in these comments.  To the extent that Defendant-

Intervenor the Full Member Subgroup of the American Institute of Steel Construction, LLC

("Petitioner") takes issue with any of these determinations, BSM will address those arguments in

a reply to Petitioner's comments.

As explained below, the CV profit rate that Commerce continues to apply to BSM is

unsupported by substantial evidence and not in accordance with law.  But unless the Court

remands one of the other three issues that Commerce addressed in the Final Remand Results, BSM requests that the Court refrain from remanding again on the CV profit issue.

The three changes that Commerce made to its final determination resulted in a *de minimis* margin for BSM of 0.36 percent.  Final Remand Results at 42.  In antidumping duty investigations, Commerce is instructed to disregard *de minimis* dumping margins, which are weighted average margins of less than 2 percent. 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4).  If an antidumping duty order is issued, Commerce excludes companies for whom it calculated a *de minimis* margin.  Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103-316, Vol. 1 at 844 (1994) ("Exporters or producers with *de minimis* margins will be excluded from any affirmative determination."); s*ee also, e.g.*, *Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010, 57,011 (Oct. 24, 2019).  Thus, notwithstanding any error with respect to the CV profit rate, the Final Remand Results provide the relief that BSM ultimately seeks—a negative dumping determination with respect to BSM.

As a practical matter, remanding only the CV profit rate for further consideration would not provide BSM with any additional relief, and such a remand could in fact prejudice BSM. Because "*{d}e minimis* margins are regarded as zero margins," SAA, H.R. Rep. No. 103-316, Vol. 1 at 844,[1] reducing the CV profit rate would not further lower BSM's margin, and thus BSM would not receive any direct benefit from an adjustment to the CV profit rate.  Meanwhile,

---

[1] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

remanding solely with respect to the CV profit issue could actually harm BSM.  In its opinions denying the motions to stay previously filed in this case, the Court has recognized BSM's interests in promptly obtaining a final judgment in this litigation in order to establish that it should not be subject to any antidumping duty order that might issue with respect to FSS from Mexico.  *Bldg. Sys. de Mexico, S.A. de C.V. v. United States*, No. 20-00069, 2022 WL 1692974, at *2 (Ct. Int'l Trade May 26, 2022); *Bldg. Sys. de Mex., S.A. de C.V. v. United States*, 463 F. Supp. 3d 1344, 1348 (Ct. Int'l Trade 2020).  As the Court is well aware, BSM desires to establish that its margin of dumping was zero or *de minimis **before*** any antidumping duty order issues, in order to avoid having to pay cash deposits or participate in an administrative review. Commerce, however, normally does not issue an amended final determination until final judgment is issued.  *See, e.g.*, *Timken Co. v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990) (Commerce required to issue notice of court decision not in harmony with original determination within ten days of entry of judgment); Final Remand Results at 42 (stating that Commerce will issue amended final determination if Final Remand Results are affirmed).  Delaying final judgment in this case increases the risk that BSM could be forced to pay cash deposits at the unlawful rate established in Commerce's original final determination.  It would make little sense to subject BSM to that risk in order to resolve an issue that would not have any additional impact on BSM's dumping margin.

If the Court concludes that Commerce appropriately resolved the issues regarding the project with phases cancelled after the POI, date of sale, and CEP profit, it should sustain the *de minimis* margin for BSM without remanding again on the CV profit issue.  The Court can do so on the basis that any error with respect to the CV profit rate was harmless in light of the other determinations being sustained by the Court.  *See, e.g.*, 5 U.S.C. § 706 (incorporating principle

of harmless error into review of agency action); *Intercargo Ins. Co. v. United States*, 83 F.3d

391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review

of agency proceedings."); *CC Metals and Alloys, LLC v. United States*, 222 F. Supp. 3d 1303,

1304 (Ct. Int'l Trade 2017) (explaining that court erred in remanding two issues without

ascertaining whether either issue had material effect on antidumping duty determination); *CP

Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1353 (Ct. Int'l Trade 2014) (holding that

any flaws in International Trade Commission's findings regarding post-petition effects in injury

case were harmless because they would not have changed ultimate injury finding).  Sustaining

Commerce's determination with respect to the other issues, which results in a *de minimis* margin

for BSM, would render inutile any remand on the CV profit issue.  *Cf. AL Tech Specialty Steel

Corp. v. United States*, 366 F. Supp. 2d 1236, 1243, 1245 (Ct. Int'l Trade 2005) (sustaining

Commerce remand determination when Commerce did not reach certain issues that were

remanded because overall result would have been negative countervailing duty determination

regardless of how Commerce resolved those additional issues).  The Court can also rely on

USCIT Rule 54(b), which allows the Court to "direct entry of a final judgment as to one or more,

but fewer than all, claims" if the Court finds that "there is no just reason for delay."  Here, there

is no "just reason" to delay a judgment that affirms a *de minimis* margin for BSM.  If

Commerce's amended determination with respect to those issues are later disturbed such that

BSM's margin would rise above *de minimis*, at that point it would be appropriate for the CV

profit issue to be resolved via remand.  *Cf. Int'l Custom Products, Inc. v. United States*, 878 F.

Supp. 2d 1329, 1351 (Ct. Int'l Trade 2012) (alternative claims remain dormant pending outcome

of any appeals regarding claim upon which court granted full relief).

II.     **The CV Profit Rate Applied to BSM Remains Unsupported by Substantial Evidence and Not in Accordance with Law**

In the event the Court decides to address the CV profit issue, the Court should conclude that the CV profit rate applied to BSM in the Final Remand Results is unsupported by substantial evidence and otherwise not in accordance with law.  The Court remanded for Commerce to address two issues with respect to the CV profit rate.  First, the Court observed that record evidence indicated that a Corey project included in the calculation was contracted prior to the POR, which would require Commerce to remove that project from the calculation or to change the criteria used to select projects for inclusion in the CV profit rate calculation.  567 F. Supp. 3d at 1312-14.  Second, the Court expressed concerns that the CV profit rate was not representative, given the small number of sales upon which it was based, differences between BSM's and Corey's operations, and the fact that the rate was higher than the profit rate for any other Mexican producer on the record.  *Id.* at 1315-16.  Commerce's resolution of these issues in the Final Remand Results is unreasonable and fails to demonstrate that the CV profit rate is supported by substantial evidence and in accordance with law.

A.     **The Record Shows that the CV Profit Rate Calculation Includes Data for a Project Contracted Prior to the POI**

In selecting projects to be used in the CV profit calculation, Commerce claimed that it applied the same criteria for identifying reportable U.S. sales—namely that the project was both contracted in and completed during the POI (calendar year 2018).  *See id.* at 1312.  The Court remanded for Commerce to reconsider its determination that the **[                    ]** project was contracted in 2018.  *Id.* at 1313-14.  In the Final Remand Results, Commerce continued to find that the **[                    ]** project was contracted in 2018.  *See* Final Remand Results at 5-7, 15-18.

Commerce relies primarily on the fact that the purchase orders it reviewed for this project during Corey's verification were dated in 2018 and that Corey did not identify any other contracts for this project besides those purchase orders. *See id.* at 15-16. But the Court concluded in in its opinion remanding this issue that Commerce's finding that the project was first contracted in 2018 based on those same purchase orders was *not* supported by substantial evidence. 567 F. Supp. 3d at 1312-13. As the Court noted in its earlier opinion, Corey assigns project numbers to a project when a bid is accepted, which in turn occurs upon the signing of a formal contract, the customer signing a final budget proposal, or the issuance of a purchase order, all of which constitute contracts. *Id.* at 1313. The [                         ] project had a 2017 project number, *see* Final Remand Results at 17, indicating that the initial contract for this project was agreed to in 2017, regardless of when the purchase orders (the first of which was described as a [                         ]) reviewed during verification were issued.

Corey's questionnaire response and verification exhibits also describe 2017 as the [
] for this project, which further indicates that the project was contracted in 2017. Corey Section C Response, Exhibit C-3b (P.R.336/C.R.139); Corey Cost Verification Exhibits, Exhibit CVE-12 (C.R.503-505).[2] Corey also booked costs to this project in 2017. Even if these costs were booked to the wrong project, Issues and Decision Memorandum at 48 (P.R.663); Corey Cost Verification Report at 17 (P.R.627/C.R.511), the fact remains that an account existed for this project in Corey's accounting system in 2017. Corey explained that those accounts are created only when a bid is accepted (i.e., when there is a contract). Corey Section A Response at A-34, A-36, A-37 (P.R.272/C.R.81); Corey Section D Response at 10 (P.R.337/C.R.146).

---

[2] Record citations with "C.R." or "P.R." refer to documents from Commerce's original investigation proceeding. Citations with "R.C.R. or "R.P.R." refer to documents from Commerce's remand proceeding.

Commerce speculates that Corey personnel might have mistakenly assigned this project a 2017 number based merely on the submission of the bid (instead of acceptance) or an erroneous belief that the bid had been accepted.  Final Remand Results at 6-7, 17.  Commerce cites no evidence that this is what actually happened, and nothing in Corey's questionnaire responses indicates that a project number might be assigned to a project before the bid is accepted.  "'It is well established that speculation does not constitute substantial evidence.'"  *Thai Plastic Bags Indus. Co. v. United States*, 904 F. Supp. 2d 1326, 1332 (Ct. Int'l Trade 2013) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009)).

 Commerce does assert that "Corey personnel mistakenly believed that Corey had undertaken the {project} in 2017; (2) Corey personnel assigned materials from the warehouse to the project; and (3) a project number had to be created in order to record costs associated with the materials that Corey personnel mistakenly believed were purchased for the {project}."  Final Remand Results at 17.  But the cited portions of the record—the Corey Cost Verification Report at 17 (P.R.627/C.R.511) and the Corey BPI Memorandum at Note 2 (P.R.671/C.R.540)—do not support these statements.  Rather, both documents explain that certain expenses were posted to the project in 2017 in error.  There is no indication at all that the project number itself or the initial account creation in Corey's accounting system for this project were created in error.  The Corey BPI Memorandum in fact treated the 2017 project number and the **[         ]** identified by Corey as evidence of when the bid was accepted, rather than something that was created in error based on the mere submission of the bid or in connection with the erroneous posting of expenses to that project.[3]  Commerce's theory regarding the project number and account creation

---

[3] Commerce tried to explain away this evidence by asserting that bid acceptance does not necessarily establish the terms of sale, rather than contesting whether the project number and **[         ]** for the project were assigned in error.

for the **[                    ]** project in the Final Remand Results lacks support in the record, and it is inconsistent with Commerce's original understanding of what the project number and **[          ]** for that project represented—that the bid for this project was accepted in 2017.

Commerce observes that Corey did not challenge the verification report's description of the purchase orders for this project in its briefs to the agency. Final Remand Results at 6. But Corey also certified the record evidence indicating that the project was started in 2017— including its description of its sales process and accounting system, the specific project number and cost account information for this project, and its identification of the **[          ]** for the project. Corey provided no explanation or argument to Commerce as to why the project was assigned a 2017 project number, had its own account in Corey's accounting system in 2017, and was described by Corey itself as having a **[          ]** of 2017 if the project was not in fact first contracted in 2017. Substantial record evidence demonstrates that the bid for the **[**

**]** project was accepted at some point in 2017 and that acceptance of a bid occurs with a contract. Commerce relies on nothing but speculation to find that the project nonetheless was first contracted in 2018. The Court therefore should hold that Commerce's finding regarding the contract date for the **[                    ]** project remains unsupported by substantial evidence.

### B.   The CV Profit Rate Is Otherwise Unreasonable as Applied to BSM

Even if Commerce's findings that the project discussed above was contracted in the POI is sustained, the CV profit rate is still unreasonable as applied to BSM, rendering it unsupported by substantial evidence and not in accordance with law. In remanding the CV profit rate, the Court explained that "it is unclear why it is reasonable for Commerce to conclude that Corey's home market sales are representative of the Mexican market" when record evidence "detracts from Commerce's conclusion that Corey's home market data provides a reasonable surrogate to

use for BSM's constructed value." 567 F. Supp. 3d at 1315-16. Such evidence included the

small quantity of Corey sales that Commerce used, which were fewer in number than BSM's

own home market sales, the differences in BSM's and Corey's business models, and the fact that

the profit rate based on Corey's data was higher than that of any other Mexican producer on the

record. *Id.*

The Federal Circuit has explained that when Commerce selects a CV profit rate, "{t}he

objective is to find a good proxy (or surrogate) for the profits that the respondent can *fairly be*

*expected* to build into a fair sales price for the particular merchandise," and "accuracy and

fairness must be Commerce's primary objectives." *Mid Continent Steel & Wire, Inc. v. United*

*States*, 941 F.3d 530, 542 (Fed. Cir. 2019) (emphasis added). Accordingly, Commerce must

choose reasonably from among the potential sources for CV profit. *Id.* When Commerce issued

its regulation regarding CV profit, it also expressed an intention to avoid "irrational or

unrepresentative results." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296,

27,360 (May 19, 1997). As this Court noted in its opinion remanding the matter to Commerce,

"Commerce must consider whether the data it uses to calculate constructed value profit results in

a fair comparison between normal value and export price." 567 F. Supp. 3d at 1311 (citing

*Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1349 (Ct. Int'l Trade 2015)). "An

unreasonably high profit estimate will defeat {that} fundamental statutory purpose{.}" *Thai*

*I-Mei Frozen Foods Co. v. United States*, 572 F. Supp. 2d 1353, 1368 (Ct. Int'l Trade 2008),

*rev'd on other grounds*, 616 F.3d 1300 (Fed. Cir. 2010).

The CV profit rate assigned to BSM violates the principles articulated above. As the

Court knows, the CV profit rate that Commerce continues to use for BSM is based on **[**

**]** by Corey, a company with a very different business

11

model from BSM.  Commerce fails to show that the rate is representative and "can *fairly be*

*expected* to {be} buil{t} into a fair sales price for the particular merchandise."  *Mid Continent*,

941 F.3d at 542 (emphasis added).

Regarding the fact that the CV profit rate is based on **[                    ]** for a separate

company, Commerce states the volume of FSS in **[**


**]**, while the total volume of FSS in BSM's home market sales would not be considered

viable.  Final Remand Results at 9, 20-21 (citing viability threshold in 19 U.S.C. § 1677b(a)(1)).

But, as this Court has recognized, there is no viability threshold in the statutory provision

regarding CV profit.  567 F. Supp. 3d at 1315 n.16, n.18 (citing *Mid Continent*, 941 F.3d at 538-

40).  Although Commerce can take "a 'practical, function-based' determination of when home

market data is 'available' for the purposes of 19 U.S.C. § 1677b(e)(2)(A), including taking

volume of sales into account," *id.* at 1315 n.18 (quoting *Mid Continent*, 941 F.3d at 538-40)),

Commerce is not required to use the viability threshold, and whatever discretion Commerce may

have under the statute does not excuse it from selecting a CV profit rate that is representative for

the respondent and results in a fair comparison between the export price and normal value.

Commerce eschewed using BSM's **[    ]** profitable home market sales that were produced

and sold in 2018 to calculate CV profit, *see* BSM First Supplemental Section D Response (Pt. 1),

Exhibit SD-25 (C.R.271), and instead used **[                ]** by Corey.  Even if **[                    ]**

involved a greater quantity of FSS than BSM's home market sales, that does not show that the

**[                              ]** representative of the Mexican FSS market generally or a reasonable

proxy for the profit margin that BSM could fairly be expected to achieve on its home market

sales.  The unreasonableness of Commerce's choice is magnified by the fact that the profit rate

for [                    ] was then used as the expected profit rate when calculating the

constructed value for over [        ] BSM U.S. sales.  As Commerce knows from its investigation

of BSM and Corey, the vast majority of BSM's U.S. sales were significantly different in terms of

the scope of the FSS and the ancillary services (e.g., design and erection) provided to the

customer as compared with nearly all of Corey's sales, including the [                    ]

Commerce used to calculate the CV profit rate.  The [

                    ].  Corey Sales Verification Exhibits, Exhibit SVE-1 at 8 (C.R.458).

Out of the roughly [        ] U.S. sales used in BSM's margin calculation, nearly [        ] involved

less than [        ] kg of BSM-produced FSS.  Thus, the vast majority of BSM's U.S. sales

involved less than [            ] of the FSS involved in the [                    ] Commerce used

to calculate CV profit.

     The profit rate Commerce used was also unusually high compared to the other profit rates

on the record, further showing that the profit rate was not representative of the profit rate that can

normally be expected in the home market.  The average profit rate for BSM's [    ] profitable

sales during the POI was [        ] percent, *see* BSM First Supplemental Section D Response (Pt.

1), Exhibit SD-25 (C.R.271), while the average profit rate for all of Corey's profitable projects

completed in 2018, including the [                    ] project, was roughly [    ] percent, Corey

First Supplemental Section D Response, Exhibit SD-30 (P.R.466/C.R.324).  The simple average

of the profit rates reflected in the financial statements of Grupo Carso, Arcosa, AHMSA, and

Ternium overlapping with the POI, which ranged from 2.76 percent to 20.25 percent, was 10.45

percent.  Petitioner's Submission of Other Factual Information, Exhibit 3 (P.R.497-498); BSM

Submission of New Factual Information (P.R.488-496).  These sources establish that a profit rate

of roughly 10 percent is what could be expected for an average sale of FSS in Mexico, but the

CV profit rate calculated by Commerce based on **[                    ]** was **[          ]** times that.

Commerce unconvincingly attempts to dismiss the disparities between the profit rate it chose and the other, much lower, profit rates on the record. Commerce asserts that the comparison between the CV profit rate and the profit rate for BSM's home market sales is "fallacious" because BSM's home market sales were not viable and were made to **[          ]**. Final Remand Results at 21. Again, the statutory provision regarding CV profit does not have a viability standard, and Commerce does not explain why BSM's small volume sales to **[                ]** cannot act as at least a benchmark against which the chosen CV profit rate can be compared for reasonableness. *See id.* Commerce also notes that Grupo Carso, Arcosa, AHMSA, and Ternium have numerous operations, some of which differ from FSS production or are located in countries other than Mexico. *See id.* at 18-20. BSM acknowledges that the operations of these companies are not limited to just FSS production in Mexico, but they do produce similar merchandise, as Commerce observed when it relied on a Grupo Carso financial statement to initiate the investigation. *Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 7330 (Mar. 4, 2019). Moreover, the profit rates derived from these financial statements are similar to the profit rate for BSM's POI home market sales and the profit rate for Corey's home market projects completed during the POI, which are FSS-specific. And Commerce nowhere addresses the profit rate for Corey's other projects that were contracted prior to, but completed within, the POI. Those Corey projects indicate that a profit rate of **[          ]** is atypical.

In support of the supposed reasonableness of the CV profit rate, Commerce observes that BSM had a sale with a profit rate of **[         ]** percent during 2018 and that the profit rate reflected in **[                                              ]**.  Final Remand Results at 22. The one BSM sale Commerce cites was produced in 2017 and involved a very small volume. BSM First Supplemental Section D Response (Pt. 1), Exhibit SD-25 (C.R.271).  The fact that an individual sale might occasionally result in a high profit rate does not show that a profit rate near **[   ]** percent is representative of the expected profit rate in Mexico for sales of FSS; indeed, such a profit rate was not representative of Corey's typical experience either.  *See* Corey First Supplemental Section D Response, Exhibit SD-30 (P.R.466/C.R.324).  Meanwhile, if Commerce considered the **[                                      ]** to be probative of normal profit rates for FSS because it supposedly corroborated the CV profit rate Commerce used, then it was arbitrary for Commerce to dismiss the validity of the 2018 financial statements that showed that the average profit rate during 2018 (the actual POI) was much lower than the CV profit rate Commerce selected.  *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (agency action is arbitrary when it treats similar situations differently without reasoned explanation).  Moreover, Commerce's reasoning that the 2017 profit rates' "proximity to the POI make them relevant for purposes of benchmarking," Final Remand Results at 22, underscores the need for Commerce to have considered the profit rates for Corey's home market sales that were started prior to the POI but completed within the POI, at least for benchmarking purposes—something Commerce entirely failed to do despite BSM having referenced those sales in its comments on the Draft Remand Results.  BSM

Comments on Draft Remand Redetermination at 11 (R.C.R.11/R.P.R.5). It is "well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000).

Finally, BSM offered numerous alternatives that Commerce could use to obtain a more representative profit rate instead of relying [                                    ]. BSM Comments on Draft Remand Redetermination at 12-13 (R.C.R.11/R.P.R.5). This included incorporating data for additional Corey sales completed within the POI or potentially averaging Corey's profit rate with BSM's home market profit rate, which would increase the number of observations and volume of FSS upon which the CV profit rate is based. *See id.* Commerce, however, never considered these potential options to increase the representativeness of the profit rate. Commerce's failure to consider these obvious alternatives renders its decision arbitrary and capricious and not in accordance with law. *See State Farm*, 463 U.S. at 46-49 (agency's rescission of rule was arbitrary and capricious when it had failed to consider the alternative of amending the rule); *Allegheny Ludlum*, 112 F. Supp. 2d at 1165 ("reasons for the choices made among various potentially acceptable alternatives usually need to be explained" (internal quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, the CV profit rate that Commerce continues to apply to BSM in the Final Remand Results is unsupported by substantial evidence and otherwise not in accordance with law. The Court, however, need not remand on the CV profit issue if it

concludes that the *de minimis* dumping margin that Commerce calculated for BSM in the Final

Remand Results is otherwise supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4046
E-mail: mnicely@akingump.com

*On Behalf of Building Systems de Mexico, S.A. de C.V.*

Dated: August 19, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that Plaintiff's Comments on Remand Redetermination, dated August 19, 2022, complies with the word-count limitation set forth in 2(B) of the Standard Chambers Procedures of this Court, as amended on August 1, 2022.  The memorandum of law contains 5247 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4046
Fax: (202) 887-4288
Email: mnicely@akingump.com

*On Behalf of Building Systems de Mexico,
S.A. de C.V.*

Dated:  August 19, 2022